Thomas Delehanty* (CO Bar No. 51887)
Heidi McIntosh* (CO Bar No. 48230)
Earthjustice
1125 17th Street, Suite 1010
Denver, CO 80202
(303) 623-9466
tdelehanty@earthjustice.org
hmcintosh@earthjustice.org

Roger Flynn* (CO Bar No. 21078)
Western Mining Action Project
P.O. Box 349; 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
roger@wmaplaw.org

*Attorneys for Plaintiffs Grand
Canyon Chapter of the Sierra Club
& Maricopa Bird Alliance*

*Admitted pro hac vice*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Grand Canyon Chapter of the Sierra Club, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>Neil Bosworth, *et al.*,<br><br>        Defendants,<br><br>    and<br><br>Pinto Valley Mining Corp.,<br><br>        Intervenor-Defendant. | No.  CV-24-02348-DWL<br><br>**Plaintiffs' Motion for Summary Judgment and Brief in Support**<br><br>Oral argument requested |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

I.      LEGAL BACKGROUND ............................................................................................ 2

        A.      The Endangered Species Act ................................................................ 2

        B.      The National Environmental Policy Act .............................................. 3

        C.      The Forest Service Organic Act ........................................................... 4

        D.      Arizona water appropriation laws ........................................................ 4

        E.      The Administrative Procedure Act ....................................................... 5

II.     FACTUAL BACKGROUND ........................................................................................ 5

        A.      Pinto Creek – an imperiled "jewel in the desert" ............................... 5

        B.      Pinto Valley Mine begins dewatering Pinto Creek ............................. 8

        C.      The Federal Defendants' flawed approval decisions ........................... 8

STANDARD OF REVIEW .................................................................................................. 18

ARGUMENT ................................................................................................................... 19

I.      THE CONSERVATION GROUPS HAVE STANDING ..................................................... 19

        A.      *Injury:* pumping harms Conservation Group members' recreational and aesthetic interests ................................................................................ 19

        B.      *Causation:* the challenged agency actions caused the Conservation Groups' injury ...................................................................................... 20

        C.      *Redressability:* the Court can remedy the Conservation Groups' injury by ordering compliance with the ESA, NEPA, and Organic Act .............. 22

II.     THE CONSERVATION GROUPS ARE ENTITLED TO SUMMARY JUDGMENT ................ 23

    A.     FWS and TNF violated the ESA *(Claims 4, 5, and 6)* ................................ 23

        1.  TNF and FWS arbitrarily constrained the ESA action area .................. 23

        2.  The BiOp relied on empty mitigation measures .................................... 26

    B.     TNF violated NEPA *(Claims 2 and 3)* .......................................................... 29

        1.  TNF failed to take a hard look at the mine's effects on Pinto Creek's northern perennial reach ....................................................................... 29

        2.  TNF failed to identify and analyze appropriate mitigation measures ... 31

    C.     TNF violated the Organic Act *(Claim 1)* ....................................................... 33

CONCLUSION ........................................................................................................................ 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife,*
273 F.3d 1229 (9th Cir. 2001) ........................................................................ 18, 19, 33

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council,*
462 U.S. 87 (1983).................................................................................................... 3

*Bennett v. Spear,*
520 U.S. 154 (1997)................................................................................................ 22

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)................................................................................................ 19

*Connor v. Burford,*
848 F.2d 1441 (9th Cir. 1988) ................................................................................ 23

*Ctr. for Bio. Diversity v. Bernhardt,*
982 F.3d 723 (9th Cir. 2020) ....................................................................... 3, 27, 28

*Ctr. for Bio. Diversity v. Haaland,*
87 F.4th 980 (9th Cir. 2023) ................................................................................... 27

*Ctr. for Bio. Diversity v. Rumsfeld,*
198 F. Supp. 2d 1139 (D. Ariz. 2002) .................................................................... 27

*Ctr. for Bio. Diversity v. Salazar,*
804 F. Supp. 2d 987 (D. Ariz. 2011) ........................................................................ 3

*Defs. of Wildlife v. Babbitt,*
130 F. Supp. 2d 121 (D.D.C. 2001)......................................................................... 24

*Ecological Rts. Found. v. Pac. Lumber Co.,*
230 F.3d 1141 (9th Cir. 2000) ................................................................................ 20

*Env't Prot. Info. Ctr. v. Van Atta,*
692 F. Supp. 3d 879 (N.D. Cal. 2023)..................................................................... 24

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
528 U.S. 167 (2000)........................................................................................... 19, 20

*In re Gen. Adjudication of All Rts. to Use Water in Gila River Sys. & Source,*
　198 Ariz. 330 (2000)................................................................................5, 6, 14

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.,*
　378 F.3d 1059 (9th Cir. 2004) ......................................................................2, 3

*Hells Canyon Pres. Council v. Haines,*
　No. 05-cv-01057, 2006 WL 2252554 (D. Or. Aug. 4, 2006) ...................... 34

*Hunters v. Marten,*
　470 F. Supp. 3d 1151 (D. Mont. 2020)........................................................ 35

*Idaho Conservation League v. Guzman,*
　766 F. Supp. 2d 1056 (D. Idaho 2011) ........................................................ 34

*Idaho Conservation League v. Mumma,*
　956 F.2d 1508 (9th Cir. 1992) ......................................................................21

*Idaho Sporting Cong., Inc. v. Rittenhouse,*
　305 F.3d 957 (9th Cir. 2002) ................................................................. 29, 31

*Karuk Tribe of Cal. v. U.S. Forest Serv.,*
　681 F.3d 1006 (9th Cir. 2012) (en banc) ........................................... 2, 4, 33

*Mont. Wildlife Fed'n v. Haaland,*
　127 F.4th 1 (9th Cir. 2025) .......................................................................... 35

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,*
　463 U.S. 29 (1983).................................................................................. 5, 18

*N. Plains Res. Council v. U.S. Army Corps of Eng'rs,*
　460 F. Supp. 3d 1030 (D. Mont. 2020)........................................................ 35

*Nat. Res. Def. Council v. Kempthorne,*
　506 F. Supp. 2d 322 (E.D. Cal. 2007) ......................................................... 27

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
　254 F. Supp. 2d 1196 (D. Or. 2003) ............................................................ 24

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
　524 F.3d 917 (9th Cir. 2008) ....................................................................... 28

*Native Ecosystems Council v. Dombeck,*
　304 F.3d 886 (9th Cir. 2002) .......................................................... 23, 24, 25

iv

*Native Ecosystems Council v. Weldon*,
    848 F. Supp. 2d 1207 (D. Mont. 2012)........................................................29

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
    137 F.3d 1372 (9th Cir. 1998) .....................................................................31

*Pollinator Stewardship Council v. EPA*,
    806 F.3d 520 (9th Cir. 2015) ......................................................................35

*Res. Ltd., Inc. v. Robertson*,
    35 F.3d 1300 (9th Cir. 1993) ........................................................................ 3

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989)..........................................................................3, 4, 29

*Rock Creek All. v. U.S. Forest Serv.*,
    703 F. Supp. 2d 1152 (D. Mont. 2010)............................................. 4, 34, 35

*S. Fork Band Council of W. Shoshone of Nevada v. U.S. Dep't of Interior*,
    588 F.3d 718 (9th Cir. 2009) ..................................................... 3, 29, 31, 33

*Save Our Cabinets v. U.S. Dep't of Agric.*,
    254 F. Supp. 3d 1241 (D. Mont. 2017)........................................................34

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
    145 S. Ct. 1497 (2025)..........................................................................29, 33

*Sw. Ctr. for Bio. Diversity v. FERC*,
    967 F. Supp. 1166 (D. Ariz. 1997) ..............................................................21

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978)................................................................................. 2, 35

*Tucson v. City of Seattle*,
    91 F.4th 1318 (9th Cir. 2024) .....................................................................22

*Turtle Island Restoration Network v. U.S. Dep't of Com.*,
    878 F.3d 725 (9th Cir. 2017) ......................................................................28

*W. Watersheds Project v. Kraayenbrink*,
    632 F.3d 472 (9th Cir. 2011) .......................................................... 18, 21, 22

*W. Watersheds Project v. Salazar*,
    843 F. Supp. 2d 1105 (D. Idaho 2012) ........................................................29

*Wild Fish Conservancy v. Salazar,*
   628 F.3d 513 (9th Cir. 2010) ...................................................................... 26

*WildEarth Guardians v. U.S. Dep't of Agric.,*
   795 F.3d 1148 (9th Cir. 2015) ..................................................................... 19

**Statutes**

5 U.S.C. § 702 ................................................................................................ 5

5 U.S.C. § 706 ......................................................................................... 5, 35

16 U.S.C. § 475 .............................................................................................. 4

16 U.S.C. § 528 .............................................................................................. 4

16 U.S.C. § 551 .............................................................................................. 4

16 U.S.C. § 1532 ............................................................................................ 2

16 U.S.C. § 1533 ............................................................................................ 2

16 U.S.C. § 1536 ....................................................................... 2, 3, 23, 26, 29

16 U.S.C. § 1540 .......................................................................................... 18

42 U.S.C. § 4332 ............................................................................................ 3

Ariz. Rev. Stat. § 45-151 ............................................................................... 4

Ariz. Rev. Stat. § 45-152 ............................................................................... 4

Ariz. Rev. Stat. § 45-152.01 ...................................................................... 4, 5

**Other Authorities**

36 C.F.R. § 228.1 ........................................................................................... 4

36 C.F.R. § 228.5 ......................................................................................... 33

36 C.F.R. § 228.8 ............................................................................... 4, 33, 34

50 C.F.R. § 402.02 .................................................................................. 3, 23

50 C.F.R. § 402.10 ......................................................................................... 2

50 C.F.R. § 402.14 .............................................................................. 2, 3, 28

# TABLE OF ACRONYMS

| | |
|---|---|
| ADWR | Arizona Department of Water Resources |
| AGFD | Arizona Game and Fish Department |
| APA | Administrative Procedure Act |
| BiOp | biological opinion |
| DEIS | draft environmental impact statement |
| EIS | environmental impact statement |
| ESA | Endangered Species Act |
| FEIS | final environmental impact statement |
| FWS | Defendants U.S. Fish and Wildlife Service, Heather Whitlaw, and Douglas Burgum |
| gpm | gallons per minute |
| MPO | mining plan of operations |
| NEPA | National Environmental Policy Act |
| PVMC | Pinto Valley Mining Corp. |
| ROD | record of decision |
| TNF | Defendants for the Tonto National Forest: Neil Bosworth, U.S. Forest Service, and Brooke Rollins |
| USGS | United States Geological Survey |

**INTRODUCTION**

This case challenges agency decisions that authorized a mine to dry up Pinto Creek, a unique desert stream in the mountains east of Phoenix. The once-thriving creek provides critical riparian habitat for the western yellow-billed cuckoo, a rare bird protected under the Endangered Species Act ('ESA'), and it supports other native species too. Its cool, shady environment, natural beauty, and wildlife viewing opportunities draw people, including members of the plaintiff organizations, for renewal and recreation.

Pinto Valley Mine operates a well field, located adjacent to the creek, that extracts 3,500 gallons of water *every minute* for mining activities. This ongoing pumping has caused the creek to run dry, killing riparian vegetation.

The Federal Defendants—Tonto National Forest decisionmakers Neil Bosworth, U.S. Forest Service, and Thomas Vilsack (collectively, 'TNF'), in consultation with the U.S. Fish and Wildlife Service, Heather Whitlaw, and Douglas Burgum (collectively, 'FWS')—authorized the mine to continue pumping water from this well field through 2039. In making that decision, they simply excluded from their analysis the area most profoundly affected by the mine's pumping: the creek's northern perennial reach, a waterway so important that TNF previously obtained a state water right to protect its flows. And, rather than requiring the mine's operator, Pinto Valley Mining Corp. ('PVMC') to mitigate its harm, the Federal Defendants allowed PVMC to merely monitor the creek's conditions and "coordinate with" TNF if that monitoring reveals *additional* harm, ignoring the degradation that PVMC's ongoing pumping maintains. As a result, the Federal Defendants violated the ESA, National Environmental Policy Act ('NEPA'), and Forest Service Organic Administration Act of 1897 ('Organic Act').

Plaintiffs Grand Canyon Chapter of the Sierra Club and Maricopa Bird Alliance (the 'Conservation Groups') now move for summary judgment. They ask the Court to declare the Federal Defendants' approval of the mine's operations unlawful and vacate the approval decision and supporting documents to prevent further pumping and give Pinto Creek a chance at recovery in the years to come.

- 1 -

# BACKGROUND

## I.   LEGAL BACKGROUND

### A.   The Endangered Species Act

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Congress enacted the ESA to prevent species' extinction and facilitate their recovery. *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004); 16 U.S.C. § 1532(3). To achieve these goals, the ESA directs the U.S. Fish and Wildlife Service to determine which species of plants and animals are "endangered" or "threatened." 16 U.S.C. § 1533(a)(1); *see id.* §§ 1532(6), (20) (defining those terms). Concurrently with listing, the Fish and Wildlife Service must designate "critical habitat," meaning areas "essential to the conservation of the species." *Id.* §§ 1533(a)(3), 1532(5)(A).

Section 7 of the ESA requires each federal agency to ensure that its actions are not likely to jeopardize threatened or endangered species or result in the destruction or adverse modification of designated critical habitat. *Id.* § 1536(a)(2). If an ESA-listed species "may be present in the area of such proposed action," the agency must conduct a "biological assessment" that identifies whether a listed species is "likely to be affected by such action." *Id.* § 1536(c)(1). If the action "may affect" a listed species, the agency must consult with the Fish and Wildlife Service. 50 C.F.R. § 402.14(a);[1] *see Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012) (en banc). Section 7 consultation culminates in the issuance of a "biological opinion" (or, for species and critical habitat *proposed* for listing, a "conference opinion"). 50 C.F.R. §§ 402.14(e)–(h), 402.10. That opinion must provide, among other things, a "detailed discussion of the effects of the action on listed species or critical habitat" and the Fish and Wildlife Service's opinion as to whether the action is likely to jeopardize listed species or destroy

---

[1] All citations to the ESA regulations refer to the version in effect during 2020 and 2021, when the challenged agency actions were issued.

- 2 -

or adversely modify critical habitat. *Id.* § 402.14(h)(1). These determinations must account for both survival and recovery of the species. *Id.* § 402.02; *see Gifford Pinchot*, 378 F.3d at 1069–70.

However, "[c]onsulting . . . alone does not satisfy an agency's duty" under Section 7. *Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1304 (9th Cir. 1993), *as amended on denial of reh'g* (July 5, 1994). The agency retains an independent, substantive duty to ensure that its actions are not likely to jeopardize listed species or destroy or adversely modify critical habitat. *Id.*; 16 U.S.C. § 1536(a)(2). An agency may not unreasonably rely on an inadequate, incomplete, or flawed biological opinion. *See, e.g.*, *Ctr. for Bio. Diversity v. Salazar*, 804 F. Supp. 2d 987, 1010 (D. Ariz. 2011).

### B.    The National Environmental Policy Act

NEPA is the "basic national charter for protection of the environment." *Ctr. for Bio. Diversity v. Bernhardt*, 982 F.3d 723, 734 (9th Cir. 2020). The law has "twin aims": to ensure that each federal agency "consider[s] every significant aspect of the environmental impact of a proposed action" and "inform[s] the public that it has indeed considered environmental concerns in its decisionmaking process." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983) (quoting *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 553 (1978)).

To fulfill these purposes, NEPA requires federal agencies to prepare a "detailed statement" for all "major Federal actions significantly affecting" the environment. 42 U.S.C. § 4332(2)(C). This statement—known as an environmental impact statement ('EIS')—must take a "hard look" at the environmental impacts of the proposed action before they occur. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Agencies must also identify and analyze measures to mitigate anticipated adverse environmental consequences associated with the major action under consideration. *S. Fork Band Council of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009). These requirements ensure that agencies "will have available, and will carefully consider, detailed information concerning significant

- 3 -

environmental impacts." *Robertson*, 490 U.S. at 349. They also ensure that "the relevant information will be made available" to members of the public, who "may also play a role in both the decisionmaking process and the implementation of that decision." *Id.*

### C. The Forest Service Organic Act

The Organic Act obligates TNF to protect the resources it manages—like Pinto Creek—from harm, including from mining operations. Such resources include "outdoor recreation, range, timber, watershed, and wildlife and fish." 16 U.S.C. § 528. Congress also directed the Forest Service to "secur[e] favorable conditions of water flows." *Id.* § 475. To achieve those goals, the Forest Service must "regulate the[] occupancy and use" of national forests and "preserve [them] from destruction." *Id.* § 551.

Under that statutory mandate, Forest Service regulations require that mining operations "be conducted so as, where feasible, to minimize adverse environmental impacts on National Forest surface resources." 36 C.F.R. § 228.8; *see also id.* § 228.1. This provision requires "the use of 'all practicable measures to maintain and protect fisheries and wildlife habitat which may be affected by [mining] operations.'" *Karuk Tribe*, 681 F.3d at 1033 (quoting 36 C.F.R. § 228.8(e)); *see also, e.g.*, *Rock Creek All. v. U.S. Forest Serv.*, 703 F. Supp. 2d 1152, 1164, 1170 (D. Mont. 2010) (holding mine approval violated Organic Act and Part 228 regulations by failing to protect water quality and fisheries). Thus, to comply with its duty to minimize adverse effects on forest resources, TNF may not approve mining proposals that would cause unmitigated damage to those resources.

### D. Arizona Water Appropriation Laws

Arizona water appropriation laws protect against interference with existing beneficial uses of water. Under the principle of first in time, first in right, "[a]ny person . . . may appropriate unappropriated water," and the person "first appropriating the water shall have the better right." Ariz. Rev. Stat. § 45-151(A). This framework extends to *in situ* (instream) flows, meaning a party may obtain a legal right to maintain water in a creek or other water body to protect wildlife and recreation values. *Id.* §§ 45-152(B)(6),

- 4 -

45-152.01(A)(1).

These rules apply to subsurface water that has a close hydrological connection to surface water.  Arizona law labels such water "subflow," defined as "those waters which slowly find their way through the sand and gravel constituting the bed of the stream, or the lands under or immediately adjacent to the stream, and are themselves a part of the surface stream."  *In re Gen. Adjudication of All Rts. to Use Water in Gila River Sys. & Source*, 198 Ariz. 330, 334 (2000) (quoting *Maricopa Cnty. Mun. Water Conservation Dist. No. 1 v. Sw. Cotton Co.*, 39 Ariz. 65, 96 (1931)).  Thus, subflow may not be used or diverted without right.

### E.    The Administrative Procedure Act

The Administrative Procedure Act ('APA') waives sovereign immunity and provides for judicial review of final agency actions.  5 U.S.C. § 702.  Under the APA, reviewing courts shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2).  An agency decision is arbitrary and capricious if, among other things, the agency has "entirely failed to consider an important aspect of the problem."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## II.    FACTUAL BACKGROUND

### A.  Pinto Creek - an imperiled "jewel in the desert"

Pinto Creek is a rare Arizona perennial stream that provides invaluable riparian habitat for fish and wildlife in a semi-arid environment.  The north-flowing creek stretches for 34 miles, beginning in the Pinal Mountains and flowing through the Sonoran Desert before eventually emptying into Roosevelt Lake.  TNF_60563.[2]  As Senator Barry Goldwater once put it, Pinto Creek is a "jewel in the desert."  TNF_49301.

---

[2] Record documents are identified by the prefix "TNF" (Forest Service record) or "FWS" (Fish and Wildlife Service record) followed by a 5-digit number, omitting the two zeros that begin each Bates label, e.g., "TNF_12345" rather than "TNF_0012345."

Much of Pinto Creek is perennial—meaning flowing year-round—because baseflow supplies the creek with water during periods of dry weather. Baseflow refers to consistent, sustained flows that come from subsurface water sources.[3] TNF_34988; TNF_03998; TNF_60563. Baseflow combines with surface runoff from precipitation to form the creek's overall flows.

Pinto Creek's flowing water—especially in its perennial reaches—supports riparian habitat, which consists of the water and water-dependent vegetation along the stream and floodplain. "[R]iparian ecosystems are of paramount importance in producing and maintaining a large degree of the biotic diversity of the southwestern United States." TNF_60565. Especially in arid environments, these ecosystems serve as "unique reservoirs of plant and animal diversity." *Id.* Riparian areas are also a "focal point for many recreational activities." TNF_60566. They are rare and precious: "[w]ithin the Tonto National Forest, riparian areas comprise less than 1% of the total land area." *Id.*

Pinto Creek's northern perennial reach supports one such rare, ecologically invaluable riparian zone. Along this approximately nine-mile segment of the creek—which begins at the mine's northern property boundary, *see* TNF_58455 (map labeling the reach "WR01")—"[t]he presence of year-round water results in a profusion of water-loving plants in the midst of the hot dry desert," TNF_60564. The reach is "truly unique" simply by virtue of being a "free flowing stream in the Sonoran Desert," and it also "supports a wide variety of plant and animal life." TNF_60571. However, its "riparian vegetation, wildlife, fish and recreation resource attributes are dependent upon maintaining a small, year-around baseflow." TNF_27137.

Reflecting the northern perennial reach's importance, TNF obtained a water right under Arizona state law that legally protects its flows. TNF applied for the right in 1983,

---

[3] "Baseflow" is a hydrological term, whereas "subflow" (discussed above) is a legal term. Confusingly, "groundwater" as a hydrological term refers to *all* subsurface water, *see, e.g.*, TNF_34988 (defining "subflow" as "groundwater discharge"), but as a legal term refers to subsurface water *that is not subflow*, *see In re Gila River*, 198 Ariz. at 334.

- 6 -

explaining that "[a] continuous flow of water" in the northern perennial reach is "needed to support existing aquatic life and wildlife" and "important for preservation of recreational values." TNF_60566. Following two assessments of necessary flow volumes, TNF_27128; TNF_60602, the Arizona Department of Water Resources ('ADWR') granted a certificate in 1999 recognizing TNF's instream right with a seniority date of December 14, 1983. TNF_04579. TNF holds a right to maintain 1,794.2 acre-feet per year of water "flowing in Pinto Creek, for recreation and wildlife, including fish." *Id.* Water covered by the right cannot "be diverted from the natural channel of Pinto Creek." *Id.*

Pinto Creek's riparian habitat hosts rare, imperiled species, including the western yellow-billed cuckoo.[4] The Fish and Wildlife Service listed the western yellow-billed cuckoo as threatened in 2014, due largely to loss of riparian habitat from dewatering. TNF_17115. It also proposed to designate two units of yellow-billed cuckoo critical habitat along the creek: Pinto Creek South, which comprises 373 acres, and Pinto Creek North, which comprises 427 acres along the northern perennial reach. TNF_16611–12. Both units are "part of the core area" for the species' "conservation strategy," referring to a set of rivers and their tributaries that "provide a consistent, robust supply of resources necessary for the maintenance and expansion of western yellow-billed cuckoos." TNF_61871; TNF_61884–85. Both units "provide[] migration stopover habitat," and Pinto Creek North "has been consistently occupied by western yellow-billed cuckoos during the breeding season." TNF_16619. The Fish and Wildlife Service finalized its designation of this critical habitat in April 2021, shortly before issuance of the approval decision challenged in this case.[5] TNF_61822.

---

[4] The complaint also alleged ESA violations involving the southwestern willow flycatcher. The Conservation Groups are not pursuing those claims.

[5] The Fish and Wildlife Service also revised its proposed designation in 2020. Neither that revision nor the final designation altered the two Pinto Creek units. *See* TNF_60213.

- 7 -

**B.    Pinto Valley Mine begins dewatering Pinto Creek**

Pinto Valley Mine is an open-pit copper and molybdenum mine located on a mix of private and National Forest land adjacent to Pinto Creek.  It is owned and operated by PVMC.

Much (though not all) of the mine's water comes from the Peak Well field, a set of water supply wells to the north and west of the main mine site.  TNF_57740; TNF_58420 (map).  PVMC extracts, on average, 3,500 gallons per minute from the Peak Well field— enough to cover a football field in twelve feet of water every day.  TNF_57740.  The well field has a close hydrological connection to Pinto Creek.  For example, "Peak Well 24 . . . respond[s] to flows in the creek," where "relatively sudden rises and falls" in the well's water level "correspond to" changes in the creek's flows.  TNF_51524.  Some of the wells convey water to the mine via pipelines across National Forest land.  TNF_57740; TNF_58420.  TNF previously authorized those pipelines (and associated service roads and power lines) under two permits, GLO-445302 and GLO-445303, both of which expired in 2007.  TNF_57715–16; TNF_57740.

Since the mine first opened in 1974, several entities have owned and operated it without apparent harm to Pinto Creek's flows or riparian habitat.  TNF_58689.  In fact, the northern perennial reach flowed *every single day* for at least 15 years straight, from 1998 to 2013.  TNF_58691.

However, flows in Pinto Creek rapidly plummeted when PVMC acquired the mine.  Beginning in October 2013, and operating under the expired Peak Well permits, PVMC started pumping.  *See* TNF_57726.  Three months later, the creek's surface flows dropped to zero. TNF_58265 (showing monthly flows); TNF_49292 (explaining that "the stream dried up the last 14 days of December, 2013").  In the following years, the mine continued to pump enormous quantities of water from the Peak Well field, and Pinto Creek's northern perennial reach frequently ran dry.  TNF_58265; TNF_49292.

**C.    The Federal Defendants' flawed approval decisions**

In 2016, PVMC submitted to TNF a proposed mining plan of operations ('MPO').

TNF_22477.  It proposed to expand the mine's physical footprint; "[c]onsolidat[e]" various authorizations, including the expired Peak Well permits; and extend the mine's operational life, including pumping activity, to 2039.[6]  TNF_57784–86.

While the MPO was pending approval, multiple groups raised concerns about impacts from the mine's pumping on Pinto Creek.  The Arizona Game and Fish Department ('AGFD') notified TNF that, in November 2017, AGFD evaluated an "approximate 1.5 mile reach of Pinto Creek" downstream of the mine along the northern perennial reach and "concluded that riparian tree mortality appeared to be high and of significant concern."  TNF_31395–96.  AGFD identified pumping from the Peak Well field as a likely cause and urged TNF to require PVMC to mitigate the harm. TNF_31397.  Similarly, the Salt River Project, a major utility serving much of the Phoenix metro area, advised that pumping from the Peak Well field was harming "the aquatic and riparian resources located within Pinto Creek corridor"; was "negatively impacting senior water right holders," including the Forest Service and its instream flow right; and required mitigation because "the Salt River and its tributaries, including Pinto Creek, have been fully appropriated."  TNF_40874–77.

On December 13, 2019, TNF released a draft EIS ('DEIS') evaluating the effects of the proposed MPO. TNF_60780–81; TNF_60784.  The DEIS explained that "[a] calibrated three-dimensional numerical groundwater flow model" had been developed to assess how the mine's pumping had affected, and would continue to affect, groundwater and surface water resources, including Pinto Creek.  TNF_61283.

That modeling yielded a staggering finding: "over the 2013–2018 period, the baseflow to Pinto Creek was substantially reduced from an initial rate of 1,070 gallons per minute (start of 2013) to 188 gallons per minute (end of 2018)," representing "an 82

---

[6] The mine's prior owner submitted a plan of operations for approval in 2009.  In response, TNF acknowledged the need to "authoriz[e] expired and/or on-going activities and uses" but inexplicably failed to do so, allowing PVMC to operate with expired permits when it acquired the mine.  TNF_57072; *see* TNF_56796–97.

percent reduction." TNF_61284. The DEIS also found that "[t]here were no months recording zero flow in the period of record until 2014, and [then] 26 months recording zero flow between January 2014 and December 2018." TNF_61280. The DEIS found that these enormous reductions to Pinto Creek's flows "occurred as a result of pumping from the Peak Well System during the 2013–2018 period." TNF_61297. The modeling further showed that PVMC's future pumping, through 2039, would continue this trend by "extend[ing] the duration of the predicted impacts on baseflow." TNF_61297. It also identified a "5-foot drawdown contour," meaning "[t]he area where the water table would be lowered by 5 feet or more at some point in time during the mining or post-mining period." TNF_61284; *see* TNF_61395 (map showing contour).

The DEIS linked this significant dewatering to on-the-ground ecological harm. *See* TNF_60968 (finding that continued pumping would cause "continued mortality of riparian vegetation and loss of functioning riparian habitat"); TNF_61018 (explaining that riparian die-off would "negatively affect species that depend on that vegetation, such as migratory birds and bats"); TNF_61018 (explaining that Pinto Creek's ecosystem would not recover until "long after cessation of mining activities"). To evaluate these effects on wildlife and other "biological resources," the DEIS identified an analysis area that extended well beyond the modeled 5-foot drawdown contour and included all of Pinto Creek's northern perennial reach. TNF_61362.

Much of the DEIS's hydrological analysis focused on the creek's flows at a streamflow measuring station called the Magma Weir.[7] *E.g.*, TNF_61284 (explaining that the 82 percent reduction refers to "baseflow conditions at the Magma Weir"); TNF_61297 (similar). The Magma Weir lies downstream (north) of the mine and Peak Well field along Pinto Creek's northern perennial reach, and approximately 0.4 miles downstream of the northern "edge" of the modeled 5-foot drawdown contour.

---

[7] The weir is also referred to by its U.S. Geological Survey ('USGS') gauge number, 9498502, or as "Pinto Creek near Miami, AZ." TNF_41823.

TNF_59186; *see* TNF_40654 (map showing weir relative to mine site); TNF_59223 (map showing weir relative to drawdown contour); *infra*, p. 15:4–15:20.

The DEIS proposed four mitigation measures to address the mine's dewatering: (1) a "Comprehensive Water Resources Monitoring Plan" ('Water Monitoring Plan') to monitor water and vegetation in the project analysis area; (2) recalibrating the hydrological model; (3) hosting an annual water "workshop" with "stakeholders"; and (4) monitoring for "[a]dverse impacts" to existing water rights. TNF_61302–03 (referring to measures WR-1a, WR-1b, WR-1c, and WR-2, respectively).

The Conservation Groups commented on the draft EIS in January 2020. TNF_49442. They notified TNF of newly observed tree mortality "in the vicinity of the Magma Weir" and emphasized that the mine's severe dewatering of Pinto Creek was likely caused by "excessive" pumping "and/or lack of proper management of the Peak Well field." TNF_49441. They also urged TNF to proactively protect its instream flow right from the mine's dewatering and require substantive mitigation measures rather than mere monitoring. TNF_49443–44; TNF_49447–49.

In February 2020, TNF submitted to FWS a draft biological assessment and request for formal consultation under Section 7 of the ESA, based on TNF's determination that the mine's operations were likely to adversely affect the western yellow-billed cuckoo and its critical habitat. FWS_00038–39. Like the DEIS's biological resources analysis area, TNF_61362, the draft BA's "action area" included the Magma Weir and all of Pinto Creek's northern perennial reach, FWS_00046. The draft BA incorporated the DEIS's water-monitoring-based mitigation measures, FWS_00066; FWS_00063 (adopting DEIS measures WR-1a, WR-1b, WR-1c), and required additional monitoring in the form of surveys for western yellow-billed cuckoos, FWS_00064.

In response, PVMC urged TNF to reduce the defined action area, which it claimed was "oversized" because it was based partly on the "speculative" possibility of a tailings dam breach. FWS_00121–22. PVMC also pushed back on the agency's proposed mitigation measures. FWS_00150–51.

- 11 -

In March and April 2020, TNF and FWS discussed the draft BA, including the appropriate action area. After agreeing that a tailings dam failure was too speculative to support the action area as defined, the agencies considered using the modeled "5-foot groundwater drawdown contour" as the basis for the ESA action area. TNF_51073. That contour excluded the northern perennial reach and the Magma Weir. TNF_61394 (map showing perennial reach north of contour); TNF_58274 (table showing 0.12 miles of the 8.54-mile reach, identified as "ST02" and "ST03," within the drawdown contour); TNF_59223 (map showing weir, identified as "USGS 09498502," north of contour).

During those discussions, TNF admitted repeatedly that the 5-foot drawdown contour would not capture all ecological effects of the mine's pumping. *See, e.g.*, TNF_51071 ("[T]he water modeling done does not estimate how far downstream the effects of drawdown may occur in the perennial reach of Pinto Creek."); TNF_51169 (noting that "observed riparian degradation" extended "downstream of the 5-foot groundwater contour"); TNF_51206 (questioning whether "surface flow could be affected downstream, beyond the drawdown contour" and noting that "only [a] small portion of Pinto Creek is within the drawdown contour"). Nonetheless, TNF "decided that the northern extent of the analysis area [would] not extend[] beyond the 5-foot drawdown contour to capture potential downstream effects" because those effects had "not been estimated quantitatively." TNF_51169.

The agencies also discussed the draft BA's proposed mitigation measures. FWS expressed significant concern about the BA's "monitoring based" approach and failure to "identify ways to reduce and minimize effects." TNF_51034; *see also, e.g.*, TNF_51037 (explaining that "the proposed conservation measures are primarily requirements for future monitoring," leaving for "future" determination "what actions need to be taken in response to monitoring").

TNF likewise expressed doubt over the mitigation measures' sufficiency. *See, e.g.*, TNF_51037 (questioning whether "any specific trigger points and clear requirements ha[d] been identified for adaptive management"); TNF_51059–60

- 12 -

(criticizing failure to "describe if, how, or when Pinto Creek riparian habitat would be restored" and to "identify a specific action to reduce or minimize effects"); TNF_51071 (cautioning that FWS "may want tangible mitigation proposed up front, such as plantings or a habitat improvement escrow account, instead of deferring to monitoring"); TNF_51230 (explaining that a measure had originally required "flow augmentation [if] baseflow falls to certain levels" but was subsequently "watered down" to require mere monitoring and coordination); TNF_51352 (similar).  Even PVMC was skeptical.  *See* TNF_51202 (PVMC requesting clarification of "thresholds for action" so that the mitigation was "not just monitoring for the sake of monitoring"); TNF_51206 (PVMC counsel expressing "PVMC's doubts about whether the proposed mitigation would be effective").  At least five of the March and April meetings concluded with an outstanding "[a]ction [i]tem" of identifying how "actual mitigation" would be "triggered." TNF_51037; TNF_51061; TNF_51073; TNF_51169; TNF_51200.

After those meetings, on April 29, 2020, TNF sent FWS an updated draft BA, which shrank the action area and retained the monitoring-based mitigation approach. TNF_51356.  The new action area "correspond[ed] to the area subject to groundwater drawdown of five feet or greater as modeled."[8]  FWS_00239–40.  And the mitigation measures kept the same basic approach—monitoring—but with additional focus on yellow-billed cuckoos and their habitat along Pinto Creek.  FWS_00237–38.  The updated draft BA stated that these mitigation measures were "being developed" through the Water Monitoring Plan and a newly identified "Biological Resources Monitoring and Mitigation Plan" ('Biomonitoring Plan').  FWS_00238.  The draft BA contemplated that both monitoring plans would establish "thresholds" that, if met, would require PVMC to "coordinate with" TNF to "identify appropriate actions." *Id*.

In the midst of all this, in May 2020, TNF wrote a letter to ADWR asking it to

---

[8] The action area included minor additions to the 5-foot drawdown contour for effects not relevant here.  FWS_00239.  The northern boundary followed the contour.  FWS_00240 (compare yellow shading to red line).

declare the mine's pumping illegal.  TNF_61814.  TNF's letter highlighted its instream flow right along Pinto Creek's northern perennial reach and explained that the mine had already reduced the creek's baseflow by 82 percent.[9]  *Id.*  It compared Pinto Creek's flows to nearby Cherry Creek to isolate effects from the Peak Well field, documented damage to riparian habitat, and identified eleven wells most likely to be causing the harm.  TNF_61815–20.  TNF was unequivocal: it "believe[d] that wells operated by [the mine] [were] having a direct and appreciable impact on surface water flow in Pinto Creek."  TNF_61814.  It therefore requested that "ADWR make a determination of appropriability for [the mine's] near-stream wells"—i.e., determine whether the mine's pumping was illegal, as TNF "believe[d]" it to be.  *Id.*

On July 16, 2020, before ADWR had responded, TNF completed its final BA.  FWS_000526.  The action area was constrained to the modeled 5-foot drawdown contour, FWS_00554–55, thus omitting from ESA analysis the northern perennial reach, the *very same* stream segment identified in TNF's letter to ADWR.  The final BA also retained the prior draft's mitigation measures: monitoring, to be developed through the yet-unfinished Water Monitoring Plan and Biomonitoring Plan.  FWS_00552–53.  Based on those mitigation measures and the defined action area, the final BA concluded that the mine expansion and continued operation was "likely to adversely affect" the western yellow-billed cuckoo but "not likely to result in destruction or adverse modification" of the cuckoo's critical habitat.  FWS_00578–81.

Two weeks later, on July 28, 2020, ADWR responded to TNF's request for a determination of appropriability.  ADWR stated (without explanation) that it was "unable [to] make the determination[] of appropriability" but offered to assist TNF in resolving the issue.  TNF_61821.  TNF did not respond or accept ADWR's offer of assistance.

Days later, on August 4, 2020, FWS issued its final biological opinion ('BiOp').

---

[9] Legally, the creek's baseflow constitutes "subflow," not "groundwater," *see In re Gila River*, 198 Ariz. at 334, hence TNF's position that PVMC's pumping was illegal.

FWS_00601.  The BiOp adopted the BA's action area, defined by the 5-foot drawdown contour.  FWS_00611; FWS_00634.  The final action area thus excluded the northern perennial reach, including at the Magma Weir, from Section 7 consultation:



*Figure 1*.  *Location of the Magma Weir and northern perennial reach relative to the ESA action area.  The zoomed-in part of this image overlays the action area map, FWS_00219; FWS_00517, with the map at TNF_40654.  The northern perennial reach is shown in solid blue running through the weir.  See TNF_58426 (showing same area with label for Pinto Creek and its riparian vegetation).*

The BiOp also adopted the BA's mitigation measures.  FWS_00610–11.  It did not explain why those measures were appropriate or lawful, nor did it acknowledge TNF and FWS's earlier concerns with a monitoring-based approach.  Notably, PVMC *had not yet written* the Biomonitoring Plan or Water Monitoring Plan—the core pieces of PVMC's purported mitigation—when FWS finalized the BiOp.  *See* FWS_00611.  Nonetheless, the BiOp determined that approving the MPO "as presented"—meaning with the mitigation measures as described in the BiOp—was "not likely to jeopardize the continued existence of the cuckoo, and [was] not likely to destroy or adversely modify

- 15 -

proposed critical habitat." FWS_00624–25.

On April 9, 2021, TNF issued its final EIS ('FEIS'). TNF_57658. Like the DEIS, the FEIS found that PVMC's pumping had reduced Pinto Creek's baseflow by 82 percent at the Magma Weir and caused the creek to run dry. *E.g.*, TNF_58267–68; TNF_58768; TNF_58690–91. It also concluded that approving the MPO would prolong PVMC's suppression of the creek's flows and delay the creek's ecological recovery by decades. TNF_58292 (finding that "[c]ontinued pumping from the Peak Well field" would "extend the duration of the predicted impacts on baseflow for an additional 19 years"). It found that pumping through 2039 would also increase the amount of National Forest land affected by the 5-foot groundwater drawdown. TNF_58291. TNF found repeatedly that the mine's dewatering was harming, and would continue to harm, riparian habitat along Pinto Creek. *See, e.g.*, TNF_57912 (finding that extended "reduction in baseflow" at the Magma Weir from approving the MPO would contribute to "greater . . . mortality of riparian vegetation and loss of functioning riparian habitat"); TNF_58764 (explaining that baseflow reductions like those at the Magma Weir diminish "lengths of perennial stream reaches, and their associated riparian or wetland areas").

Unlike the DEIS, but like the final BA and BiOp, the FEIS's assessment of biological resources was limited to the modeled 5-foot drawdown contour, omitting Pinto Creek's northern perennial reach from analysis. TNF_58574; TNF_58426 (FEIS biological resources map); TNF_58576 (map of "analysis area" for FEIS "biological evaluation"); TNF_59076 (map of "analysis area" for Biomonitoring Plan). TNF did not explain why the biological resources analysis area had been shrunk from the DEIS. *See, e.g.*, TNF_56215 (acknowledging the change but not explaining why it had been made).

The FEIS's final mitigation measures tracked those in the DEIS, BA, and BiOp. Namely: the Biomonitoring Plan (BR-1), the Water Monitoring Plan (WR-1), plus the annual water "workshop" (WR-3), and water rights monitoring (WR-4). TNF_59023–24; TNF_59042–47. The now-completed Water Monitoring Plan contemplated "develop[ing] site specific mitigation plans" in the future, "as necessary and feasible"—

- 16 -

provided that any future dewatering harms were found to be "directly and reasonably attributable to the mine operations." TNF_59198. The Biomonitoring Plan identified "thresholds"—including changes in certain vegetation metrics "compared with values recorded during the first year of monitoring"—that could trigger "consideration of" responsive actions. TNF_59071–72. The so-called "[a]ctions" identified were described in remarkably vague terms, like "[o]ptions for reducing water-resource related impacts resulting from mine drawdown that could be affecting the [cuckoo's] habitat," and "[p]ossible mitigation measure options that may be identified in the [Water Monitoring Plan] relevant for [cuckoo] habitat." TNF_59072. The FEIS did not include an evaluation of these measures' effectiveness in addressing harm to Pinto Creek, its riparian habitat, or the wildlife the creek supports. Instead, it merely stated, in general terms, that each would be useful. TNF_59024; TNF_59044; TNF_59046; TNF_ 59047.

The FEIS also did not evaluate other, more useful mitigation strategies in detail. For example, TNF declined to consider requiring PVMC to evaluate and optimize configurations of the Peak Well field and minimize pumping from wells with the greatest impact on the creek. TNF_57804–05. Similarly, the FEIS summarily rejected options for alternative water sources, in part to avoid imposing additional costs for the mine. TNF_57801–06. The FEIS also failed entirely to consider requiring a water reduction or conservation plan.

On the same day it issued its FEIS, TNF issued a draft record of decision selecting the proposed action. TNF_59554. The Conservation Groups formally objected, detailing TNF's numerous legal and factual errors. TNF_59913. On August 6, 2021, TNF rejected the Conservation Groups' and others' objections. TNF_60374–77. In its rejection letter, TNF explained that it would update the Water Monitoring Plan with a two-step process. First, PVMC would update and re-run the hydrological model, and, if results showed "statistically significant" declines in water quantity, PVMC would "work with" TNF to identify additional "monitoring points" or "instrumentation" that would be "incorporated" into *another* model re-run. TNF_60441–42. If the "analysis of trends and

collection of additional data . . . confirm the findings," PVMC would again "coordinate with" TNF to identify "appropriate and practicable" actions. TNF_60442. Options for such actions "may" include "[s]ecuring alternative water sources"; "[i]mproving on-site water conservation measures"; or "[o]ptimizing the Peak wellfield performance" by, among other options, "changing the configuration of the pumped wells." *Id.*

TNF did not conduct additional NEPA analysis to evaluate the effectiveness of this updated measure. Nor did it explain why potentially "appropriate and practicable" measures like alternative water sourcing, water conservation, or Peak wellfield optimization had not been implemented based on the FEIS's original modeling results, which showed clear, ongoing harm to the creek.

TNF issued its final record of decision ('ROD') on August 19, 2021, TNF_60096, and approved the MPO on November 3, 2021.

## STANDARD OF REVIEW

Five of the Conservation Groups' six claims arise under the APA. The sixth claim—that TNF violated its substantive Section 7 duty—arises under the ESA's citizen suit provision. 16 U.S.C. § 1540(g). Courts borrow the APA's standard of review to assess such claims. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011). Thus, the APA's standard of review applies to all claims in this case.

That standard requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs.*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). An agency decision is arbitrary and capricious where, among other things, it has "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency." *Id.* While agencies deserve deference on matters involving their scientific or technical expertise, courts "must not 'rubber-stamp . . . administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.'" *Ariz. Cattle Growers' Ass'n v.*

*U.S. Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001) (quoting *Nat'l Labor Rel. Bd. v. Brown*, 380 U.S 278, 291–92 (1965)).

Summary judgment is appropriate where the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## ARGUMENT

### I.   THE CONSERVATION GROUPS HAVE STANDING.

An organization "has standing to bring suit on behalf of its members when its members would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 169 (2000). Here, the interests at stake—protection of a critically important creek and the plants and animals it supports—are germane to the Conservation Groups' missions of protecting wildlife and natural places. No claim requires participation of individual members because their interests are fully represented by the Conservation Groups. And, for the reasons below, the Conservation Groups' members have standing to sue in their own right.

To establish standing, a plaintiff must show that: "(1) he or she has suffered an injury in fact that is concrete and particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision." *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015) (quoting *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1225 (9th Cir. 2008). The Conservation Groups, through their members, satisfy each of these factors here.

### A.   *Injury*: pumping harms Conservation Group members' recreational and aesthetic interests.

"[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values

- 19 -

of the area will be lessened' by the challenged activity." *Friends of the Earth*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)); *see also Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000).

The Conservation Groups' members readily satisfy this standard.  Their members have a long history of visiting, recreating along, and enjoying Pinto Creek.  *See* Decl. of Richard C. Martin ¶¶ 6, 10–16 (describing 49-year history of visiting and working to protect Pinto Creek, including as hydrologist with the Tonto National Forest); Decl. of Charles J. Babbitt ¶¶ 12–17 (describing longstanding interests in and activities at Pinto Creek, including birdwatching for the western yellow-billed cuckoo); Decl. of Tim Flood ¶¶ 8–20 (similar).  The loss of Pinto Creek's perennial flows and degradation of its riparian habitat has diminished these members' enjoyment of Pinto Creek, and continued delay in the creek's ecological recovery further harms those interests.  *See* Martin Decl. ¶¶ 17–35 (describing and documenting ongoing harm related to the creek's "critically stressed riparian vegetation"); Babbitt Decl. ¶¶ 18–24 (explaining that birdwatching along Pinto Creek has become less enjoyable because many bird species "can no longer be found in the area because of the lack of appropriate riparian habitat"); Flood Decl. ¶¶ 21–33 (documenting reduction in creek's flow and riparian vegetation over time); *see also* Martin Decl. ¶ 33 (describing procedural harm from lost opportunity to participate in lawful administrative process); Babbitt Decl. ¶ 22 (same).

These declarations establish that Conservation Group members' enjoyment of Pinto Creek has already been diminished and that their "future li[ves] will be less enjoyable" because the creek will "remain[] . . . environmentally degraded." *Ecological Rts. Found.*, 230 F.3d at 1149.  They satisfy the injury prong of the test.

**B.    *Causation*: the challenged agency actions caused the Conservation Groups' injury.**

To assess causation, courts examine "whether the alleged injury can be traced to the defendant's challenged conduct." *Id.* at 1152.  A plaintiff challenging agency action satisfies this standard by showing that injury-causing activity carried out by a third party

would not happen "*but for* the challenged decision."  *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1518 (9th Cir. 1992).  When assessing causation for procedural claims, like those alleging violations of NEPA or Section 7 of the ESA, courts apply a relaxed standard.  For such claims, a plaintiff simply "must show that the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing."  *W. Watersheds Project*, 632 F.3d at 485 (quoting *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969 (9th Cir. 2003)); *see also, e.g.*, *Sw. Ctr. for Bio. Diversity v. FERC*, 967 F. Supp. 1166, 1171 (D. Ariz. 1997) (finding causation and redressability under relaxed standard for procedural ESA claim).

Here, but for the 2021 approval of the MPO, the mine could not operate and would have been required to halt its pumping operations that have harmed, and continue to harm, Pinto Creek.  TNF_57750 (explaining that "the primary water supply pipelines and electrical lines to the mine are on National Forest System lands and . . . are necessary to operate the mine").  Thus, that approval—and the flawed analyses supporting it—increased both the *duration* and *severity* of harm to Pinto Creek.

Regarding duration, TNF's approval of the MPO allowed PVMC to dewater Pinto Creek for an additional 19 years.  Hydrological modeling completed for the NEPA analysis showed that, absent the approval decision, "peak recovery in baseflow" to Pinto Creek would occur in 2028, whereas under the approved MPO, peak recovery will not occur for another two decades, in 2048.  TNF_58297.  Similarly, without the additional years of pumping, Pinto Creek would have begun recovering four years ago instead of fourteen years hence, with all the resulting benefits to riparian habitat, wildlife, and the Conservation Groups' members.  TNF_58276 (Figure 3-21 depicting temporal shift in creek's recovery); *see* Martin Decl. ¶ 29 (explaining that, due to this delay, Mr. Martin will "probably not live to see and enjoy the recovery of Pinto Creek").  Regarding severity, approval of the MPO resulted in steeper losses to the creek's baseflow.  TNF_58808 (showing that approving the MPO will reduce baseflow to a low of 73 gpm as opposed to 97 gpm).

By increasing the duration and severity of suppressed flows, the challenged agency actions are a but-for cause of the Conservation Group members' injuries.

### C. *Redressability:* the Court can remedy the Conservation Groups' injury by ordering compliance with the ESA, NEPA, and Organic Act.

The burden to show redressability is "relatively modest." *Bennett v. Spear*, 520 U.S. 154, 171 (1997). To satisfy this burden, a plaintiff need only show "a substantial likelihood"—not "a guarantee"—that the relief sought would redress the relevant injury. *Tucson v. City of Seattle*, 91 F.4th 1318, 1325 (9th Cir. 2024) (quoting *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018)). And, as noted, courts apply a "relaxed" standard when assessing redressability for procedural claims like the Conservation Groups' ESA and NEPA claims here. *W. Watersheds Project*, 632 F.3d at 485 (quoting *Cantrell v. City of Long Beach*, 241 F.3d 674, 682 (9th Cir. 2001)). Under that relaxed standard, a plaintiff "must show only that they have a procedural right that, if exercised, *could* protect their concrete interests." *Id.* (quoting *Defs. of Wildlife v. EPA*, 420 F.3d 946, 957 (9th Cir. 2005), *rev'd on other grounds sub nom.*, *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007)).

Here, vacatur of the challenged decisions would allow the creek to begin recovering much sooner than it otherwise would. In fact, Pinto Creek's baseflow will rebound almost immediately after pumping from the Peak Well field ceases. TNF_58276 (Figure 3-21 showing recovery timelines); TNF_58292–93 (explaining that the creek's baseflow will "fully recover" in the first ten years after pumping stops, before stabilizing at 430 gallons per minute). This immediate increase in flow would benefit the creek's riparian habitat and the Conservation Groups' members. *See* Martin Decl. ¶ 35; Babbitt Decl. ¶¶ 23–24; Flood Decl. ¶¶ 33–34. Furthermore, remand to the TNF with instructions to reconsider its approval decision "*could*" result in a different outcome that better protects the Conservation Group members' interests, which is all that Article III requires for procedural injuries. *W. Watersheds Project*, 632 F.3d at 485 (quoting *Defs. of Wildlife*, 420 F.3d at 957).

Because their members can show injury, causation, and redressability, the Conservation Groups have standing to sue.

## II.    THE CONSERVATION GROUPS ARE ENTITLED TO SUMMARY JUDGMENT.

The Court should grant summary judgment in the Conservation Groups' favor on all claims, as two key agency errors corrupt the challenged actions.  First, even though the Federal Defendants knew that PVMC's pumping was drying up Pinto Creek's northern perennial reach, they omitted that area from their analyses of effects on wildlife and riparian habitat.  Second, the Federal Defendants failed to require concrete mitigation measures to offset known harm from the mine's dewatering.  In committing these failures, the agencies violated (1) the ESA; (2) NEPA, and (3) the Organic Act.

### A.  FWS and TNF violated the ESA (*Claims 4, 5, and 6*).

Section 7—the heart of the ESA—requires every federal agency to ensure that its actions are "not likely to jeopardize the continued existence" of threatened or endangered species or "result in the destruction or adverse modification" of designated critical habitat.  16 U.S.C. § 1536(a)(2).  The Federal Defendants here violated Section 7 by (1) unlawfully constraining the action area used to identify and assess harm to the cuckoo and its critical habitat; and (2) relying on unlawfully vague, meaningless mitigation measures.

#### 1.    TNF and FWS arbitrarily constrained the ESA action area.

During Section 7 consultation, agencies must analyze the full "effects of the action," meaning "all consequences to listed species or critical habitat that are caused by the proposed action."  50 C.F.R. § 402.02; *see Connor v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988).  To satisfy this requirement, the "action area" must correspond to "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action."  50 C.F.R. § 402.02.  The BA and BiOp must explain the "scientific methodology, relevant facts, or rational connections linking the project's potential impacts" to the action area boundaries.  *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 902 (9th Cir. 2002).

Failure to define the action area in accordance with these standards violates the ESA. *See id.* at 900–03 (holding Forest Service irrationally used a "Bear Management Subunit" as action area where timber sale was likely to have effects beyond that boundary); *Env't Prot. Info. Ctr. v. Van Atta*, 692 F. Supp. 3d 879, 896–97 (N.D. Cal. 2023) (finding agency unlawfully limited action area for a dam's operation by omitting downstream reaches that held critical habitat for endangered salmon); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 254 F. Supp. 2d 1196, 1212 (D. Or. 2003) (similar); *Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 128–30 (D.D.C. 2001) (finding action areas "overly narrow" because they excluded "relevant impacts" to Sonoran pronghorn).

The Federal Defendants irrationally constrained the action area here. While they claimed that the BA and BiOp's action area included "the furthest reaching" effects of the mine's operation, including all areas affected by "water withdrawals," FWS_00554; *see* FWS_00611, that was false. The action area *excluded* the place most affected by the mine's pumping: the northern perennial reach, including at and around the Magma Weir.

Time and again, TNF (and others) concluded that PVMC's pumping was dewatering Pinto Creek's northern perennial reach and would continue to do so through 2039. *Supra*, p. 9:4–16, 9:22–10:10, 11:9–15, 12:9–19, 13:25–14:10, 16:2–16, 21:16–18. Indeed, effects at the Magma Weir were central to TNF's water resource modeling and analysis. *Supra*, p. 10:20–11:2. TNF also found that this dewatering was, and would continue, harming riparian habitat at the weir and farther downstream. *Supra*, p. 10:11–19, 12:9–19, 16:10–16. In fact, TNF was confident enough in these conclusions to petition ADWR for a *legal declaration* that PVMC was impairing TNF's instream water right for the northern perennial reach. *Supra*, p. 13:25–14:10. Nowhere did TNF find that the northern perennial reach would *not* be affected by PVMC's pumping.

Furthermore, a "significant" contributor to the northern perennial reach's year-round flow is subsurface water that originates upstream—exactly where the Peak Well field pumps its water. TNF_03998 (explaining that upstream water flows underground

- 24 -

until it encounters the reach's impermeable "bedrock channel" and is forced to the surface); *see also* TNF_03964 (characterizing this flow as "[t]he major source of the perennial baseflow at the [Magma] weir"); TNF_61389 (map showing that water flows from action area into northern perennial reach). In other words, the water that PVMC pumps would ordinarily flow downhill into the northern perennial reach.

And yet, neither the BA nor BiOp evaluated effects in the northern perennial reach, which "begins at"—i.e., falls outside of—"the northern boundary of the action area." FWS_00499. The action area also excluded the Magma Weir, the very location where the 82 percent baseflow reduction was measured. *Supra*, p. 15:4–15:20. Thus, the Federal Defendants' Section 7 consultation omitted from analysis the exact area that TNF determined had been, and would continue to be, harmed by the mine's pumping. The area that, through decades of work, TNF protected with a state-law instream flow water right. The area *known* for its perennial flows and riparian habitat, including designated critical habitat for the cuckoo.

The Federal Defendants never offered a justification for their decision to omit this habitat-rich stretch of creek from the action area—despite conceding that the 5-foot drawdown boundary would exclude known effects. *Supra*, p. 12:9–19. Nor did they apply scientific or other expertise that justified ignoring those effects. They simply turned a blind eye to the evidence before them. If the drawdown area were somehow "a proper proxy for the project's action area, . . . one cannot tell this from the administrative record." *Native Ecosystems Council*, 304 F.3d at 902.

The flawed action area also undermined the BiOp's final conclusions.

***First***, the BiOp determined that the mine's pumping would not jeopardize the yellow-billed cuckoo based primarily on its finding that "[t]here are no known breeding cuckoos within the action area." FWS_00625. But Pinto Creek North—the unit of critical habitat along the northern perennial reach—is "consistently occupied by western yellow-billed cuckoos during the breeding season." FWS_00570–71; *see also* FWS_00617 (acknowledging finding at the time of listing that "cuckoos likely bred along

Pinto Creek"); TNF_61885 (finding that Pinto Creek North "is used by the western yellow-billed cuckoo during the breeding season").  The BiOp's exclusion of known breeding habitat from the action area undermined the primary basis for its no-jeopardy conclusion.

*Second*, the BiOp concluded that the mine's pumping would not destroy or adversely modify yellow-billed cuckoo critical habitat because the amount of habitat that the BiOp found would be affected, 308 acres, is a small percentage of the species' total breeding range.  FWS_00622–23.  That reasoning overlooked the 373 acres of Pinto Creek North that were arbitrarily omitted from the action area.  *See* FWS_00618 (noting that 54 acres of Pinto Creek North were within action area); TNF_16612 (providing that Pinto Creek North is 427 acres total).  Including the excised habitat more than doubles what FWS evaluated: 681 acres (308 + 373), approximately ten percent of the cuckoo's critical habitat in the Tonto Basin.  *See* FWS_00623.  Moreover, Pinto Creek North is part of the cuckoo's "core area" of critical habitat, which "provide[s] a consistent, robust supply of resources *necessary* for the maintenance *and expansion* of western yellow-billed cuckoos."  TNF_61871 (emphases added); TNF_61885.  The BiOp's exclusion of this "core" critical habitat undermined its determination that the mine would not "appreciably diminish[] the conservation role of proposed critical habitat."  FWS_00625.

These material errors rendered the BiOp, and Section 7 consultation as a whole, arbitrary and capricious.  TNF's reliance on those findings was likewise contrary to the record, arbitrary, capricious, and in violation of TNF's independent duty to ensure that its action would not jeopardize the cuckoo or destroy or adversely modify cuckoo critical habitat.  16 U.S.C. § 1536(a)(2); *see Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 532 (9th Cir. 2010) ("Arbitrarily and capriciously relying on a faulty Biological Opinion violates this duty.") (quoting *Defs. of Wildlife*, 420 F.3d at 976).  The Court should hold that the BA, BiOp, and TNF's reliance on the BiOp violated the ESA.

**2.    The BiOp relied on empty mitigation measures.**

A BiOp may rely on mitigation measures only if they are "reasonably certain to

yield tangible benefits." *Ctr. for Bio. Diversity v. Haaland*, 87 F.4th 980, 988–89 (9th Cir. 2023).  This standard requires evidence that the measure will "offset the environmental damage caused by the project," so a mere "general commitment to future improvements—without more specificity—is insufficient." *Bernhardt*, 982 F.3d at 743 (internal quotation marks omitted).  A promise to monitor and *consider mitigating later* does not suffice.  *See, e.g.*, *Ctr. for Bio. Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1153 (D. Ariz. 2002); *Nat. Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322, 352 (E.D. Cal. 2007).

The BiOp here failed those requirements.  The only purported mitigation it identified for the cuckoo and its habitat involved: (i) surveying for cuckoos, the details of which PVMC was still "developing" in the Biomonitoring Plan; (ii) monitoring of riparian habitat and proposed cuckoo critical habitat, which PVMC was still "developing" in the Biomonitoring Plan; and (iii) water resource monitoring, which PVMC was still "designing" through the Water Monitoring Plan.  FWS_000610–11.  In other words, the BiOp's mitigation measures were merely plans that did not yet exist.  Moreover, if monitoring "identifie[d]" unspecified "thresholds," PVMC would be required—not to fix the problem—but merely to "coordinate" with TNF to "identify appropriate actions and/or mitigation measures to address the identified effects" at some later, undefined time.  FWS_000611.  It was a plan to have a plan to have a plan.  *See Rumsfeld*, 198 F. Supp. 2d at 1154 (rejecting a plan to monitor and "come up with a long-term plan").

The inadequacy of this figure-it-out-later approach was no secret.  Throughout the Section 7 consultation process, both TNF and FWS personnel questioned the validity of their monitoring-only framework and acknowledged that concrete mitigation *actions* were needed.  *Supra*, p. 12:20–13:13.  But FWS did not apply its expertise or judgment in the BiOp to resolve these concerns; it did not even acknowledge them.  Nor did it offer any analysis of the measures' utility or efficacy.  Thus, FWS' blind acceptance of these vague, non-substantive mitigation measures, untethered to any scientific judgment, is owed no deference and was arbitrary and capricious.  *See Haaland*, 87 F.4th at 989–90;

*Bernhardt*, 982 F.3d at 743, 748.

The monitoring-based mitigation approach was unlawful for another reason: the triggers for mitigatory action were defined relative to already-degraded conditions. The ESA prohibits "comparing the effects of the [action] against the baseline conditions that have already contributed to the [species'] decline." *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 878 F.3d 725, 737–38 (9th Cir. 2017). Instead, agencies must "*[a]dd* the effects of the action . . . *to* the environmental baseline," evaluating whether the baseline and new effects, combined, cause jeopardy. 50 C.F.R. § 402.14(g)(4) (emphasis added). Any other rule would allow "listed species [to] be gradually destroyed, so long as each step on the path to destruction is sufficiently modest"—a "slow slide into oblivion [that] is one of the very ills the ESA seeks to prevent." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 930 (9th Cir. 2008).

But that is precisely what the Federal Defendants did here. Per the Biomonitoring Plan, PVMC and TNF must discuss (unspecified) mitigation actions only if monitoring reveals changes to vegetation "compared with values recorded *during the first year of monitoring*." TNF_59072 (emphasis added). In other words, so long as the mine's continued pumping merely maintains riparian degradation recorded in 2022 (the first year of monitoring), no mitigation action will be required. The nine years of degradation that the mine caused between 2013 and 2022 will be completed ignored—even though the mine's continued pumping will, at minimum, *extend* the preexisting degradation and *delay* the creek's ecological recovery. *Supra*, p. 9:22–10:10, 16:2–16, 21:16–18.

Allowing the mitigation baseline to reset in this way would encourage permittees like PVMC to create as much damage as possible before Section 7 consultation begins. That concern is especially salient here given that PVMC began degrading the creek while operating under expired permits. TNF_57710; TNF_57715. If TNF had required permit renewal in a timely manner, it would have undergone Section 7 consultation *before* PVMC began dewatering the creek. Its negligence cannot now excuse failure to mitigate the ongoing damage to threatened and endangered species.

- 28 -

In sum, the Federal Defendants failed to "insure" that PVMC's ongoing pumping will not jeopardize the cuckoo or destroy its critical habitat.  16 U.S.C. § 1536(a)(2).  They violated the ESA.

### B.    TNF violated NEPA (*Claims 2 and 3*).

With its "look before you leap" mandate, NEPA requires agencies to take a "hard look" at the environmental consequences of their actions before taking them.  *Robertson*, 490 U.S. at 350 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410, n.21).  They must also identify and analyze the efficacy of any mitigation measures included to reduce a project's environmental effects.  *S. Fork Band*, 588 F.3d at 727.  These requirements are all the more important against the backdrop of governing law requiring TNF to "minimize" harm to forest resources, including fish and wildlife.  *Infra* p. 33:21–34:16.

Here, TNF did neither.  It leaped before it looked, and in so doing violated NEPA.

### 1.    TNF failed to take a hard look at the mine's effects on Pinto Creek's northern perennial reach.

NEPA's hard look requirement obligates agencies to evaluate "all foreseeable direct and indirect impacts" of their actions.  *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002).  The geographic area included in an EIS "must represent a reasoned decision and cannot be arbitrary."  *Id.*; *see also Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1513 (2025) ("[I]nherent in NEPA . . . is a 'rule of reason.'") (quoting *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004)).  Thus, an EIS is unlawful if it ignores impacts by irrationally constraining its analysis to an area smaller than the full geographic scope of foreseeable effects.  *Idaho Sporting Cong.*, 305 F.3d at 973–74 (enjoining project where EIS limited analysis to species' "home range" despite agency's "own findings that there would be significant depletion of habitat" at a larger "landscape scale"); *see also, e.g.*, *Native Ecosystems Council v. Weldon*, 848 F. Supp. 2d 1207, 1216–17 (D. Mont. 2012) (similar), *vacated on other grounds*, No. 11-cv-00099, 2012 WL 5986475 (D. Mont. Nov. 20, 2012); *W. Watersheds Project v. Salazar*, 843 F. Supp. 2d 1105, 1127–28 (D. Idaho 2012) (finding

"wider scope of analysis" was necessary due to known "wide-spread destruction" of species' habitat in surrounding areas).

Here, TNF's analysis of the pumping's effects on plants and wildlife was unreasonable and arbitrary because it omitted Pinto Creek's northern perennial reach, precisely where much of the impact would occur.  Like the BA and BiOp, Chapter 3.3 of the FEIS, titled "Biological Resources (Vegetation, Fish and Wildlife, and Special Status Species)," and Appendix C of the FEIS, titled "Biological Evaluation," were both limited to "the area subject to a change in groundwater level of 5 feet or greater as modeled." TNF_57863; TNF_58574.  TNF simply excluded all plant and animal communities downstream of the 5-foot drawdown area—those in the northern perennial reach—from its analysis, despite the voluminous evidence of harm there.  *See, e.g.*, TNF_57905 (discussing "[e]ffects of the proposed action and alternatives on fish and wildlife . . . *within the analysis area*" (emphasis added)).

As a result, numerous species received short shrift in the FEIS.  As just one example, populations of desert sucker, a native fish species, were detected in Pinto Creek both inside the analysis area "just downstream" of the mine and "outside the analysis area" in the northern perennial reach.  TNF_58586.  The FEIS evaluated only those populations "[w]ithin the analysis area," ignoring effects to the downstream populations. TNF_57953; *see generally* TNF_57946–57 (evaluating effects on numerous plant and animal species only within the defined analysis area); TNF_58575–602 (same).

TNF failed to explain why effects on these downstream populations were not worthy of inclusion in its analysis of effects on vegetation and wildlife.  Even if TNF believed that, in the abstract, the modeled 5-foot drawdown contour would capture all biological effects—an assumption belied by  the record—the significant evidence of baseflow reduction and riparian die-off downstream of that area should have made TNF reconsider.  But it did not.  It simply proceeded as though PVMC's pumping, which had already caused an 82 percent reduction in baseflow at the Magma Weir, would have no effect on vegetation and wildlife just a short distance downstream and below the arbitrary

5-foot contour line.  The Court should find that analysis arbitrary, capricious, and contrary to NEPA.  *Idaho Sporting Cong.*, 305 F.3d at 973–74.

### 2. TNF failed to identify and analyze appropriate mitigation measures.

Akin to the ESA, NEPA "require[s] that an EIS discuss mitigation measures, with 'sufficient detail to ensure that environmental consequences have been fairly evaluated.'" *S. Fork Band*, 588 F.3d at 727 (quoting *Robertson*, 490 U.S. at 352).  To fulfill that requirement, agencies must provide sufficient detail about the measures and "an assessment of whether [they] can be effective."  *Id.*; *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1381 (9th Cir. 1998) (holding that vague and general references to mitigation failed to provide sufficient detail of measures and their effectiveness).  Importantly, mitigation measures must be identified and evaluated *before*, not after, harmful effects occur.  *S. Fork Band*, 588 F.3d at 727.

Here, TNF both failed to identify mitigation actions with reasonable specificity and failed to evaluate the effectiveness of the vague, lackluster measures it did identify.

***First***, the FEIS included no details for implementing concrete mitigation *actions*, leaving that task for some unspecified future time.  *Supra* p. 16:24–17:19; *see also, e.g.*, TNF_57966 (acknowledging that "no specific restoration . . . activities [were] proposed" in the Biomonitoring Plan).  While TNF's last-minute modification to the Water Monitoring Plan listed, for the first time, *concepts* for real mitigation action, it provided no details on how or when they might be implemented.  TNF_60441–42.

However, in providing that late-breaking list of potentially "appropriate and practicable" actions, TNF_60442, TNF conceded that real mitigation options were available and should have been analyzed.  The listed actions included: "[s]ecuring alternative water sources for mining operations;" "[i]mproving on-site water conservation measures;" and [o]ptimizing the Peak wellfield performance including . . . [by] changing the configuration of the pumped wells."  TNF_60442.  One of these stands out as plainly feasible, appropriate, and suitable for implementation all along: optimizing the Peak Well

- 31 -

field to minimize adverse effects to Pinto Creek.  In its 2020 letter to ADWR, TNF highlighted a list of eleven Peak Wells that it believed were "the most likely to be pumping appropriable surface water" from the creek.  TNF_61818.  The FEIS likewise acknowledged that "[p]umping from some Peak Wells may have a greater effect than others based on well depth and proximity to Pinto Creek."  TNF_57804.  But the FEIS rejected, without analysis, the idea of a pumping optimization plan on the basis that PVMC lacked "excess pumping capacity that would allow for idling of Peak Wells closest to Pinto Creek."  TNF_57804–05.

The record disproves that claim.  As the FEIS explained, while average production from the Peak Well field is 3,500 gallons per minute ('gpm'), "[a]nnual production can range from 3,000 [gpm] to 3,700 [gpm]."  TNF_57740.  So the mine had flexibility— spanning 700 gpm—in how much water it used.  *See also* TNF_57740 n.5 (stating that the number of wells in the Peak Well field "is subject to change based on project needs").  The eleven wells on TNF's most-wanted list each produced, on average, anywhere from zero to 524 gpm, TNF_61818, meaning PVMC almost certainly could have idled any of those wells while keeping overall pumping volumes within normal parameters.  Between TNF's findings about the mine's variable—and seemingly discretionary—pumping volumes and its eleventh-hour characterization of a pumping optimization plan as "appropriate and practicable," TNF_60442, there was no rational basis not to at least *analyze* such a plan (and/or the other two options above).  But TNF did not.

***Second***, TNF did not evaluate the effectiveness of the mitigation measures that it did include in the FEIS.  Its conclusory sentences claiming that each monitoring measure would be effective, without explaining how they would actually mitigate the loss of water or associated harm to the creek, was insufficient.  *See* TNF_59024 (Biomonitoring Plan, BR-1); TNF_59044 (Water Monitoring Plan, WR-1); TNF_59046 (annual "workshop," WR-3); TNF_ 59047 (water rights, WR-4).  Likewise, the late amendments to the Water Monitoring Plan offered no analysis of their purported effectiveness.  TNF_60442.

This failure strikes at NEPA's core purpose: had TNF conducted the analysis, it

would have recognized that the measures were unlikely to be effective. For example, the water rights mitigation measure (WR-4) claimed that PVMC would "monitor[] groundwater levels downstream of the mine" and that any "[a]dverse impacts on . . . water rights would be identified and mitigated as required under Arizona State law." TNF_59047. But TNF had already concluded that mine-induced drawdown was impairing its instream water right, TNF_61814, and still allowed PVMC's pumping to continue unabated. Thus, the assumption underlying TNF's approach—that the mitigation duty could be fulfilled at some future point when further monitoring showed harm—was fatally flawed. Scrutinizing the mitigation measures' effectiveness *before* approving the MPO, as NEPA required, would have revealed this error and allowed TNF to change course, which is NEPA's whole point. *See S. Fork Band*, 588 F.3d at 727.

The same is true of TNF's NEPA failings more broadly. Especially given the priority TNF placed on protecting Pinto Creek with its instream water right, the missing NEPA analysis—a hard look at the mine's effects on the northern perennial reach and proper evaluation of mitigation measures—might have led TNF to reject the MPO as proposed and to insist on pumping modifications to preserve the northern perennial reach. *See Seven Cnty.*, 145 S. Ct. at 1514. Because these failures amount to an abdication of TNF's NEPA duties and are not simply a disagreement with the agency's expertise, the Court should afford limited, if any, deference to TNF's ultimate decision.

### C.    TNF violated the Organic Act (*Claim 1*).

Regulations implementing the Organic Act require the Forest Service to ensure that forest resources are not unduly harmed by mining operations. Such operations must "be conducted so as, where feasible, to minimize adverse environmental impacts on National Forest surface resources." 36 C.F.R. § 228.8. And they specifically require the mine operator to protect "fisheries and wildlife habitat." *Id*. § 228.8(e). The Forest Service enforces these requirements by, among things, making "changes" or "additions" to a plan of operations as "necessary to meet the purpose" of the Part 228 regulations, i.e., by adding mitigation measures. *Id*. § 228.5(a)(3); *see Karuk Tribe*, 681 F.3d at 1025.

- 33 -

The minimization requirement is not an empty promise. Approval of a mining plan of operations without fulfilling the minimization requirement violates the Organic Act. *See Save Our Cabinets v. U.S. Dep't of Agric.*, 254 F. Supp. 3d 1241, 1252–55, 1258 (D. Mont. 2017) (finding Forest Service "violated the . . . Organic Act" by approving mining project despite modeling that showed the mine would cause "significant baseflow losses" to multiple nearby creeks in violation of state law); *Hells Canyon Preservation Council v. Haines*, No. 05-cv-01057, 2006 WL 2252554, at *2–3, *6 (D. Or. Aug. 4, 2006) (finding Forest Service violated Organic Act by approving mining project that would cause significant sedimentation in nearby streams). Similarly, the Forest Service violates the Organic Act and Part 228 regulations if it fails to impose feasible, environmentally protective mitigation measures. *See Rock Creek All. v. U.S. Forest Serv.*, 703 F. Supp. 2d 1152, 1158–59, 1166–70 (D. Mont. 2010) (finding Forest Service violated Organic Act by requiring mitigation for only one of two phases of mining); *cf. Idaho Conservation League v. Guzman*, 766 F. Supp. 2d 1056, 1072 (D. Idaho 2011) (faulting Forest Service for failing to demonstrate how it implemented off-road vehicle minimization criteria and rejecting conclusory statements as insufficient).

Here, as in *Save Our Cabinets*, *Hells Canyon*, and *Rock Creek*, TNF approved mining operations that were, and are, destroying critical water resources while failing to minimize those harmful effects. As explained, the record is replete with the harm that PVMC's mining operations are causing to Pinto Creek by both prolonging and worsening the suppression of the creek's baseflow. TNF's approval decision also enabled impairment of its legal instream water right—a forest resource in its own respect—by functionally surrendering that right to PVMC.

Given these known harms, TNF was obligated to assess and impose feasible mitigation measures. 36 C.F.R. § 228.8. It was certainly aware of its authority to do so. TNF_27330–31 (explaining that "[t]here are almost always changes [to the proposed plan of operations] required to meet the requirements for environmental protection at 36CFR228.8" and that TNF "ha[d] the flexibility to modify the proposed action to

- 34 -

address issues raised in the EIS process") (citing 36 C.F.R. § 228.5(a)(3)).  And feasible mitigation options existed, including a pumping optimization plan aimed at decommissioning or reducing pumping from Peak Wells with the greatest impact on Pinto Creek's flows.  *Supra*, p. 31:21–32:20.  By failing to examine and implement measures to minimize harm, TNF violated the Organic Act and Part 228 regulations. *See Rock Creek*, 703 F. Supp. 2d at 1166–70.

**CONCLUSION**

Based on the violations above, the Court should declare unlawful and vacate the BA, BiOp, FEIS, ROD, and TNF's approval of the MPO.  The APA is clear: courts "*shall* . . . hold unlawful and set aside agency action[s]" found to be arbitrary, capricious, or otherwise unlawful.  5 U.S.C. § 706(2) (emphasis added).  Hence, "vacatur and remand [to the agency] is the default remedy under the APA." *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025).

That default remedy is warranted here.  While courts may order remand without vacatur in "limited circumstances . . . when equity [so] demands," *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015), "the balance [of equities] has been struck in favor of affording endangered species the highest of priorities," *Tenn. Valley Auth.*, 437 U.S. at 194; *see also, e.g.*, *N. Plains Res. Council v. U.S. Army Corps of Eng'rs*, 460 F. Supp. 3d 1030, 1037 (D. Mont. 2020) (ordering vacatur and explaining that courts must "tip the scales in favor of the endangered species" when remedying ESA violations).  Furthermore, the Court could minimize any risk of disruptive consequences by tailoring its vacatur order to bar just the mine's pumping.  *See, e.g.*, *Hunters v. Marten*, 470 F. Supp. 3d 1151, 1181 (D. Mont. 2020) (vacating only "that portion" of a project for which Section 7 consultation was inadequate); *Mont. Wildlife Fed'n*, 127 F.4th at 52 (ordering remand without vacatur for NEPA violation but "enjoin[ing] the [agency] from permitting any surface-disturbing activity" on oil leases).

Such a remedy would give Pinto Creek a fighting chance to once more thrive as a jewel in the desert.

Respectfully submitted September 24, 2025.

*/s/ Thomas Delehanty*
Thomas Delehanty
Heidi McIntosh
EARTHJUSTICE
1125 17th Street, Suite 1010
Denver, CO 80202
(303) 623-9466
tdelehanty@earthjustice.org
hmcintosh@earthjustice.org

Roger Flynn
Western Mining Action Project
P.O. Box 349; 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
roger@wmaplaw.org

*Attorneys for Plaintiffs Grand*
*Canyon Chapter of the Sierra Club*
*& Maricopa Bird Alliance*

## STATEMENT REGARDING ORAL ARGUMENT

The Conservation Groups believe that oral argument would be beneficial given the significance of the legal and factual issues.

## CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2025, I electronically transmitted the foregoing and all exhibits to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

*/s/ Thomas Delehanty*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the above memorandum complies with the 35-page limit set forth in this Court's February 20, 2025 Order, ECF No. 25, and July 23, 2025 Order, ECF No. 40 (accepting parties' updated joint proposed briefing schedule).

*/s/ Thomas Delehanty*