**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Grand Canyon Chapter of the Sierra Club, et al.,

Plaintiffs,

v.

Neil Bosworth, et al.,

Defendants.

No. CV-24-02348-PHX-DWL

**ORDER**

In this action, a pair of nonprofit organizations, Grand Canyon Chapter of the Sierra Club and Maricopa Audubon Society (collectively, "Plaintiffs"), "challenge[] the U.S. Forest Service's decision to approve the expansion of an open pit mine whose water pumping is drying up Pinto Creek . . . within Tonto National Forest." (Doc. 1 ¶ 1.) Plaintiffs invoke certain Forest Service regulations, certain provisions of the National Environmental Policy Act ("NEPA"), and certain provisions of the Endangered Species Act ("ESA"). (*Id.* ¶¶ 137-70.)

The six named defendants (together, "the Federal Defendants") are (1) Robert Trujillo, in his official capacity as Forest Supervisor for the Tonto National Forest; (2) the U.S. Forest Service; (3) Brooke Rollins, in her official capacity as the U.S. Secretary of Agriculture; (4) Heather Whitlaw, in her official capacity as Field Supervisor for the U.S. Fish and Wildlife Service's Arizona Ecological Services Office; (5) the U.S. Fish and Wildlife Service; and (6) Douglas Burgum, in his official capacity as the U.S. Secretary of

the Interior. (*Id.* ¶¶ 21-26.)[1] Pinto Valley Mining Company ("PVMC"), which owns the mine in question and seeks to defend the Federal Defendants' actions, intervened at an earlier stage of the case. (Doc. 21.)

Now pending before the Court are the parties' cross-motions for summary judgment. (Docs. 42, 47, 48.) After the motions became fully briefed, the Court issued a tentative ruling (Doc. 63) and held oral argument (Doc. 64). For the reasons that follow, each motion is granted in part and denied in part.

## BACKGROUND

### I. Relevant Factual Background

Judicial review of an administrative decision is generally limited to the record that was before the agency when it rendered its decision. *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 331 (1976). *See also Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."). To that end, the Federal Defendants have provided certified copies of the Forest Service's and Fish and Wildlife Service's administrative records. (Doc. 30.)[2] The facts below are derived from those administrative records.

#### A. Pinto Creek

"Pinto Creek originates in the Pinal Mountains (elevation 6647 ft.) southwest of Globe, Arizona and flows northward approximately 34 miles before emptying into Roosevelt Lake (elevation 2140 ft.)." (TNF_0060563.) Pinto Creek is a "north-flowing stream that is predominantly intermittent with several perennial and ephemeral reaches." (TNF_0058251.) "Surface water flow in Pinto Creek is influenced by several components:

---

[1] Trujillo, Rollins, Whitlaw, and Burgum are not identified by name in the complaint because they did not hold their current roles at the time the complaint was filed. Under Rule 25(d) of the Federal Rules of Civil Procedure, they have been automatically substituted as official-capacity defendants.

[2] Certified copies of the administrative records were provided to the Court on a USB Drive. (Doc. 30.) Each agency's set of records was separately Bates-stamped. When referring to documents in the Forest Service's administrative record, the Court will use the format TNF_0000001, and when referring to documents in the Fish and Wildlife Service's administrative record, the Court will use the format FWS_000001.

rainfall runoff, interflow, and baseflow." (TNF_0058687.) "Rainfall runoff is the overload flow from precipitation." (*Id.*) "Interflow is shallow groundwater and infiltration within the alluvium . . . ." (*Id.*) "Baseflow" is the "groundwater contribution component to total stream flow." (*Id. See also* TNF_0058777 [referring to "groundwater discharge" as "baseflow"].)

As discussed, Pinto Creek has both intermittent and ephemeral reaches, as well as perennial reaches. (TNF_0058251.) "Ephemeral and intermittent springs and stream reaches flow only during or after wet periods in response to runoff events. By definition, these surface waters are not controlled by discharge from the groundwater flow systems. During the low-flow period of the year, ephemeral and intermittent springs and stream reaches typically are dry." (TNF_0058764.) "In contrast, perennial springs and stream reaches generally flow throughout the year. Flows observed during the wet periods in perennial springs and streams include a combination of surface runoff and groundwater discharge, whereas flows observed during the low-flow period are sustained entirely by discharge from the groundwater system." (*Id.*) "If the flow from the perennial spring or stream is controlled by discharge from the aquifer affected by mine-induced [groundwater] drawdown, a reduction of groundwater levels could reduce the groundwater discharge to perennial springs or streams with a corresponding reduction in spring flows, lengths of perennial stream reaches, and their associated riparian or wetland areas." (*Id.*)

Tonto National Forest is home to certain riparian areas. "Within the Tonto National Forest, riparian areas comprise less than 1% of the total land area (three million acres)." (TNF_0060566.) "[S]outhwestern riparian ecosystems . . . [are] [f]or the most part, . . . characterized by (1) their diverse and productive nature, and (2) their limited size," and "[r]iparian habitats in arid environments can be viewed as unique reservoirs of plant and animal diversity." (TNF_0060565.) "Most of Pinto Creek's riparian vegetation, wildlife, fish and recreation resource attributes are dependent upon maintaining a small, year-round baseflow and, to a lesser extent, upon maintaining occasional high flows and floods." (TNF_0027137.)

### B. Pinto Creek's Northern Perennial Reach

Pinto Creek's northern perennial reach is an approximately nine-mile segment that begins at the Pinto Valley Mine project's boundary. (TNF_0058455 [labeling the northern perennial reach as WR01].) "Lower Pinto Creek is a free flowing stream in the Sonoran Desert" that "supports a wide variety of plant and animal life." (TNF_0060571.)

### C. Tonto National Forest's Water Right

In 1983, Tonto National Forest ("TNF")[3] applied for a permit to appropriate water for Pinto Creek. (TNF_0060556-601.) In its application, TNF stated that "[a] continuous flow of water in lower Pinto Creek is needed to support existing aquatic life and wildlife. It is also important for preservation of recreational values." (TNF_0060566.) In 1999, the Arizona Department of Water Resources ("ADWR") granted TNF a "Certificate of Water Right" with a priority date of December 14, 1983. (TNF_0004578-81.) TNF holds the right to a Total Annual Volume of 1,794.2 acre-feet/year, and "[w]ater will not be diverted from the natural channel of Pinto Creek." (TNF_0004579.) "The beneficial use [is] for recreation and wildlife, including fish . . . ." (*Id.*)

### D. Western Yellow-Billed Cuckoo

In 2014, the U.S. Fish and Wildlife Service ("FWS")[4] listed the western yellow-billed cuckoo (sometimes, "YBC") as threatened, explaining, among other things, that "[w]ater extractions, both from surface water diversions and ground water pumping, can negatively affect riparian vegetation"; that "[w]ater diversions and withdrawals can lower ground water levels in the vicinity of riparian vegetation," which "is sometimes sufficient to induce water stress in riparian trees, especially in the western United States"; and that "[t]hese effects reduce and degrade habitat for the western yellow-billed cuckoo for foraging, nesting, and cover." (TNF_0017115.) FWS also proposed critical habitat units

---

[3] "TNF" is used throughout this order to refer to both Tonto National Forest itself and to refer collectively to the Forest Service defendants (i.e., Trujillo, U.S. Forest Service, and Rollins). The parties use "TNF" and "Forest Service" interchangeably.

[4] "FWS" is used throughout this order to refer to both the U.S. Fish and Wildlife Service itself and to refer collectively to the Fish and Wildlife Service defendants (i.e., U.S. Fish and Wildlife Service, Whitlaw, and Burgum).

for the YBC, including Pinto Creek South (373 acres) and Pinto Creek North (427 acres). (TNF_0016611-12.)[5] "Pinto Creek North (Unit 29) is a 6-mile-long segment from the northern end of the [Pinto Valley Mine] project boundary to a point 1.3 miles south of Blevens Wash." (FWS_000618. *See also* Doc. 48 at 6-7 [PVMC explaining that "Unit 29 begins near the Magma Weir and extends downstream (north) about six miles"].) This designation of critical habitat was finalized in April 2021. (TNF_0061822.)

E. **Pinto Valley Mine And Peak Well Field**

"The Pinto Valley Mine is an existing open pit copper and molybdenum mine located approximately 8 miles west of Miami, Arizona in Gila County." (TNF_0057660.) "The Pinto Valley Mine is located in the Globe-Miami mining district, which is among the oldest and most productive mining districts in the United States." (TNF_0057710.) "The general site of the Pinto Valley Mine has been mined by various entities over the past century." (*Id.*) The mine "was developed in 1972 and became operational in 1974" and "has operated continuously since 1974 with the exception of a short period of curtailed operations in 1983, and curtailments from 1998 to 2007 and from 2008 to 2012." (*Id.*) "In October 2013, [PVMC] . . . acquired the Pinto Valley Mine from BHP Copper, Inc. and now operates the mine." (TNF_0057711.)

The mine "encompasses an estimated 3,915 acres, of which 3,349 acres are on private lands and 566 acres are on National Forest System lands." (*Id.*) "Existing facilities at Pinto Valley Mine include, but are not limited to, the Open Pit and adjacent milling and processing operations, tailings storage facilities, waste rock disposal areas, roads, pipelines, transmission lines, wells, and other infrastructure." (*Id.*) "Although the majority of Pinto Valley Mine is located on private property, certain facilities and operations are located on National Forest System lands." (TNF_0057710.) "These uses were authorized by the Forest Service or the Bureau of Land Management (later transferred to the Forest Service in 1989) through rights-of-way, plans of operations, special use permits, or letter

[5] PVMC's motion states that Pinto Creek North encompasses 415 acres. (Doc. 48 at 6.)

agreements." (*Id.*)

"The Peak Well field was developed in the mid-1970s to provide water used at the site, which is transported to the mine site via surface and buried pipelines. National Forest System lands were used for pipelines to deliver some of the water from the Peak Well field to the Pinto Valley Mine site." (TNF_0057740.) "The pipelines on National Forest System lands supporting the Peak Well field were constructed following existing National Forest System roads; in some locations, new access roads were built to access well sites and provide a corridor for associated water pipelines." (*Id.*)

"The average annual water production rate for the Peak Well field is 3,500 gallons per minute," whereas the "average consumptive water use" for the whole Pinto Valley Mine is 9,722 gallons per minute. (TNF_0057739-40.) Of the 23 wells in Peak Well field, 22 are "industrial water supply wells" located on private land, and "one potable water supply well, Peak Well 37 . . . was previously authorized on National Forest System lands under special use permit Tonto 468." (TNF_0057740.)

F. **Mining Plan Of Operations**

In 2016, PVMC submitted to TNF a mining plan of operations ("MPO"). (TNF_0022477.)[6] The MPO "encompasses the following broad categories of actions that would extend the mine life by approximately . . . 19 years":

- Consolidation and authorization of previously authorized activities and permitted disturbances on National Forest System lands at the Pinto Valley Mine. Power lines, pipelines, roads, and other facilities and infrastructure on National Forest System lands at the Pinto Valley Mine are integral to the mining operations at the mine. As such, their authorization is most appropriate under a consolidated mining plan of operations.
- Authorization of new operations on National Forest System lands including expansion of the Open Pit and Tailings Storage Facilities Nos. 3 and 4, and construction or relocation of linear features (access roads,

[6] In 2009, "BHP Copper, Inc. (former Pinto Valley Mine owner) submitted a proposed mining plan of operations . . . for the administrative consolidation of . . . prior Federal land use authorizations to continue ongoing activities on National Forest System lands." (TNF_0057710.) However, PVMC's acquisition of the mine in 2013 came while any approval of BHP's MPO was still pending.

electrical power distribution lines, pipelines).

- Authorization of existing legacy encroachments on approximately 29 acres of National Forest System lands from prior mine operators associated with activities appurtenant to mining, such as roads, an equipment laydown yard, storm water ponds, powder magazines, and a water pipeline and stand.

(TNF_0057784. *See also* TNF_0057710-11.)

"In addition to the activities described above that require Forest Service approval, the integrated mining operations at Pinto Valley Mine also includes [PVMC's] actions on private lands that support ongoing and expanded mining operations." (TNF_0057784.) Although "the Forest Service does not have authority to regulate activities on private land,[7] . . . [t]hese other activities on private lands are interdependent parts of the integrated mining operations at the Pinto Valley Mine, they are closely related to the proposed operations on National Forest System lands, and they generally would not occur unless the Forest Service takes action to approve previously authorized activities." (*Id.*)

G. **Concerns Raised Regarding The Mining Plan Of Operations**

"While the MPO was pending approval, multiple groups raised concerns about impacts from the mine's pumping on Pinto Creek." (Doc. 42 at 9.) For example, on January 26, 2018, the Arizona Game and Fish Department ("AGFD") sent a letter to TNF after AGFD "conducted a site visit at Pinto Creek downstream of the Iron Bridge and Horrel Ranch on November 20, 2017 as related to the expansion and consolidations of the Pinto Valley Mine (PVM) Environmental Impact Statement (EIS)." (TNF_0031395.) The purpose of AGFD's visit was "two-fold":

1. To assess current riparian habitat conditions in response to receiving a public concern regarding habitat downstream of the Horrel Ranch and the [AGFD's] concern for potential depletion of surface water in Pinto Creek (AGFD April 27, 2017; M17-03275056)
2. To investigate current stream and riparian habitat conditions in the Pinto Creek watershed in preparation for review and comment as a cooperating agency on the developing Pinto Valley Mine EIS.

---

[7] As discussed in greater detail below, Plaintiffs dispute that TNF lacks regulatory authority over PVMC's pumping on private land.

(*Id.*) AGFD "personnel hiked an approximate 1.5 mile reach of Pinto Creek, downstream of Horrel Ranch, beginning at the FR1020/Pinto Creek crossing and just upstream of the USGS [U.S. Geological Survey] stream gage station (09498502) [also known locally as the "Magma Weir," discussed in greater detail below]; and to a point where riparian vegetation mortality visually appeared to decrease." (*Id.*) AGFD "personnel concluded that riparian tree mortality appears to be high and of significant concern." (TNF_0031396.) AGFD "note[d] that the observed conditions appear to be divergent from other current local riparian habitat conditions observed this past year by [AFGD] personnel . . . ; and from what [AGFD] know[s] historically about the area of interest along Pinto Creek." (*Id.*) AGFD expressed that it was "concerned that this situation is a local impact related to water use as opposed to a regional concern related to drought and significant use of that water can exceed the sustainable levels protecting instream flows and habitats for fish and wildlife Mines are one of the largest consumers of water in the Pinto Creek area of concern (and watershed), and may be a significant contributing factor(s) influencing the hydrology and functions of the ecosystem." (*Id.*) AGFD "recognize[d] the two major copper mines: Carlotta [sic] and Pinto Valley Mine, both operating upstream of the area of concern and utilizing the local groundwater resources that influence surface water resources within Pinto Creek." (*Id.*) Ultimately, AGFD "conclude[d] there [was] a need, within the EIS process *and* irrespective of the EIS process, to determine . . . if current rates of Peak Well Field pumping and water use are impacting surface water resources, native fish populations, and/or causing riparian habitat mortality along Pinto Creek." (TNF_0031396-97.) AGFD stated it was "concerned with the current situation and future long-term conservation and protection of Pinto Creek perennial surface flows, riparian habitat, native fish populations and other riparian wildlife obligate; and request[ed] attention and additional investigation to evaluate further." (TNF_0031397.) AGFD stated that it "believe[d] there are current wildlife habitat losses, potential for losses to increase potentially due to ongoing water use by mining operations in the Pinto Creek watershed, and that Pinto Creek instream flows have already been cumulatively impacted based on a

cursory review of the USGS stream flow gage data." (*Id.*)

Likewise, Salt River Project ("SRP"), a utility in the Phoenix area, provided comments on the proposed MPO, stating that its "greatest concern is that the streamflow in Pinto Creek has been impacted by well pumping by [PVMC]" and that "[t]he recent decline in the health of the riparian habitat within Pinto Creek is evidence of that impact." (TNF_0040873.) SRP stated that it was "interested in ensuring that potential impacts to the water resources caused by PVMC operations are studied and that any impacts are sufficiently monitored and appropriately mitigated." (*Id.*) SRP provided an analysis of USGS streamflow data "and identified potential impacts caused by increased pumping of the PVMC Peak Well System." (TNF_0040874.) SRP suggested that "groundwater pumping from the PVMC Peak Well System is impacting surface water flows" and that "[t]hese impacts include harming the aquatic and riparian resources located within Pinto Creek corridor." (*Id.*) SRP also stated that "Pinto Creek . . . [has] been fully appropriated by SRP" and others and that "any reduction in the flows of Pinto Creek and in the alluvium underlying Pinto Creek caused by pumping from PVMC Peak Well System must be mitigated." (TNF_0040877.)

H. **Draft Environmental Impact Statement**

"Approval of the proposed [MPO] under applicable regulations (Title 36 part 228, subpart A of the Code of Federal Regulations [CFR]) is considered a major Federal action subject to" NEPA. (TNF_0057706.) "Accordingly, the Forest Supervisor determined that preparation of an [Environmental Impact Statement ('EIS')] was necessary to identify the scope of issues associated with the proposed [MPO], identify and assess reasonable alternatives to the proposed [MPO] in order to minimize adverse effects on National Forest System surface resources to the extent feasible, and evaluate and disclose the potential significant environmental effects." (*Id.*) The Forest Service began that process in 2017 by engaging in public scoping, which included, among other things, public meetings and receiving and addressing comments. (TNF_0060118-19.)

In December 2019, and pursuant to NEPA, TNF released a Draft Environmental

Impact Statement (the "Draft EIS" or "DEIS"). (TNF_0060766.) As part of the "Environmental Consequences" analysis, the DEIS explained that "[a] calibrated three-dimensional numerical groundwater flow model was developed for the EIS to estimate effects on groundwater and surface water resources resulting from groundwater extraction and water management activities that would occur" as a result of approving the proposed action. (TNF_0061283.) This model was produced by SRK Consulting, Inc. ("SRK"). SRK's "groundwater model was used to simulate the changes in groundwater elevations and groundwater discharge rates that occurred after restarting active mining at the Pinto Valley Mine at the beginning of 2013 and the end of 2018." (TNF_0061284.) Among other things, "[t]he model results predict[ed] that over the 2013-2018 period, the baseflow to Pinto Creek was substantially reduced from an initial rate of 1,070 gallons per minute (start of 2013) to 188 gallons per minute (end of 2018) (figure 3-18). This represents an 82 percent reduction in baseflow compared to the estimated average baseflow conditions at the Magma Weir at the end of 2013." (*Id.*)[8] The DEIS also "show[ed] a comparison of actual flow volume at the Pinto Creek near" the Magma Weir "to the flow volume required to maintain sufficient flows in Pinto Creek per [TNF's] instream flow right" and found that "[i]n recent years the number of consecutive months recording zero flow has increased"; and although "[t]here were no months recording zero flow in the period of record until 2014," there were "26 months recording zero flow between January 2014 and December 2018." (TNF_0061280.)

The DEIS also found that SRK's "[m]odel simulations predict[ed] that impacts on baseflow occurred as a result of pumping from the Peak Well System during the 2013-2018" period and that those impacts "would continue at a similar magnitude until pumping

---

[8] The model developed for the DEIS simulated baseflow reductions at a gaging station locally referred to as the Magma Weir. (TNF_0061284; TNF_0061297.) "The Magma Weir lies downstream (north) of the mine and Peak Well field along Pinto Creek's northern perennial reach, and approximately 0.4 miles downstream of the northern 'edge' of the modeled 5-foot drawdown contour." (Doc. 42 at 10-11, citing TNF_0059186, TNF_0040654, and TNF_0059223.) As discussed later in this order, the 5-foot groundwater drawdown contour, as modeled by SRK, is what the agencies used to draw the boundary of the ESA "action area" and the NEPA "analysis area."

ceases under the proposed action." (TNF_0061297.) The DEIS further found that "[c]ontinued pumping from the Peak Well System under the proposed action scenario is predicted to extend the duration of the predicted impacts on baseflow for an additional 12 years" and that "long-term reduction in baseflow would likely result in a measurable reduction in flow (or elimination of surface flow) that would be particularly noticeable during the low-flow periods." (*Id.*) The DEIS found that "[a]s a consequence, segments of Pinto Creek that were previously characterized as perennial prior to 2013, and that may have been affected by pumping that occurred between 2013-2018 (and no longer sustain perennial flow conditions), would be expected to continue to be affected at a similar magnitude but for a longer duration." (*Id.*)

SRK's model also "predicted changes in groundwater levels" and defined the "drawdown area" as "the area predicted to experience a reduction in groundwater levels of 5 feet or more at any point in time over the mining or post-mining periods." (TNF_0061284.)

In determining the effects of the proposed action on "biological resources," the DEIS defined the "analysis area" as "consist[ing] of portions of the following sixth-level hydrologic units (12-digit hydrologic unit code subwatersheds) that are north of U.S. Highway 60: Upper Pinto Creek (150601030703), Middle Pinto Creek (150601030704), and Lower Pinto Creek (150601030706), as well as areas affected by surface disturbance or water withdrawals outside these subwatersheds." (TNF_0060952.) The DEIS's analysis area for biological resources extended "beyond the modeled 5-foot drawdown contour and included all of Pinto Creek's northern perennial reach." (Doc. 42 at 10, citing TNF_0061362 [Map 3-2 showing Biological Resources Analysis Area (purple) covering entire northern perennial reach].)

The DEIS stated that "[t]he results of groundwater model simulations for Pinto Valley Mine (SRK Consulting, Inc. 2019a, 2019d) indicate the [groundwater] drawdown associated with the projected pumping from the Peak Well System under the proposed action would contribute to, or extend the duration of, reductions in groundwater levels over

a broad area surrounding the well field and reduced baseflows in Pinto Creek adjacent to and downstream of the well field." (TNF_0061301-02.)

The DEIS also proposed mitigation measures "to provide for an adaptive management approach for monitoring and mitigation of impacts on surface water and groundwater resources resulting from drawdown-related impacts resulting from the project." (TNF_0061302-03.)

Plaintiffs, among other organizations, provided comments on the DEIS. (TNF_0049427.) In their comments, Plaintiffs stated:

> Die off of riparian vegetation in Pinto Creek below the mine was noticed shortly after Capstone reopened the mine in 2013. A recent field trip by Sierra Club members revealed about half a mile of dead and downed trees in the vicinity of the Magma Weir. Tree mortality of this magnitude has not been observed by our members in this area previously – Club members have been visiting Pinto Creek for decades. Both Miller Ecological Consultants and [AGFD] (p. 3-60 to 61) have studied and documented the die off of vegetation and have noted that such impacts have not occurred on other nearby creeks. Clearly, groundwater pumping has lowered the water table and depleted flows to the point where major segments of the creek are being killed off.

(TNF_0049441.) Plaintiffs also expressed concerns about the monitoring-focused mitigation measures in the DEIS:

> There is little meaningful mitigation to prevent what may occur to Pinto Creek. . . . Of the 5 mitigation measures proposed, none require the mine owners to do anything beyond monitoring and reporting.

(TNF_0049443-44.) Plaintiffs also argued that "[t]he DEIS unequivocally shows that the Pinto Valley Mine is in effect appropriating surface waters from Pinto Creek, and [Forest Service] approval of continuing and expanded operations will only make the situation worse. The Forest Service 1983 instream flow priority right greatly predates any competing claim." (TNF_0049449.)

TNF considered these and other comments on the DEIS. (TNF_0059414-553; TNF_0060120.)

…

I. **Draft And Revised Biological Assessment**

In February 2020, TNF sent FWS a draft "biological assessment addressing potential effects of the Pinto Valley Mine project" and "request[ed] formal consultation [per the ESA] on threatened western yellow-billed cuckoo (*Coccyzus americanus*) and conference on proposed critical habitat for western yellow-billed cuckoo." (FWS_000038.) The draft biological assessment ("BA") used the same "action area" as the DEIS. (FWS_0000067.) Thus, "the draft BA's 'action area' included the Magma Weir and all of Pinto Creek's northern perennial reach." (Doc. 42 at 11, citing FWS_000046 [map at Figure 1-1 showing Biological Resources Analysis Area (purple) covering entire northern perennial reach].)

In terms of mitigation measures, the draft BA identified the following "Impact" to be addressed:

> **Impact:** The results of groundwater model simulations for Pinto Valley Mine (SRK Consulting, Inc. 2019a, 2019c) indicate the drawdown associated with the projected pumping from the Peak Well System under the proposed action would contribute to, or extend the duration of, reductions in groundwater levels over a broad area surrounding the well field and reduce baseflows in Pinto Creek adjacent to and downstream of the well field. The projected drawdown area indicates that drawdown would also likely encompass other identified surface water resources (seeps and springs). Reductions in baseflow and seepage from mine facilities could affect surface water and groundwater quality.

(FWS_000066.) To address this impact, the draft BA adopted the mitigation measures from the DEIS. (*Id.*) The draft BA also included additional monitoring protocols for "[i]mpacts on fish and wildlife from water drawdown associated with project-related water use" (FWS_000063), as well as surveying and monitoring for YBC (FWS_000064).

PVMC provided TNF with comments on the draft BA. (FWS_000120.) Among other things, PVMC argued that "the Forest Serice's action area [was] clearly excessive." (FWS_000121.) Specifically, PVMC argued:

> A primary reason for this grossly oversized action area is that the Forest Service considered effects that are *not* reasonably certain to occur. The most obvious example is the agency's consideration of 'potential tailings dam

> breach.' BA at 18. There is no clear and substantial information showing that a tailings dam breach is reasonably certain to occur. Even the Forest Service acknowledges the highly speculative nature of this event, stating "the probabilistic risk of dam failure is unknown, but it is not zero." The long-term impacts of water withdrawals and potential contamination of water resources, are likewise speculative in nature. BA at 17-18.

(FWS_000121-22.) "PVMC also pushed back on the agency's proposed mitigation measures." (Doc. 42 at 11, citing FWS_000150-51.)

TNF "held a series of teleconferences in March and April 2020 to coordinate with [FWS] on the [ESA] Section 7 process." (FWS_000220.) During a Section 7 consultation meeting on March 17, 2020, Greg Beatty (USFWS) "said the action area appears somewhat broadly defined and asked for additional explanation as to how it was delineated." (TNF_0051036.) Laura Stewart (ICF) "explained that the northern extent of the action area includes and extends beyond the 5-foot modeled groundwater drawdown contour to capture the area of potential effects in the event of a dam breach and runout." (*Id.*) Mindy Vogel (USFS) "said extending the analysis area to accommodate the potential runout area may not be appropriate if it represents a 'worse case' scenario not expected to occur." (*Id.*) Stewart "said the dam breach was analyzed as a potential effect in the absence of an assessment quantifying the level of risk," and Beatty "recommended omitting the effects of a dam breach and runout from the BA, but could reinitiate consultation later if such an even[t] occurred." (TNF_0051037.)

During a Section 7 consultation meeting on March 25, 2020, Stewart explained that "the BA currently characterizes the dam breach as an unlikely event." (TNF_0051059.) Stewart also "recommended further discussion with hydrologists and biologist to determine likely downstream extent of drawdown effects on surface water" to "inform how to redraw the northern boundary of the biological resources analysis area or action area." (*Id.*)

During a Section 7 consultation meeting on March 30, 2020, Stewart "explained that ICF [was] revising the action area to remove the area potentially affected by a dam breach and runout event." (TNF_0051071.) Stewart also noted that "[a] challenge in delineating the northern action area boundary is that the water modeling done does not

estimate how far downstream the effects of drawdown may occur in the perennial reach of Pinto Creek." (*Id.*) It was decided that "[f]or the BA, ICF/ACS [would] revise project overview map or provide additional maps depicting the inputs for the action area, including: (1) watershed boundaries and (2) 5-foot groundwater drawdown contour" and "[p]rovide additional text describing rationale for action area extent." (TNF_0051073.)

The "[a]nalysis area" was also discussed during another meeting on April 6, 2020. (TNF_0051169.) During that meeting, and "[a]fter discussion, it was decided that the northern extent of the analysis area will not extended beyond the 5-foot drawdown contour to capture potential downstream effects, which have not been estimated quantitatively. Qualitative text should be added to the BA and EIS to explain the potential for downstream effects and limits of available data." (*Id.*) Following that decision, during a meeting on April 9, 2020, Vogel questioned "if surface flow could be affected downstream, beyond the drawdown contour." (TNF_0051206.)

Throughout the Section 7 consultation process, "[t]he agencies also discussed the draft BA's proposed mitigation measures." (Doc. 42 at 12.) In an email dated March 6, 2020, Beatty expressed that he had "some questions as [he] move[d] through the BA" and that "most are about the conservation measures and how many are monitoring based and don't specifically identify ways to reduce and minimize effects." (TNF_0051034.) During a Section 7 consultation meeting on March 17, 2020, the agencies again discussed mitigation measures:

> [Beatty] said the proposed conservation measures are primarily requirements for future monitoring, which place future burdens on the Forest Service and [FWS] to determine what actions need to be taken in response to monitoring. John [Priecko (ICF)] explained that monitoring and adaptive management are a key components of the proposed mitigation because of uncertainties regarding modeled effects and their causes, and complications presented by mixed landownership.
>
> [Beatty] and [Vogel] asked if any specific trigger points and clear requirements have been identified for adaptive management. Judd [Sampson (USFS)] explained that with the information currently available, various factors that make it difficult to determine causality to justify specific mitigation. [Priecko] explained that monitoring plans are currently under

> development that will provide more detail on how monitoring will occur and how results will be evaluated and acted upon.

(TNF_0051037.)

Mitigation measures were also discussed during a March 25, 2020 Section 7 consultation meeting, in which Beatty expressed concerns that Mitigation Measure B-3 in the BA "does not describe if, how, or when Pinto Creek riparian habitat would be restored" and that "Mitigation Measure B-5 does not identify a specific action to reduce or minimize effects." (TNF_0051059-60.)

During a Section 7 consultation meeting on March 30, 2020, Vogel "suggested asking for PVMC's input on mitigation" and noted that the "Forest Service could request voluntary mitigation for actions outside the agency's authority." (TNF_0051071.) Drew Ulberg (USFS) stated that "the [FWS] may want tangible mitigation up front, such as plantings or a habitat improvement escrow account, instead of deferring to monitoring." (*Id.*)

During a meeting on April 16, 2020, Patrick Plumley (PAI) "explained that [SRK's] groundwater model and Australian water balance demonstrate with reasonable certainty that the mine's pumping has been a primary cause of reduced baseflow in Pinto Creek." (TNF_0051230.) The notes from the meeting provide:

> [Plumley] explained that Mitigation Measure WR-1c was significantly watered down from its original language to now only require an annual meeting rather than requiring flow augmentation baseflow falls to certain levels. [Carlota Mine's] current mitigation plan, which includes flow augmentation, is based solely on the authority of a mitigation measure in the Carlota ROD. [Vogel] said the Forest Service generally had more authority to apply mitigation for Carlota because it is largely on NFS lands.

(*Id. See also* TNF_0051352.)[9]

On April 30, 2020, TNF sent FWS a revised BA. (TNF_0051356.)[10] The "action

---

[9] Plaintiffs' briefing identifies several other meetings during which mitigation measures were discussed, including discussion of whether a monitoring-only approach was appropriate. (Doc. 42 at 13.)

[10] Plaintiffs' brief says the revised BA was sent on April 29, 2020 (Doc. 42 at 13), but

area" for the revised BA was now limited "to the area subject to groundwater drawdown of five feet or greater as modeled by SRK Consulting, Inc. (2019a)." (TNF_51385; FWS_000238-40.)[11] This meant the entirety of Pinto Creek's northern perennial reach, including the Magma Weir, was now excluded. (FWS_000240 [map, Figure 3-1, showing "Action Area" (red outline)].) As for mitigation measures, the revised BA identified "Potential Impacts to Western Yellow-billed Cuckoo and Proposed Critical Habitat for Western Yellow-billed Cuckoo from Project-Related Effects to Riparian Vegetation and Hydrology" and proposed a surveying/monitoring approach, including proposing a Biological Resources Monitoring and Mitigation Plan ("BRMMP") that was still "being developed." (FWS_000238.)

### J. Appropriability Letter

In May 2020, before the final BA was complete, TNF wrote a letter to ADWR regarding TNF's water right for Pinto Creek. (TNF_0061814.) In that letter, TNF noted that "[s]ince October 2013, when [PVMC] re-started operations at the Pinto Valley Mine (PVM), flows through the instream flow reach of Pinto Creek have declined drastically." (*Id.*) TNF further noted that "calibrated three-dimensional numerical groundwater flow model created as part of the 2020 [DEIS] for [Pinto Valley Mine] shows an 82% percent decrease in baseflow in Pinto Creek has occurred from 2013-2018 as compared to the pre-mining calibration period" and that "[a] second watershed-based model also developed for the DEIS comes to a similar conclusion on baseflows." (*Id.*) "Given this evidence," TNF stated that it "believe[d] that wells operated by [PVMC] are having a direct and appreciable impact on surface water flow in Pinto Creek." (*Id.*) "Because of this observed and modelled impact, [TNF] respectfully request[ed] that ADWR make a determination of appropriability for near-stream wells operated by [PVMC]." (*Id.*)

On July 28, 2020—after TNF had completed its final BA—ADWR responded to

---

the cited email is dated April 30, 2020 (TNF_0051356).

[11] The action area included certain locations outside the 5-foot drawdown contour, but those were added to address effects not at issue here (e.g., surface disturbance and mine-related noise).

TNF's letter. (TNF_0061821.) ADWR stated that it was "unable to make the determinations of appropriability but may be able to provide [TNF] with any factual material available at the [ADWR] to assist [TNF] in the resolution of the issues at hand." (*Id.*)

K. **Final Biological Assessment**

In July 2020, TNF issued the final BA. (FWS_000526.)[12] The "action area" for the BA was described as follows:

> The action area includes area that could be directly or indirectly affected by the action and not merely the immediate area involved in the action (50 Code of Federal Regulations § 402.02). The boundary of the action area was defined as the furthest reaching effects of the action that could alter the ecological setting and thereby affect federally-listed species that were to be present. Activities and effects associated with this project that have the potential to alter the ecological setting include surface disturbance, traffic, artificial lighting, dust, noise, water withdrawals, and contamination of water resources. These activities are described in Section 3.2.
>
> *The furthest reaching effects of the proposed action generally correspond to the area subject to groundwater drawdown of five feet or greater as modeled by SRK Consulting, Inc. (2019a).* Areas beyond the modeled groundwater drawdown subject to surface disturbance, mine-related noise greater than 60 dBA as modeled by WestLand Resources, Inc. (2018b) or that are included in PVMC's unpatented claims and prior authorizations are also included in the action area. In total, approximately 40 square miles are included within the action area (Figure 3-1). The temporal boundary for analyzing direct and indirect impacts on federally-listed species from the implementation of the proposed action includes the active operation of Pinto Valley Mine and extends through closure and final reclamation, with some effects on vegetation composition and habitat continuing indefinitely into the post-closure period.

(FWS_000554, emphasis added.) Because Pinto Creek's northern perennial reach, including the Magma Weir, fell outside the modeled 5-foot groundwater drawdown contour, it was excluded from the BA's "action area." The same monitoring and surveying approaches were adopted for mitigation measures. (FWS_000552-53.)

As for the yellow-billed cuckoo, the BA explained, among other things:

---

[12] *See also* TNF_0054748.

> Other impacts on western yellow-billed cuckoos may occur as a result of loss or degradation of riparian vegetation along Pinto Creek. Continued operation of the Peak Well System would continue to drawdown groundwater within the action area, resulting in a modeled 10 percent increase in baseflow reduction in Pinto Creek over the period of active mining as compared to the baseflow reduction experienced from 2013-2018. Over the operational life of the mine, groundwater drawdown and associated baseflow reductions are anticipated to contribute to the deterioration of riparian vegetation along Pinto Creek, which has been subject to recent mortality and decline (Cedar Creek Associates, Inc. 2018, Miller Ecological Consultants, Inc. 2011, 2019, AGFD 2018a, WestLand Resources, Inc. 2020b; see *Chapter 2.1 Ecological Setting* for a full description). Deterioration of riparian vegetation would in turn result in the loss of non-breeding and foraging habitat for yellow-billed cuckoos. . . . Further, the Peak Well System would continue to operate for an additional 12 years under the proposed action, thus delaying recovery of affected riparian vegetation.

(FWS_000579.)

The BA ultimately determined that "[t]he proposed action may affect, and is likely to adversely affect, the western yellow-billed cuckoo" but was "not likely to result in the destruction or adverse modification of proposed critical habitat for the western yellow-billed cuckoo." (FWS_000581.)

L. **Biological Opinion**

In August 2020, FWS sent TNF its Biological Opinion ("BiOp"). (FWS_000601.)[13] The BiOp adopted the BA's action area. (FWS_000611.) In other words, the BiOp's action area excluded Pinto Creek's northern perennial reach, including the Magma Weir. (FWS_000634 [map, Figure 1-1, showing "Action Area" (red outline) that does not include the Magma Weir or northern perennial reach].) The BiOp also adopted the same "monitoring and mitigation plans" as the BA, including the BRMMP and Comprehensive Water Resource Monitoring and Mitigation Plan ("CWRMMP"), both of which were still being developed. (FWS_000610-11.)

Ultimately, the BiOp made the following determinations and reached the following conclusions:

---

[13] *See also* FWS_000484.

> After reviewing the current status of the western yellow-billed cuckoo and its proposed critical habitat, the environmental baseline for the action area, the effects of the action, as proposed, and the cumulative effects, it is our biological and conference opinion that the action, as proposed, is not likely to jeopardize the continued existence of the cuckoo, and is not likely to destroy or adversely modify proposed critical habitat.
>
> We base this conclusion on the following:
>
> • There are no known breeding cuckoos within the action area. We expect migrating and dispersing cuckoos can and will continue to use Pinto Creek within the action area for foraging, cover and shelter. We do not anticipate any fatalities, injuries, or other harm or harassment to individual migrating or dispersing cuckoos from the proposed action. Therefore, we anticipate no incidental take of cuckoos from the proposed action.
>
> • The ongoing and future proposed action will diminish the quality of approximately 308 acres of proposed cuckoo critical habitat for cuckoo conservation, but the proportion of the entire proposed designation affected is small. The adverse effects to proposed critical habitat are a small fraction (0.06 %) of the total 493,665 acres of proposed critical habitat across Arizona, California, Colorado, Idaho, New Mexico, Texas, and Utah.
>
> • The ongoing and future proposed action at Pinto Creek will affect 4.3 percent (308 acres) of the proposed cuckoo critical habitat in Tonto Basin (7,051 acres). Proposed critical habitat also occurs along the Salt River, and Tonto and Pinal Creeks. Breeding cuckoos occur on Rye, Cucamonga, Tonto and Cherry creeks; the Rockhouse Demonstration Site; Salt River; and the Rockhouse Demonstration Site within Tonto Basin.
>
> • Based upon the distribution of breeding cuckoos across Tonto Basin and the small proportion of proposed critical habitat affected within Tonto Basin and across the cuckoo's range, we do not expect [Pinto Valley Mine's] effects to Pinto Creek will reach a tipping point, preventing the bird's recovery or appreciably diminishing the conservation role of proposed critical habitat.
>
> We based the conclusions of this biological opinion on full implementation of the project as presented in the Description of the Proposed Action section of this document.

(FWS_000624-25.)

M. **Final Environmental Impact Statement**

In April 2021, TNF issued the Final Environmental Impact Statement ("Final EIS" or "FEIS"). (TNF_0057658.) The FEIS was 1,895 pages long and contained Appendices

A-J. (TNF_0057658-9553.) The FEIS analyzed and compared the effects of three alternatives: (1) a "No Action Alternative," under which "the Forest Service would not authorize use of National Forest System lands for the Pinto Valley Mine except those necessary for mine closure and reclamation" (the No Action Alternative "provide[d] a baseline for comparison of the environmental consequences of alternative 1 and the proposed action") (TNF_0057666-67); (2) "Alternative 1," which "would extend the mine life for approximately 7 more years than the no-action alternative" (TNF_0057670-71); and (3) the "Proposed Action," which would authorize the MPO and "would extend the mine life by approximately 12 years compared to alternative 1 and 19 years compared to the no-action alternative" (TNF_0057674, footnote omitted).[14]

As discussed, most of the Pinto Valley Mine and Peak Well field is located on private land. The FEIS stated that "the Forest Service does not have authority to regulate activities on private land"[15] but nevertheless described and analyzed "actions on private lands . . . in accordance with 49 CFR 1508.25." (TNF_0057714.)[16] The FEIS explained that "[t]hese other activities on private lands are interdependent parts of the integrated

---

[14] Other alternatives were considered but rejected for various reasons, including economic and technical infeasibility. (TNF_0057797-816.)

[15] As discussed later in this order, Plaintiffs dispute that the Forest Service lacked such authority.

[16] PVMC explains in its opening brief that 40 C.F.R. § 1508.5 contains the Council on Environmental Quality's ("CEQ's") NEPA regulations, "which required that 'connected actions' be discussed in the same EIS as the proposed federal action." (Doc. 48 at 4.) TNF's final Record of Decision explains:

> On July 16, 2020, the Council on Environmental Quality published a final rule to amend its regulations implementing the National Environmental Policy Act of 1969 (Council on Environmental Quality 2020). The final rule went into effect on September 14, 2020. In accordance with 40 CFR 1506.13, the amended regulations apply to any National Environmental Policy Act review process begun after September 14, 2020; however, an agency may apply the amended regulations to ongoing activities and environmental documents begun before September 14, 2020. The Notice of Intent for the Pinto Valley Mine EIS was published in March 2017 and the draft EIS was published in December 2019. As a result, the Pinto Valley Mine National Environmental Policy Act review and associated EIS are proceeding under the previous Council on Environmental Quality 1978 regulations, as amended, and existing Forest Service National Environmental Policy Act procedures (Council on Environmental Quality 1978).

(TNF_0060102.)

mining operations at the Pinto Valley Mine, they are closely related to the proposed operations on National Forest System lands, and they generally would not occur unless the Forest Service takes action to approve previous authorizations." (*Id.*) Thus, in analyzing the environmental consequences of the proposed action, the FEIS stated that "[t]he analysis areas" addressed in the FEIS "include the extent of potential impacts that could result from the alternatives, regardless of surface ownership." (TNF_0057818.)

The FEIS explained on several occasions that groundwater drawdown caused by the mine's pumping was predicted to reduce baseflow to Pinto Creek. (*See, e.g.*, TNF_0057723 ["Expansion of the Pinto Valley Mine and extension of the mine life under the proposed mining plan of operations could result in reductions in groundwater quantity associated with Pinto Valley Mine water use and could result in the potential for decreased flow and supply to the surface waters that are fed by groundwater, including Pinto Creek . . . ."]; TNF_0057917 ["Groundwater extraction under the no-action alternative is predicted to result in continued drawdown of the water table and reduced baseflow in Pinto Creek on private and National Forest System lands in the vicinity of the Pinto Valley Mine (SRK Consulting Inc. 2020a). From 2013 to 2018, the baseflow in Pinto Creek is modeled to have declined from an initial rate of 1,070 gallons per minute to 188 gallons per minute (SRK Consulting, Inc. 2019b)."]; TNF_0057922-23 ["Impacts may also be more pronounced under alternative 1 because baseflow in Pinto Creek is predicted to decrease to 73 gallons per minute by the end of active mining, 24 gallons per minute less than the 97 gallons per minute predicted under the no-action alternative. Furthermore, impacts from low baseflow during active mining would continue for approximately 7 more years, during which time aquatic and riparian resources would continue to deteriorate."]; TNF_0057924 ["Impacts would be the most pronounced under the proposed action because reduced baseflow in Pinto Creek occurs over the longest timeframe under this alternative. Similar to alternative 1, baseflow under the proposed action is predicted to decrease to 73 gallons per minute during the first 6 years of active mining. Baseflow is then predicted to increase to a maximum of 162 gallons per minute over the remaining duration of active mining,

which is lower than the 188 gallons per minute experienced in 2018 and the 2013 rate of 1,070 gallons per minute. Impacts from low baseflow during active mining would continue for approximately 12 more years than alternative 1 and 19 more years than the no-action alternative, during which time aquatic and riparian resources would continue to deteriorate."].).

The Water Resources and Geochemistry Technical Report ("the Water Resources Report"), appended to the FEIS as Appendix E, explained that the results of the model developed by SRK "predict[ed] that over the 2013-2018 period, the baseflow to Pinto Creek was substantially reduced from an initial rate of 1,070 gallons per minute (start of 2013) to 188 gallons per minute (end of 2018) (figure 3-18). This represents an 82 percent reduction in baseflow compared to the estimated average baseflow conditions at the Magma Weir at the end of 2012." (TNF_0058768.) The Water Resources Report further explained that SRK's "model simulated reductions in baseflow to Pinto Creek at the Magma Weir attributed to drawdown effects resulting from pumping from the Peak Well field over the 2013-2018 period." (*Id.*) And it explained that "[c]omparison of the average streamflow and number of zero-flow days recorded at the Magma Weir before and after the beginning of 2013 shows similar trends to those predicted by [SRK's] groundwater model for baseflow" and that "[t]hese results suggest that the reduction in the average streamflow and increase in the number of zero-flow days observed over the 2013-2016 period are not attributable to reductions in the annual precipitation (BGC Engineering USA, Inc. 2019)." (*Id. See also* TNF_0058690.)[17] The FEIS also reiterated that "*[m]odel simulations predict that impacts on baseflow occurred as a result of pumping from the Peak Well field during the 2013-2018 period*," and the FEIS predicted that such impacts on baseflow "*would continue at a similar magnitude until pumping ceases under the proposed action (2038).*" (TNF_0058292, emphasis added.) The FEIS also concluded that "*[c]ontinued pumping from the Peak Well field under the proposed action scenario is*

[17] From 1998-2006, "there were no days with zero flow reported at" the Magma Weir. (TNF_0058690.)

*predicted to extend the duration of the predicted impacts on baseflow for an additional 19 years*." (*Id.*, emphasis added.) The FEIS explained that "[t]he potential impacts on baseflow and on perennial stream flow in Pinto Creek in the affected area would be the same as those described under the no-action alternative in that long-term reduction in baseflow would likely result in a measurable reduction in flow (or elimination of surface flow) that would be particularly noticeable during the low-flow periods." (*Id.*) "As a consequence," the FEIS predicted that "segments of Pinto Creek that were previously characterized as perennial prior to 2013, and that may have been affected by pumping that occurred between 2013-2018 (and no longer sustain perennial flow conditions), would be expected to continue to be affected at a similar magnitude for a longer duration." (*Id.*) Additionally, the FEIS separately found that "[t]he predicted changes in groundwater levels under the proposed action indicate the drawdown area is predicted to continue to expand" and that "[a]t the 100-year post-mining timeframe, the proposed action drawdown area is 6 percent larger than under the no action alternative scenario." (TNF_0058291.)

In determining the effects of the proposed action on plant health, including riparian vegetation, the FEIS reiterated that "[c]ontinued pumping from the Peak Well field under the proposed action is predicted to result in a reduction in groundwater discharge to Pinto Creek at the Magma Weir from 1,070 gallons per minute at the beginning of 2013 (and 188 gallons per minute in 2018) to 162 gallons per minute at the end of mining (an 85-percent reduction from 2013 versus 90 percent under the no-action alternative and 93 percent under alternative 1)." (TNF_0057912.) It also explained that the "predicted drawdown area encompasses 5.86 miles of perennial streams, including portions of Pinto Creek (4.80 miles)," and predicted that "[r]iparian areas long these perennial reaches are anticipated to be indirectly affected by the continued pumping of the Peak Well field, which would result in a reduction in baseflow in Pinto Creek of greater magnitude than the no action alternative . . . but persisting for approximately 19 more years than the no-action alternative." (*Id.*) "As a result," the FEIS predicted that "reduction in baseflow during the operational life of the mine could be a greater contributing factor to mortality of riparian vegetation and loss

of functioning riparian habitat than both the no-action alternative and alternative 1." (*Id.*)

The "analysis area" for biological resources in the FEIS was—like in the BA and BiOp but unlike in the DEIS—generally limited to the 5-foot groundwater drawdown contour. (TNF_0057863; TNF_0058574.) Once again, Pinto Creek's northern perennial reach, including the Magma Weir, fell outside that 5-foot drawdown contour and was thus excluded from the FEIS's analysis area.

"Mitigation Measures" were detailed in Appendix H to the FEIS. (TNF_0059004.) The FEIS addressed eight general mitigation measures. (TNF_0059013-22.) The FEIS also addressed two mitigation measures for Biological Resources. (TNF_0059023-26.) As relevant here, the first of those, BR-1, "address[ed] potential impacts on vegetation, wildlife, and special status species from . . . project related water use, and potential effects on water . . . quantity that could affect vegetation, wildlife habitat, and special status species." (TNF_0059023.) BR-1 included the BRMMP, attached as Attachment A, which "outline[d] a program of monitoring, surveys, and potential mitigation and adaptive management to address the [ESA]-listed threatened [YBC] and its proposed critical habitat." (*Id.*) The "plan identifie[d] thresholds for these monitored ecosystem components and identifie[d] possible mitigation actions that could be taken if these thresholds are exceeded." (*Id.*) It proposed "no specific restoration or relocation activities" and instead proposed that "[i]f impacts are identified through surveys and monitoring, the plan identifies potential adaptive management approaches and mitigation measures that would be considered to reduce potential impacts." (TNF_0059024.)

The FEIS also addressed four mitigation measures for Water Resources and Hydrogeochemistry. (TNF_0059042-47.) As relevant here, WR-1 addressed "[m]ine-related drawdown and potential contamination of water resources from mine-related facilities that could affect groundwater and surface water quantity and quality." (TNF_0059042.) WR-1 included the CWRMMP, attached as Attachment D, which "provide[d] for a comprehensive approach to monitoring and tracking potential changes in groundwater . . . quantity . . . [and] surface water in Pinto Creek." (*Id.*) "The plan also

identifie[d] monitoring triggers and mitigation measures, actions, and adaptive management that would be considered to reduce potential impacts." (*Id.*) Specifically, the CWRMMP provided for an "adaptive management strategy" under which "PVMC [would] develop site specific mitigation plans, as necessary and feasible, to address reductions in baseflow or drying up of perennial stream reaches or springs that are directly and reasonably attributable to the mine operations." (TNF_0059198.) Also relevant here, WR-3 addressed "[m]ine related water use" and effects on surface water quantities and "beneficial uses downstream." (TNF_0059045.) It provided that PVMC would host meetings "to discuss Pinto Valley Mine water use" and "review observed and modeled surface water flows" and that the PVMC "could propose additional recommended monitoring and mitigation measures." (*Id.*) Last, WR-4 addressed "[m]ine-induced drawdown and well field pumping [that] could potentially reduce water levels and affect the active water rights within the projected drawdown areas" and made PVMC "responsible for monitoring groundwater levels downstream of the mine to ensure water rights within the projected mine-related and well field-related drawdown area are not affected as part of the water resources monitoring program (see Mitigation Measure WR-1)." (TNF_0059047.) WR-4 provided that any "[a]dverse impacts on water wells and water rights would be identified and mitigated as required under Arizona state law." (*Id.*)[18]

N. **Draft Record of Decision**

In April 2021, TNF issued its Draft Record of Decision ("Draft ROD"). (TNF_0059554.) The Draft ROD selected the proposed action (i.e., approving the MPO). (TNF_0059564.)

---

[18] Plaintiffs argue in their opening brief that "[t]he FEIS . . . did not evaluate other, more useful mitigation strategies in detail." (Doc. 42 at 17.) For example, Plaintiffs argue that "TNF declined to consider requiring PVMC to evaluate and optimize configurations of the Peak Well field and minimize pumping from wells with the greatest impact on the Creek." (*Id.*, citing TNF_0057804-05.) Similarly, Plaintiffs argue that "the FEIS summarily rejected options for alternative water sources, in part to avoid imposing additional costs for the mine." (*Id.*, citing TNF_0057801-06.) But the portions of the FEIS that Plaintiffs cite discuss potential alternatives for the EIS and not mitigation measures; Plaintiffs did not challenge the agencies' choice of project alternatives. (*Cf.* Doc. 55 at 14 n.4.)

Plaintiffs, among other organizations, provided TNF with objections to the FEIS and Draft ROD. (TNF_0059913.) TNF subsequently rejected those objections. (TNF_0060374-77.) In its rejections, TNF explained that it was updating the existing Mitigation Measure WR-1, which included the CWRMMP. (TNF_0060441.) That amendment provided for a two-tier approach. First, the amendment provided that PVMC would update the "groundwater model with data collected since the groundwater model was initially run." (*Id.*) It proposed two model reruns (anticipated 2021 and 2024), after which PVMC would "review the data to determine if trends are apparent." (*Id.*) Specifically, the update provided that "[s]hould data analysis indicate a decrease in surface or groundwater quantity, or that trends are indeterminate, PVMC will work with [TNF] to identify additional groundwater monitoring points, flow monitoring points, or additional well instrumentation that may be installed to verify the data and model results" and that "[t]he additional data collected would be incorporated in the subsequent model run." (TNF_0060442.) Second, "[b]ased on the analysis of trends and collection of additional data to confirm the findings, PVMC [would] coordinate with [TNF] to identify appropriate and practicable mitigation measures for those impacts deemed to mining related." (*Id.*) The update provided that "[s]uch measures may include":

1. Constructing guzzlers or similar features to offset reduced flows at seeps and springs;
2. Securing alternative water sources for mining operations;
3. Improving on-site water conservation measures; or
4. Optimizing the Peak wellfield performance including redrilling, rehabilitating or relocating Peak wells at the end of their functional well life and changing the configuration of the pumped wells to maximize capture of tailings seepage relative to regional groundwater.

(*Id.*)

O. **Final ROD**

In August 2021, TNF issued its Final Record of Decision ("Final ROD"). (TNF_0060096.) The Final ROD again selected the proposed action (i.e., approving the MPO). (TNF_0060107.) The Final ROD reiterated that the "Forest Service does not have authority to regulate activities on private land" but noted that "the actions on private lands

are described and analyzed in the final EIS in accordance with 40 C.F.R. 1508.25." (TNF_0060146.) Appendix B to the final ROD, titled "Monitoring and Mitigation Measures for the Selected Action," included, among other things, the BRMMP and the CWRMMP. (TNF_0060178-79; TNF_0060199-01.)

On November 3, 2021, the MPO was approved. (Doc. 42 at 18.)

II. Relevant Procedural Background

On September 5, 2024, Plaintiffs initiated this action. (Doc. 1.)

On November 26, 2024, PVMC filed a motion to intervene. (Doc. 14.) That motion was granted. (Doc. 21.)

On May 27, 2025, PVMC filed a motion to supplement the administrative record (Doc. 31). That motion was granted in part, such that certain documents were admitted as extra-record evidence but not as part of the administrative record. (Doc. 38.)

On September 24, 2025, Plaintiffs moved for summary judgment. (Doc. 42.)[19]

On December 18, 2025, the Federal Defendants filed their combined cross-motion for summary judgment and response to Plaintiffs' motion. (Doc. 47.)

On December 30, 2025, PVMC filed its combined cross-motion for summary judgment and response to Plaintiffs' motion. (Doc. 48.)

That same day, PVMC filed a motion to admit extra-record evidence on the issue of remedy. (Doc. 49.) That motion was granted. (Doc. 53.)

On February 5, 2026, Plaintiffs filed their combined reply in support of their motion for summary judgment and response to both cross-motions. (Doc. 51.)

That same day, Plaintiffs filed a motion to admit extra-record evidence on the issue of remedy. (Doc. 52.) That motion was granted. (Doc. 57.)

On March 24, 2026, the Federal Defendants filed their reply in support of their cross-motion. (Doc. 55.)

On March 31, 2026, PVMC filed its reply in support of its cross-motion for

---

19 In their motion, Plaintiffs clarify that although "[t]he complaint also alleged ESA violations involving the southwestern willow flycatcher," Plaintiffs "are not pursuing those claims"—thereby limiting the claims at issue to those involving the YBC. (Doc. 42 at 7.)

summary judgment. (Doc. 56.)

On April 27, 2026, Plaintiffs filed a notice of supplemental authority. (Doc. 58.)

On September 2, 2026, the Court issued a tentative ruling. (Doc. 63.)

On September 15, 2026, the Court heard oral argument. (Doc. 64.)

**DISCUSSION**

I. <u>Standing</u>

Plaintiffs argue they have standing. (Doc. 42 at 19-23.) Neither the Federal Defendants nor PVMC dispute this claim. (Docs. 47, 48, 55, 56.) Nevertheless, "Article III standing is a necessary component of subject matter jurisdiction," *In re Palmdale Hills Prop., LLC*, 654 F.3d 868, 873 (9th Cir. 2011), and the Court has an independent obligation to determine whether subject-matter jurisdiction exists, *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999).

The Court is satisfied that Plaintiffs have standing. "The fundamentals of standing are well-known and firmly rooted in American constitutional law. To establish standing, . . . a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief. Those specific standing requirements constitute an essential and unchanging part of the case-or-controversy requirement of Article III." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (cleaned up).

When it comes to organizational plaintiffs, "an organization may not establish standing simply based on the intensity of the litigant's interest or because of strong opposition to the government's conduct, no matter how longstanding the interest and no matter how qualified the organization." *Id.* at 394 (cleaned up). Instead, one way an organization may establish standing is by showing that "(1) at least one member would have standing to sue individually, (2) the interests it seeks to protect are germane to its purpose, and (3) neither the claim nor relief requires the participation of individual members in the lawsuit." *L.A. Press Club v. Noem*, 171 F.4th 1179, 1188 (9th Cir. 2026)

(cleaned up). *See generally Pub. Int. Legal Found., Inc. v. Nago*, 174 F.4th 664, 675-76 (9th Cir. 2026) (noting that an organization may establish standing without attempting to show interference with core business activities).

Beginning with the second element, the Court agrees with Plaintiffs that "the interests at stake—protection of [Pinto Creek] and the plants and animals it supports—are germane to [both Plaintiffs'] missions of protecting wildlife and natural places." (Doc. 42 at 19.) *See, e.g.*, *Friends of Animals v. Ross*, 396 F. Supp. 3d 1, 8-9 (D.D.C. 2019) (environmental organization WildEarth had standing in case brought under the APA challenging an ESA listing determination, where, among other things, "the aesthetic and recreational interests that its members assert are directly related to its 'mission and organizational purpose to protect and restore wildlife and wild places'").

As for the third element, the Court agrees with Plaintiffs that "[n]o claim requires participation of individual members because their interests are fully represented by" Plaintiffs. (Doc. 42 at 19.)

Finally, turning back to the first element, Plaintiffs' members would otherwise have standing to sue. Plaintiffs have submitted declarations from three members. (Doc. 42-1 [declarations from (1) Richard C. Martin, member of the Grand Canyon Chapter of the Sierra Club; (2) Charles J. Babbitt, Conservation Chairman of the Maricopa Bird Alliance (formerly Maricopa Audubon Society); and (3) Tim Flood, member of the Grand Canyon Chapter of the Sierra Club and Maricopa Bird Alliance].) These declarations establish that Plaintiffs' "individual members derive scientific, aesthetic, conservational, and recreational interests from [Pinto Creek] and have concrete plans to do so in the future" and that "an order directing" the Federal Defendants to "issue a new finding would likely redress" the individual members' asserted harms. *Compare Friends of Animals*, 396 F. Supp. 3d at 8 *with Satanic Temple v. Labrador*, 149 F.4th 1047, 1050 (9th Cir. 2025) (concluding that organization lacked standing because "[d]espite the general requirement to name affected members, TST names no member, even by pseudonym, who would have standing to sue").

II. <u>APA Standard Of Review</u>

Under the Administrative Procedure Act ("APA"), a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[20] "The Supreme Court has held that the ultimate standard of review under 5 U.S.C. § 706(2)(A) is a narrow one, noting that a court is not empowered by section 706(2)(A) to substitute its judgment for that of the agency." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994) (citations omitted). "This deferential standard simply ensures that the agency has acted within a zone of reasonableness." *Ariz. Mining Reform Coal. v. U.S. Forest Serv.*, 172 F.4th 641, 653-54 (9th Cir. 2026) (cleaned up).

"[W]here, as here, the district court is reviewing the decision of an administrative agency which is itself the finder of fact . . . summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did . . . ." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 770 (9th Cir. 1985). "In reviewing an agency's decision under section 706(2)(A), a court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . . In order for an agency decision to be upheld under the arbitrary and capricious standard, a court must find that evidence before the agency provided a rational and ample basis for its decision." *Nw. Motorcycle*, 18 F.3d at 1471 (citations and quotation marks omitted).

"[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits," but the Court must consider all evidence submitted in support of both cross-motions when separately reviewing the merits of each motion. *Fair*

---

[20] As Plaintiffs note, five of the six claims asserted in the complaint "arise under the APA," but "[t]he sixth claim—that TNF violated its substantive Section 7 duty—arises under the ESA's citizen suit provision." (Doc. 42 at 18, citing 16 U.S.C. § 1540(g).) The Ninth Circuit has held that "[i]rrespective of whether an ESA claim is brought under the APA or the [ESA] citizen-suit provision, the APA's 'arbitrary and capricious' standard applies." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011).

*Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (cleaned up).

III. ESA Claims

In Count Four, Plaintiffs allege that the FWS violated the ESA by improperly defining the "action area" where anticipated effects would occur—more specifically, by excluding "the portion of Pinto Creek outside of the modeled 5-foot drawdown contour that is directly and indirectly harmed by the mine's pumping at the Peak Well field." (Doc. 1 ¶¶ 157-61.) In Count Five, Plaintiffs allege that the FWS violated the ESA by relying on "vague, undefined, and unenforceable mitigation provisions." (*Id.* ¶¶ 162-66.) In Count Six, Plaintiffs allege that the TNF violated the ESA by "initially defining the flawed action area in its BA," by "formulating the meaningless mitigation measures that the BiOp adopted," and by then "unreasonably rel[ying] on the flawed BiOp when issuing its ROD and approving the mine's plan of operations." (*Id.* ¶¶ 167-70.) For these three ESA claims, Plaintiffs ask the Court to "hold that the BA, BiOp, and TNF's reliance on the BiOp violated the ESA" by "(1) unlawfully constraining the action area used to identify and assess harm to the [YBC] and its critical habitat; and (2) relying on unlawfully vague, meaningless mitigation measures." (Doc. 42 at 23, 26.)

A. **ESA**

The ESA "is a comprehensive scheme with the broad purpose of protecting endangered and threatened species." *Conservation Cong. v. Finley*, 774 F.3d 611, 615 (9th Cir. 2014) (citation omitted). Section 7(a)(2) of the ESA "governs the consultations that must take place between agencies." *Id.* The ESA "imposes both substantive and procedural duties on agency consultation." *Id.* "Substantively, agencies contemplating certain kinds of federal action are required to insure that the action they take 'is not likely to jeopardize the continued existence' or 'result in the destruction or adverse modification of [critical] habitat' of an endangered or threatened species." *Id.* (citation omitted). "Agencies must consult with . . . the Fish and Wildlife Service (for land-based species) . . . to determine the likely effects of their proposed actions on endangered or threatened

species." *Id.* If an ESA-listed species "may be present in the area of such proposed action," the action agency "shall conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action." 16 U.S.C. § 1536(c)(1). "According to the implementing regulations, the first step in the consultation process is for the acting agency to independently determine whether its actions 'may affect' an endangered or threatened species or that species's habitat." *Conservation Cong.*, 774 F.3d at 615 (citation omitted). "If so, the agency must initiate either informal or formal consultation with the consulting agency." *Id.* If either the acting agency or the consulting agency "determines that the proposed action is 'likely to adversely affect' a listed species or habitat, formal consultation is required." *Finley*, 774 F.3d at 615. "Formal consultation entails the consulting agency preparing a 'biological opinion' stating whether the proposed action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.'" *Id.* (cleaned up).

"Consulting with the FWS alone does not satisfy an [acting] agency's duty under the [ESA]," and the acting agency's "decision to rely on a FWS biological opinion must not have been arbitrary or capricious." *Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1304 (9th Cir. 1993), *as amended on denial of reh'g* (July 5, 1994).

B. **Action Area**

1. <u>The Parties' Arguments</u>

a. **Plaintiffs' Motion For Summary Judgment**

Plaintiffs argue that the "Federal Defendants here violated Section 7 by . . . unlawfully constraining the action area used to identify and assess harm to the [YBC] and its critical habitat." (Doc. 42 at 23.) Specifically, Plaintiffs argue that although the BA and BiOp "claimed that the . . . action area included 'the furthest reaching' effects of the mine's operation, including all areas affected by 'water withdrawals,' that was false" because "[t]he action area *excluded* the place most affected by the mine's pumping: the northern perennial reach, including at and around the Magma Weir." (*Id.* at 24.) Plaintiffs

argue that, "[t]ime and again, TNF (and others) concluded that PVMC's pumping was dewatering Pinto Creek's northern perennial reach and would continue to do so through 2039." (*Id.*) Plaintiffs also argue that "effects at Magma Weir were central to TNF's water resource modeling analysis" and that "TNF was confident enough in these conclusions to petition ADWR for a *legal declaration* that PVMC was impairing TNF's instream water right for the northern perennial reach." (*Id.*) Plaintiffs emphasize that "[n]owhere did TNF find that the northern perennial reach would *not* be affected by PVMC's pumping." (*Id.*) Plaintiffs also argue that because the BA and BiOp did not evaluate effects in the northern perennial reach, which falls outside the action area, and because the "action area also excluded the Magma Weir, the very location where the 82 percent baseflow reduction was measured," "the Federal Defendants' Section 7 consultation omitted from analysis the exact area that TNF determined had been, and would continue to be, harmed by the mine's pumping." (*Id.* at 25.) Plaintiffs further argue that the "Federal Defendants never offered a justification for their decision to omit this habitat-rich stretch of creek from the action area—despite conceding that the 5-foot drawdown boundary would exclude known effects." (*Id.*) Plaintiffs argue that "[t]he flawed action area also undermined the BiOp's final conclusions" for two reasons. (*Id.*) First, Plaintiffs argue that "the BiOp determined that the mine's pumping would not jeopardize the yellow-billed cuckoo based primarily on its finding that '[t]here are no known breeding cuckoos within the action area.' But Pinto Creek North—the unit of critical habitat along the northern perennial reach—is 'consistently occupied by western yellow-billed cuckoos during the breeding season.'" (*Id.*, record citations omitted.) Thus, Plaintiffs argue that "[t]he BiOp's exclusion of known breeding habitat from the action area undermined the primary basis for its no-jeopardy conclusion." (*Id.* at 26.) Second, Plaintiffs argue that "the BiOp concluded that the mine's pumping would not destroy or adversely modify yellow-billed cuckoo critical habitat because the amount of habitat that the BiOp found would be affected, 308 acres, is a small percentage of the species' total breeding range." (*Id.*) According to Plaintiffs, this "reasoning overlooked the 373 acres of Pinto Creek North that were arbitrarily omitted

from the action area," and thus "[t]he BiOp's exclusion of this 'core' critical habitat undermined its determination that the mine would not 'appreciably diminish[] the conservation role of proposed critical habitat.'" (*Id.*) Plaintiffs argue that "[t]hese material errors rendered the BiOp, and Section 7 consultation as a whole, arbitrary and capricious" and that "TNF's reliance on those findings was likewise contrary to the record, arbitrary, capricious, and in violation of TNF's independent duty to ensure that its action would not jeopardize the cuckoo or destroy or adversely modify cuckoo critical habitat." (*Id.*)

b. **The Federal Defendants' Response And Cross-Motion**

The Federal Defendants argue that "the agencies reasonably and rationally identified the 'action area' for determining impacts on the [YBC] and its habitat." (Doc. 47-1 at 11, cleaned up.) Specifically, the Federal Defendants argue that "Plaintiffs' recitation of the scope of an 'action area' leaves out an important component of the[] regulations that undermines Plaintiffs' argument: The definition of 'effects of the action' also specifies that '[a] consequence is caused by the proposed action if it would not occur but for the proposed action *and it is reasonably certain to occur*.'" (*Id.*, citation omitted.) The Federal Defendants argue that "the model the Forest Service and FWS relied on" when defining the action area as the 5-foot drawdown contour "demonstrated" that "the 'consequence' of Peak Well field drawdown impacts to Pinto Creek and attendant riparian vegetation decline downstream of the contour line . . . was not 'reasonably certain to occur.'" (*Id.* at 12.) The Federal Defendants emphasize that the FEIS "notes '[c]hanges in groundwater levels of fewer than 5 feet often are difficult to distinguish from natural seasonal and annual fluctuations in groundwater levels.'" (*Id.*) The Federal Defendants argue that, "[i]n other words, outside the 5-foot drawdown contour line, the model could not establish with reasonable certainty that changes in Pinto Creek flows were attributable to drawdown from pumping at the Peak Well field." (*Id.*) In support, the Federal Defendants cite *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 441 F. Supp. 3d 843 (D. Ariz. 2020), *aff'd in part, rev'd in part and remanded*, 67 F.4th 1027 (9th Cir. 2023), where "the court held that FWS's attempt to predict 'take' of listed species from

downstream flow loss based on reductions in groundwater levels of less than 5 feet was arbitrary and violated the ESA because the groundwater model the agencies relied on (the same model used here) 'could not reliably predict groundwater drawdowns that were less than 5 feet.'" (*Id.*) The Federal Defendants argue that "Plaintiffs ask for just the opposite of that holding here, asserting that the Forest Service should have extended the 'action area' drawdown contour to less than 5 feet, beyond the limits of the model in predicting riparian impacts." (*Id.*) The Federal Defendants argue that the agencies "adopted a highly technical scientific model to predict groundwater drawdown from mining operations" and that "[t]his choice was informed, is consistent with ESA requirements for selecting action areas, and is entitled to great deference." (*Id.* at 13.) The Federal Defendants next argue that "none of the instances Plaintiffs cite involve any . . . conclusions, determinations, or findings" that "PVMC's pumping was dewatering Pinto Creek's northern perennial reach" and "harming riparian habitat" outside the 5-foot drawdown contour, "let alone to the level required to include the area in the action area for the ESA consultation." (*Id.*) For example, the Federal Defendants argue that "in petitioning for a determination of appropriability for the near-stream Peak Wells . . . the Forest Service stated that it *believed* the wells were affecting surface water flow in Pinto Creek, but was expressly asking the [ADWR] to make that determination, which the State agency declined to do." (*Id.* at 13-14.) Similarly, the Federal Defendants argue that "in its letter describing its November 2017 site visit to assess riparian habitat conditions for 1.5 miles downstream of what would later be the southern border of the 'action area' in the ESA consultation, the [AGFD] did not identify 'pumping from the Peak Well field as a likely cause' of observed riparian tree mortality as Plaintiffs assert, but only stated that there is a need *to determine* whether Peak Well field pumping was impacting or causing riparian habitat mortality along Pinto Creek." (*Id.* at 14.) And the Federal Defendants emphasize that the FEIS acknowledges that WestLand Resources "evaluated the same stream segment during the growing season (summer) and observed healthier tree conditions than noted in the aforementioned [AGFD] study, which was conducted during a vegetation dormancy season (winter)." (*Id.*, record citation omitted.)

The Federal Defendants argue that both WestLand and AGFD found that "tree mortality decreased and stream flows increased approximately 0.5 miles below the action area boundary," and "[t]hus, even if the 5-foot groundwater drawdown contour 'action area' boundary missed the location of some adverse effects on the [YBC] and its critical habitat, it was at most a very small, half-mile stretch of Pinto Creek, and not the entire 6-mile length on the Pinto Creek North critical habitat unit, as Plaintiffs presuppose in their assessment of adverse modification." (*Id.*)

c. **PVMC's Response And Cross-Motion**

As an initial matter, PVMC argues that Plaintiffs "have cherry-picked facts from the record to support their claim that PVMC's groundwater pumping is 'dewatering' Pinto Creek and destroying its riparian vegetation" and that "[t]he record shows that these allegations are simplistic and misleading." (Doc. 48 at 11.) For example, PVMC argues that "Plaintiffs rely on monthly streamflow volumes recorded at the Magma Weir from 1999 through 2018," but "[t]hese data, standing alone, are inconclusive" because although "[t]hey show a declining trend," they "do not explain *why* that decline occurred." (*Id.*) In addition, PVMC argues that "recent streamflow data reported for the Magma Weir is questionable" and emphasizes that "WestLand conducted a study of the Magma Weir, including the condition of the weir and reliability of streamflow data collected at that station" and "concluded that data after 2007 is unreliable due to various weir design, maintenance, and integrity issues." (*Id.* at 12.) Next, PVMC argues that "there is no evidence that PVMC is using more groundwater or is operating the Peak Wells differently than the prior mine owner" and that "[o]ther factors (e.g., drought) have affected the creek's streamflow" since 2013. (*Id.*) PVMC next argues that "Plaintiffs' assertion that PVMC's groundwater pumping is killing large swaths of the creek's riparian habitat below the Magma Weir is also unfounded." (*Id.*) Specifically, PVMC rejects Plaintiffs' reliance on the AGFD's 2018 report as "unreliable," arguing it "took place in late November 2017 when the trees . . . were dormant and had dropped their leaves, making them appear lifeless" and "during a period of severe drought." (*Id.* at 12-14.) PVMC emphasizes that

WestLand's repeat study of the same area undermined the AGFD's conclusions. (*Id.* at 13.) PVMC argues that "[t]he continued presence of healthy riparian vegetation along the lower Pinto Creek is also evidenced by FWS's recent designation of that reach as YBC critical habitat" and that "[i]f PVMC's groundwater pumping had destroyed the riparian vegetation along lower Pinto Creek, as Plaintiffs claim, that area would not have met FWS's criteria for critical habitat designation." (*Id.* at 13-14.) As for SRK's modeling of reduced simulated baseflow at Magma Weir from 2013-2018, PVMC first argues that "the model predicts a reduction in groundwater that is discharged to the stream resulting from a change in the regional groundwater level—*not a direct streamflow reduction*" and "baseflow from groundwater accounts for only about 35 percent of total streamflow at the Magma Weir," which is primarily sourced from "stormwater runoff and interflow, which depend on precipitation." (*Id.* at 15.) Second, PVMC argues that "the estimated reduction in baseflow is misleading" because an "artificial recharge" of the creek's baseflow caused "the impact of PVMC's groundwater pumping relative to actual premining conditions [to be] overstated." (*Id.*) Third, PVMC argues that "the impact of PVMC's groundwater pumping on perennial stream reaches is controlled by geologic units and structural conditions across the Pinto Creek watershed." (*Id.* at 16.) According to PVMC, the 5-foot drawdown contour from SRK's modeling was "selected because changes in groundwater levels fewer than five feet are difficult to distinguish from naturally occurring seasonal and annual fluctuations in groundwater levels." (*Id.*) PVMC argues that "[t]he limited impact of the groundwater drawdown on lower Pinto Creek is caused by the area's geology," because "[i]mmediately below the Magma Weir, the stream channel becomes narrow and is bedrock-controlled." (*Id.*) Next, PVMC rejects Plaintiffs' reliance on TNF's 2020 letter to ADWR, arguing, among other things, that "[t]he fact that an agency's initial position changed does not make the agency's final decision arbitrary and capricious." (*Id.* at 17-18.) PVMC also argues at length that Plaintiffs "erroneously treat the TNF's letter to ADWR as if it were a determination by the agency that PVMC was violating Arizona law" and that "Plaintiffs are erroneously equating baseflow with subflow." (*Id.* at 18-19.)

PVMC then argues that "the BiOp's action area is supported by substantial evidence." (*Id.* at 28, cleaned up.) Among other things, PVMC asserts that although the draft BA "proposed a larger action area," "[d]uring the consultation, Forest Service staff explained to FWS that this action area was intended to include possible effects from a tailings dam failure, while acknowledging that such an analysis may not be appropriate given the uncertainty of such an event." (*Id.*) PVMC argues that "[a]s a result of these discussions, the Forest Service . . . provided the Revised BA to FWS, which, among other things, removed the impacts of a tailings damn breach" and accordingly adopted the 5-foot drawdown contour as the action area boundary. (*Id.* at 29.) PVMC also argues that the Forest Service addressed the AGFD report and Miller studies relied on by Plaintiffs, acknowledging that "[t]his groundwater drawdown and associated reduction in baseflow may have contributed to observed changes in riparian vegetation and aquatic conditions along Pinto Creek; however, causes of these changes *have not been definitively established.*" (*Id.*) PVMC then reiterates its argument that Plaintiffs' "assert[ion] that PVMC's groundwater pumping is dewatering Pinto Creek below the Magma Weir and destroying the creek's vegetation and that those effects are the consequence of the MPO . . . is contradicted by other evidence in the record." (*Id.* at 30.) PVMC also argues that it was not "irrational . . . for the agencies to rely on SRK's groundwater modeling to define the scope of the action area" because "effects must be caused by the proposed action and reasonably certain to occur" and "[t]he Forest Service acknowledged that it was uncertain whether PVMC's groundwater pumping is causing changes in riparian vegetation and aquatic conditions along lower Pinto Creek," so "it would have been improper to extend the action area downstream and engage in speculation about future effects." (*Id.* at 31.)

**d. Plaintiffs' Reply And Response To Cross-Motions**

Plaintiffs first address what they refer to as the Federal Defendants' and PVMC's "mischaracterizations." (Doc. 51 at 6.) Plaintiffs argue "that PVMC, not 'dynamic' conditions, caused the northern perennial reach's steady baseflow to run dry." (*Id.* at 8.) Next, Plaintiffs argue that "[m]odeling found significant reductions in both groundwater

*and* streamflow, but the Federal Defendants' action area ignored the latter." (*Id.*) Specifically, Plaintiffs argue that "TNF relied on modeling in the NEPA process to assess two separate effects relevant to the impacts of pumping on Pinto Creek: reduction in *groundwater* levels, and reduction in *baseflow* at the Magma Weir." (*Id.* at 9.) Plaintiffs argue that "TNF and FWS erred by limiting their ESA and NEPA analysis to the area defined exclusively by lowered groundwater levels: the five-foot drawdown contour. By ignoring the baseflow results, they missed half the picture." (*Id.*) Next, Plaintiffs argue that "USGS streamflow records supported the model's findings" and that PVMC's arguments to the contrary "do not support the challenged agency actions because they are post hoc rationalizations that contradict TNF's own findings that pumping was to blame" and "are further belied by the record." (*Id.* at 10.) Plaintiffs next argue that "TNF's letter to ADWR concluded that the mine was harming the creek." (*Id.* at 11.) Among other things, Plaintiffs argue that "Defendants misunderstand the letter's relevance to the Court's review of the [Plaintiffs'] claims," and Plaintiffs clarify that "[t]he point is not, as [the Federal Defendants and PVMC] seem to suggest, that the Court must find PVMC's pumping illegal under Arizona law—although [Plaintiffs] maintain that it is illegal. Rather, the point is that TNF concluded, *as a factual matter*, based on robust evidence, that PVMC's pumping was 'having a direct and appreciable impact on surface water flow' in Pinto Creek's northern perennial reach." (*Id.* at 12-13, record citations omitted.) Plaintiffs also argue that "[m]ultiple reports of riparian die-off bolstered the findings of harm"—namely, the AGFD survey, several letters from Plaintiffs' members anecdotally reporting die-off, and WestLand's survey. (*Id.* at 13-14.) As for the WestLand study specifically, Plaintiffs argue that "even that report documented dead trees outside the five-foot drawdown contour, meaning *at least some* ecological effects were unlawfully excluded from analysis." (*Id.* at 15, record citation omitted.) Plaintiffs then argue that "TNF and FWS arbitrarily constrained the action area" because the action area—"defined by the modeled five-foot drawdown contour—excluded Pinto Creek's northern perennial reach even though TNF found that PVMC's pumping would cause harm there." (*Id.* at 16.)

Plaintiffs argue that conclusion is supported by (1) SRK's modeling that showed PVMC's pumping reduced baseflow at the Magma Weir; (2) streamflow records at Magma Weir; (3) TNF's letter to ADWR; and (4) field reports of riparian vegetation die-off. (*Id.* at 16-17.) Specifically, Plaintiffs fault the agency for relying on the 5-foot *groundwater* drawdown contour as the boundary for the action area, arguing that the "agencies' unexplained reliance on groundwater levels, at the exclusion of streamflow (baseflow), rendered the Section 7 process arbitrary, capricious, and unlawful under the ESA." (*Id.*) Plaintiffs argue that the Federal Defendants and PVMC are "conflating two related but distinct concepts" (i.e., groundwater and baseflow/streamflow) and that "while the Federal Defendants may be correct that the model was not sensitive enough to evaluate groundwater level reductions of less than five feet and corresponding loss of surface flow overlying that area, that limitation did not apply to baseflow reduction, which was explicitly evaluated at the Magma Weir, outside of the drawdown contour." (*Id.* at 18.) Plaintiffs then proceed to explain why "pumping harms the northern perennial reach, not by reducing the groundwater levels beneath it, but by sucking up water that would otherwise spill into it—an effect captured by the baseflow analysis alone." (*Id.* at 19.) Last, Plaintiffs argue that the Federal Defendants and PVMC "fail to address the non-modeling evidence." (*Id.* at 20.) And Plaintiffs argue that "TNF's letter to ADWR, in particular, was a clear finding." (*Id.* at 21.) Plaintiffs also argue that "the Federal Defendants do not address the [Plaintiffs'] members' reports of riparian harm . . . or the USGS streamflow data, which further substantiate loss of surface flow at the Magma Weir corresponding to PVMC's pumping." (*Id.*) Plaintiffs also respond to PVMC's reliance on the draft BA (which found that the cause of riparian die-off along Pinto Creek has not been "definitively established"), arguing that "[w]hile true—because correlation does not prove causation—the observations of riparian die-off served as compelling *evidence* of the mine's impact." (*Id.*) Plaintiffs argue that "[a]t the end of the day, neither TNF nor FWS explained why they considered only groundwater levels—not the model results showing significant baseflow reductions, USGS streamflow data showing a major drop in flow just months

after PMVC began pumping, TNF's letter to ADWR ruling out drought as the cause, or field reports documenting riparian death around the Magma Weir—in their delineation of the action area. While the Defendants try to excuse that significant oversight by critiquing, post hoc, some of the relevant evidence of downstream harm and asking the Court for deference, none is owed." (*Id.* at 22.)

e. **The Federal Defendants' Reply**

The Federal Defendants argue that "Plaintiffs attempt to substitute their flawed analysis for the extensive analysis of the expert agencies." (Doc. 55 at 2.) The Federal Defendants argue that "Plaintiffs fault Federal Defendants for relating the 5-foot drawdown contour modeling to baseflows in Pinto Creek, but this is precisely what the modeling was intended to do." (*Id.*) The Federal Defendants cite the Water Resources Report appended to the FEIS, which states that the "expansion of drawdown resulting from mine-induced drawdown" predicted in the modeling "could result in a reduction in baseflow in these stream reaches," i.e., those stream reaches *within* the drawdown contour. (*Id.*, citing TNF_0058808.) The Federal Defendants also emphasize that when SRK "present[ed] the 5-foot drawdown contour model to the Forest Service," it stated that "the completed predictions for the revised groundwater model are reliable for supporting an assessment of direct and indirect impacts to surface and groundwater resources . . . as required in the EIS." (*Id.*, citing TNF_0041857.) Thus, the Federal Defendants argue that "it is Plaintiffs who are wrong is asserting that the 5-foot drawdown contour model does not provide a reasonable tool for establishing an 'action area' for ESA (and NEPA) purposes for delineating potential areas of impact from Pinto Creek flow change resulting from Project implementation." (*Id.*) As for Plaintiffs' "complain[t] that the 5-foot drawdown contour does not encompass the Magma Weir where baseflows were lower and AGFD observed dead trees up to 1.5 miles downstream along Pinto Creek from the Mine's northern boundary after PVMC restarted Peak Well field pumping in 2013," the Federal Defendants argue that in the BA, "the Forest Service correctly explained that AGFD's observations did not 'definitively establish' that Peak Well pumping caused those habitat effects,

particularly in light of WestLand Resources' subsequent and more thorough review of the same area that found dead trees only 0.5 miles downstream (and fewer of them), and attributed the deaths to local changes in stream morphology, not streamflow reductions." (*Id.* at 3, record citations omitted.) The Federal Defendants also argue that "the Forest Service only noted that the flow reductions at the Magma Wier '*may* have contributed to' the tree mortality, which is plainly a far lower standard than 'reasonably certain.'" (*Id.*, record citation omitted.) As for TNF's letter to ADWR, the Federal Defendants argue that letter "did not establish with 'reasonable certainty' that Peak Well field pumping was the cause of flow reductions at the Magma Weir." (*Id.*) Next, the Federal Defendants argue that "even if the Forest Service and FWS should have included Pinto Creek downstream to the Magma Weir in the 'action area' for the ESA Section 7(a)(2) consultation analyses, it would not have changed the result." (*Id.*) Specifically, the Federal Defendants argue that none of the "FWS's jeopardy and adverse modification determinations in the BiOp . . . would change by adding one-half mile downstream to the 'action area.'" (*Id.*) The Federal Defendants conclude that "[t]he ESA does not prohibit adverse effects to listed species or critical habitat, and the agencies' reliance on the 5-foot drawdown contour model to demarcate the 'action area' where the Project might cause baseflow reductions in Pinto Creek was rational and entitled to judicial deference." (*Id.* at 5.)

f. **PVMC's Reply**

PVMC reiterates that the "BiOp's 'action area' is supported by the record." (Doc. 56 at 5.) PVMC argues that "Plaintiffs argue that this action area improperly excluded the reach of Pinto Creek downstream of the Magma Weir, which contains critical habitat for the YBC. Plaintiffs' argument, however, conflicts with the discussion of groundwater drawdown impacts in the FEIS and in the [Water Resources Report] appended to the FEIS, which provided the technical basis for the action area." (*Id.* at 6.) PVMC argues that "[t]he FEIS and the [Water Resources Report] explained that the perennial stream reaches that may be impacted by groundwater drawdown, including Pinto Creek are located *within the predicted 5-foot drawdown contour*." (*Id.*) Citing, as the Federal Defendants did, the

Water Resources Report at TNF_0058808, PVMC argues that this language explains that groundwater drawdown impacts baseflow/streamflow. (*Id.* at 6-7.) PVMC argues that "Plaintiffs . . . are misreading the FEIS and [Water Resources Report], which clearly explained that the perennial stream segments likely to be affected by mine-induced groundwater drawdown *are the stream segments within the 5-foot drawdown area.* The FEIS and [Water Resources Report] do not predict reductions in Pinto Creek's streamflow outside the 5-foot drawdown contour." (*Id.* at 7.) Next, PVMC argues that "Plaintiffs' other argument . . . that PVMC failed to address the 'non-modeling evidence' . . . is also incorrect." (*Id.*) PVMC argues that it "addressed the TNF's 2020 letter in detail and explained why it had no legal import." (*Id.*) PMVC also argues that it addressed Plaintiffs' "rel[iance] on the 2018 AGFD report and the reports of Miller Ecological Consultants . . . explaining that the timing of [AGFD's] field survey and its conclusions are problematic, particularly in light of WestLand Resources' May 2020 surveys" and because Miller's surveys were conducted in *upper* Pinto Creek. (*Id.* at 7-8.) PVMC also reiterates why the Draft EIS does not render the agencies' reliance on the 5-foot drawdown contour unreasonable. (*Id.* at 8.) PVMC argues that "[i]n short, the Federal Defendants used the modeled 5-foot groundwater drawdown contour to define the action area because it 'represents the maximum extent of drawdown impacts under the alternatives'" and that "[t]his is precisely the sort of technical choice that should receive substantial deference from the Court." (*Id.*)

2. <u>Analysis</u>

As part of the Section 7 consultation process, agencies must determine the proposed federal action's "action area," defined as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02. An agency's "choice of appropriate action areas 'requires application of scientific methodology and, as such, is within the agency's discretion." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 950 (9th Cir. 2014). *See also Nat'l Fam. Farm Coal. v. U.S. EPA*, 966 F.3d 893, 927 (9th Cir. 2020) ("We accord deference to [the agency] in the way

it chose to define the action area."). However, an agency's choice of action area may be arbitrary if it "contains no discussion of scientific methodology, relevant facts, or rational connections linking the project's potential impacts with the [action area's] boundaries." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 902 (9th Cir. 2002). Where the agency fails to "discuss or justify its decision to restrict its analysis to" a certain action area, and "[i]ts decision to restrict its analysis to this area is presented as a conclusion, without support," the agency's decision may be found to be arbitrary. *Id.*

a. **"Reasonably Certain To Occur" Standard**

A bit of housekeeping is in order before turning to the merits of the parties' dispute. As noted, the term "action area" is defined by the ESA regulations as encompassing "all areas to be affected directly or indirectly by the Federal action." 50 C.F.R. § 402.02. Thus, in identifying the "action area," agencies must consider the effects of the action. And the phrase "effects of the action" also has a regulatory definition.

Before 2019, "the ESA regulations defined 'effects of the action' to 'refer[] to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action" and "further defined '[i]ndirect effects' as 'those that are caused by the proposed action and are later in time, but still are reasonably certain to occur.'" *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 2026 WL 898264, *11 (N.D. Cal. 2026). However, a "2019 rulemaking amended the definition to 'all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action' and provided that '[a] consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur.'" *Id.*

In their motions, the Federal Defendants and PVMC both emphasize that the action area does not need to include areas for which effects are not "reasonably certain to occur." (Doc. 47-1 at 11; Doc. 48 at 31.) However, just as the summary judgment briefing was being completed, a district court in the Northern District of California issued a decision

concluding that the 2019 amendment was invalid because "limiting 'effects of the action' to those that are 'reasonably certain' violates the [ESA] statute by prohibiting the Services from considering effects that are likely, but not reasonably certain, to cause jeopardy or adverse modification of habitat." *Ctr. for Biological Diversity*, 2026 WL 898264 at *13. The court reached this determination, in part, because it disagreed with the defendants' argument "that 'reasonably certain to occur' is synonymous with 'likely,'" concluding that the former "require[s] a degree of certainty higher than" the latter. *Id.* at *13-14. As a remedy, the court ordered vacatur of the 2019 amendment as it applied to the term "effects of the action." *Id.* at *25 ("The Court vacates the definition[] of 'effects of the action' . . . and reinstates the version[] in effect before the problematic revisions were made in 2019.").

In the Court's view, this development has no bearing on the outcome here. The Federal Defendants' and PVMC's arguments regarding the "uncertain[ty] whether PVMC's groundwater pumping is causing changes in riparian vegetation and aquatic conditions along lower Pinto Creek" (Doc. 48 at 31) do not turn on any minute difference between "likely" effects and "reasonably certain" effects. Rather, the Court understands the Federal Defendants' and PVMC's argument to be that those effects are both unlikely *and* not reasonably certain—and, thus, it is irrelevant which version of the regulatory definition controls. To that end, district courts decisions from within the Ninth Circuit (dated before and after the 2019 regulatory change) hold that an ESA "action area" need not cover areas for which any effects caused by the federal action would be "speculative," "unlikely," or "unexpected" to occur. *See, e.g.*, *Skagit Cnty. Dike, Drainage & Irrigation Improvement Dist. No. 12 v. Nat'l Marine Fisheries Serv.*, 2025 WL 1222238, *7 (W.D. Wash. 2025) ("[T]he Action Area consists of all areas where the environmental effects (physical, chemical, and biotic) of the proposed NNS Tidegate Project *are expected to occur*, and which are *reasonably expected to occur in the future*.") (emphasis added); *Gallatin Wildlife Ass'n v. U.S. Forest Serv., Marten*, 2015 WL 4528611, *11 (D. Mont. 2015) (holding that the "Biological Opinion's designation of the BDNF as the action area does not appear to be arbitrary or capricious, especially in light of the requirement that the

Court grant the highest deference to technical determinations made in a biological opinion," and where, among other things, the plaintiff "failed to point to any effects of the forest plan that are *likely to occur* outside the analysis area") (emphasis added); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 254 F. Supp. 2d 1196, 1212 (D. Or. 2003) (holding that NOAA's definition of the action area, although "entitled to substantial deference," was "unreasonably narrow" because its definition included areas where salmon ESU were "substantially and directly impacted by the FCRPS operations" but did "not encompass the range-wide area, where the impact is perhaps less direct *but no less certain to occur*") (emphasis added); *San Francisco Baykeeper v. U.S. Army Corps of Eng'rs*, 219 F. Supp. 2d 1001, 1021-22 (N.D. Cal. 2002) (rejecting the plaintiffs' attempt to expand the action area where their proposal would "require a degree of *speculation* not contemplated by § 7 of the ESA, which focuses on actions that are '*likely* to jeopardize' the continued existence of listed species") (emphases added). *See also Defs. of Wildlife v. US. Forest Serv.*, 2026 WL 914620, *6 (W.D.N.C. 2026) ("Given the substantial deference owed to the BiOp's action area definition and *the speculative nature of the Revised Forest Plan's indirect effects*, the Court concludes that the BiOp's action area definition falls within the 'broad zone of reasonableness' and is not arbitrary and capricious.") (citation omitted, emphasis added). Based on the above-cited authorities, the Court proceeds with the understanding that "action area" need not include areas for which effects attributable to the proposed federal action are speculative, unlikely, or unexpected.[21]

#### b. **Limiting The Action Area To The 5-Foot Groundwater Drawdown Contour**

As discussed, an agency's chosen "action area" must include "*all areas to be affected* directly or indirectly by the federal action." 50 C.F.R. § 402.02 (emphasis added). To analyze the effects of PVMC's groundwater pumping, the agencies relied on "[a] calibrated three-dimensional numerical groundwater flow model" that was developed by

---

[21] This conclusion is consistent with *Ctr. for Biological Diversity*, which holds that even if the "effects" to be considered by the agency need not be "reasonably certain," they still must be "likely"—i.e., "reasonably expected." 2026 WL 898264 at *13-14.

SRK "to estimate effects on groundwater and surface water resources resulting from groundwater extraction and water management activities that would occur under the no-action alternative, alternative 1, proposed action, and cumulative scenarios." (TNF_0058758.)

As relevant here, SRK's "numerical model was used to evaluate or estimate" two related, albeit distinct, parameters: "(1) areal extent, magnitude, and timing of [*groundwater*] drawdown and recovery of groundwater levels through the mining and post-mining periods; [and] (2) changes in *baseflow* to Pinto Creek." (*Id.*, emphases added.) As for the first parameter, groundwater is, as its name implies, water beneath the ground. Why was it important for SRK to evaluate reductions in groundwater levels caused by the mine's pumping? A reduction in groundwater levels can injure species such as the YBC because the "lower[ing] [of] ground water levels in the vicinity of riparian vegetation" "is sometimes sufficient to induce water stress in riparian trees, especially in the western United States," and "[t]hese effects reduce and degrade habitat for the western yellow-billed cuckoo for foraging, nesting, and cover." (TNF_0017115.)

As for the second parameter, "baseflow" is simply the "groundwater contribution component to total stream flow." (TNF_0058687. *See also* TNF_0058777 [describing "baseflow" as "groundwater discharge"].) In other words, baseflow is groundwater discharge that becomes part of a stream's surface flow. Why was it important for SRK to separately evaluate baseflow? "Most of Pinto Creek's riparian vegetation, wildlife, fish and recreation resource attributes are dependent upon maintaining a small, year-around baseflow . . . ." (TNF_0027137.) This dependency on year-round baseflow arises from the fact that Pinto Creek is home to both intermittent/ephemeral reaches and perennial reaches. (TNF_0058251.) The surface water flow, or streamflow, in Pinto Creek is influenced by, among other things, rainfall runoff and baseflow. (TNF_0058687.) The ephemeral/intermittent stream reaches of Pinto Creek "flow only during or after wet periods in response to runoff events" because the surface waters of these stream reaches "are not controlled by discharge from the groundwater flow systems"—i.e.,

ephemeral/intermittent stream reaches run dry when there is no rainfall runoff because they are not controlled by baseflow. (TNF_0058764.) In contrast, perennial streams "generally flow throughout the year." (*Id.*) During wet periods, the surface flow of perennial stream reaches is dictated by both rainfall runoff and baseflow (i.e., groundwater discharge); however, during low-flow periods, perennial stream reaches "are sustained entirely by discharge from the groundwater system," i.e., baseflow. (*Id.*) Put differently, the reason that perennial streams are able to have surface flow year-round, including during periods without rainfall, is because they are fed by a year-round baseflow. Importantly, "[i]f the [surface] flow from the perennial spring or stream is controlled by discharge from the aquifer affected by mine-induced [groundwater] drawdown, a reduction of groundwater levels could reduce the groundwater discharge [i.e., baseflow] to perennial springs or streams with a corresponding reduction in spring flows, lengths of perennial stream reaches, and their associated ripiarian or wetland areas." (*Id.*) A reduction or elimination of baseflow in these perennial stream reaches would be relevant for ESA purposes because "[a] continuous flow of water in lower Pinto Creek is needed to support existing aquatic life and wildlife." (TNF_0060566.) In other words, when PVMC pumps groundwater for use at the mine, the reduction in groundwater levels caused by that pumping can, in turn, reduce the baseflow (i.e., groundwater discharge) to perennial stream reaches in Pinto Creek—and because those perennial stream reaches rely entirely on baseflow to support their streamflow during periods without rainfall runoff, those perennial stream reaches could run dry during low-flow periods in the absence of that baseflow, thereby causing harm to the riparian habitats that rely on that perennial stream.

Turning back to the first parameter addressed by SRK, i.e., *groundwater* drawdown, "[t]he calibrated groundwater model was used to simulate the groundwater levels and change in groundwater levels . . . that have occurred (through 2018), and are projected to occur in the future as a result of mine development and groundwater extraction activities associated with the alternatives." (TNF_0058764.) SRK specifically evaluated the areal extent of projected groundwater drawdown caused by the mine's groundwater pumping,

and in doing so, SRK drew a boundary referred to as "the projected 5-foot groundwater drawdown contour." (*Id.*) "The 5-foot [groundwater] drawdown contour define[d] the area where the water table would be lowered by 5-feet or more at some point in time during the mining or post-mining period." (*Id.*) This groundwater drawdown boundary was chosen because "[c]hanges in groundwater levels of fewer than 5 feet often are difficult to distinguish from natural seasonal and annual fluctuations in groundwater levels." (*Id.*) Both the BA and BiOp adopted SRK's five-foot groundwater drawdown contour as the "action area" for the ESA evaluation. (FWS_000554 [BA]; FWS_000611 [BiOp]. *See also* TNF_0057863 [FEIS defining its NEPA "analysis area" as the 5-foot groundwater drawdown contour].)

As for the second parameter addressed by SRK, i.e., changes to *baseflow*, SRK evaluated "reductions in the groundwater discharge to baseflow in Pinto Creek at the Magma Weir," a gaging station located approximately one-half mile downstream of (and therefore outside) the 5-foot groundwater drawdown contour. (TNF_0058768.) SRK concluded "that over the 2013-2018 period, the baseflow to Pinto Creek was substantially reduced from an initial rate of 1,070 gallons per minute (start of 2013) to 188 gallons per minute (end of 2018). This represents an 82 percent reduction in baseflow compared to the estimated average baseflow conditions at the Magma Weir at the end of 2012." (*Id.*) SRK also concluded that PVMC's mining activities were the *cause* of that baseflow reduction at the Magma Weir from 2013-2018. (*Id.*, emphasis added ["The model simulated reductions in baseflow to Pinto Creek at the Magma Weir *attributed to drawdown effects resulting from pumping* from the Peak Well field over the 2013-2018 period."]. *See also* TNF_0051230, emphasis added [during an agency meeting on April 16, 2020, Patrick Plumley (PAI) "explained that the groundwater model and Australian water balance *demonstrate with reasonable certainty that the mine's pumping has been a primary cause of reduced baseflow in Pinto Creek*"].)[22] Put differently, SRK concluded

---

[22] During oral argument, PVMC seemed to dispute whether SRK's model concluded that the mine's pumping was the cause of this baseflow reduction from 2013-2018, arguing that SRK's model merely "simulated" that result. This argument is without merit. The

that, from 2013-2018, PVMC's groundwater pumping caused a corresponding reduction in baseflow to Pinto Creek, and that baseflow reduction was measured at a location outside the 5-foot drawdown contour (i.e., at the Magma Weir).

SRK's model also predicted that those baseflow reductions from 2013-2018 would be expected to continue as a result of the proposed action. The FEIS explains:

> Model simulations predict that *impacts on baseflow* [simulated at Magma Weir] *occurred as a result of pumping* from the Peak Well field during the 2013-2018 period, would continue at slightly greater magnitude under the no-action alternative (2019-2022) and alternative 1 (2019-2027), and *would continue at a similar magnitude until pumping ceases under the proposed action (2038)* (figure 3-23). *Continued pumping from the Peak Well field under the proposed action scenario is predicted to extend the duration of the predicted impacts on baseflow for an additional 19 years* compared to the no-action alternative and an additional 12 years compared to alternative 1. The potential impacts on baseflow and on perennial stream flow in Pinto Creek in the affected area would be the same as those described under the no-action alternative in that *long-term reduction in baseflow would likely result in a measurable reduction in flow (or elimination of surface flow) that would be particularly noticeable during the low-flow periods. As a consequence, segments of Pinto Creek that were previously characterized as perennial prior to 2013, and that may have been affected by pumping that occurred between 2013-2018 (and no longer sustain perennial flow conditions), would be expected to continue to be affected at a similar magnitude but for a longer duration.*

(TNF_0058292, emphases added.)

This language is notable for several reasons. First, SRK concluded that from 2013-2018, baseflow reduction occurred in Pinto Creek (as measured at the Magma Weir), and it also concluded that this baseflow reduction was caused by PVMC's pumping from Peak Well field. Second, SRK's model predicted that continued pumping of Peak Well field under the proposed action would cause such baseflow reduction to continue at a similar magnitude and for an additional 19 years. Third, TNF acknowledged that "long-term reduction in baseflow *would likely* result in a measurable reduction in [surface] flow (or elimination of surface flow)" and that "[a]s a consequence," perennial streams affected by

---

simulations produced by SRK's model were the results upon which the agencies relied.

the pumping from 2013-2018 "*would be expected to continue to be affected*." (*Id.*, emphases added.) In sum, TNF acknowledged in the FEIS that baseflow in Pinto Creek was predicted to be reduced as a result of continued pumping and that long-term reduction in baseflow was "likely" and "expected" to impact surface flow.

The BA also unequivocally states that continued operation of the mine under the proposed action would result in groundwater drawdown, which in turn would cause baseflow reduction in Pinto Creek—and that such baseflow reduction would be expected to deteriorate riparian vegetation along Pinto Creek:

> Other impacts on western yellow-billed cuckoos may occur as a result of loss or degradation of riparian vegetation along Pinto Creek. *Continued operation of the Peak Well System would continue to drawdown groundwater within the action area, resulting in a modeled 10 percent increase in baseflow reduction in Pinto Creek over the period of active mining as compared to the baseflow reduction experienced from 2013-2018 [at the Magma Weir.] Over the operational life of the mine, groundwater drawdown and associated baseflow reductions are anticipated to contribute to the deterioration of riparian vegetation along Pinto Creek, which has been subject to recent mortality and decline.* Deterioration of riparian vegetation *would in turn result* in the loss of non-breeding and foraging habitat for yellow-billed cuckoos. . . . Further, the Peak Well System would continue to operate for an additional 12 years under the proposed action, thus delaying recovery of affected riparian vegetation.

(FWS_000579, emphases added, citations omitted.)

Likewise, the BiOp states: "We *expect* ongoing and future [Pinto Valley Mine] groundwater extraction from the Peak Well system will adversely affect Pinto Creek cuckoo riparian habitat. . . . Between 2013 and 2018, groundwater modeling estimated there was an 82 percent reduction in Pinto Creek baseflow from [Pinto Valley Mine] operations (USFS 2020). *Additional modeling identified in the BA describes future Pinto Creek baseflow will decline* a further 10 percent during the period of active mining, for a maximum baseflow reduction of 92 percent from 2012 levels (USFS 2020)." (FWS_000621.) Put differently, both TNF and FWS acknowledged that, from 2013-2018, baseflow reduction occurred in Pinto Creek (as measured at the Magma Weir) as a result

of pumping from Peak Well field and that those effects would be expected to continue until pumping ceases under the proposed action. Moreover, both TNF and FWS appeared to acknowledge that long-term[23] baseflow reduction in Pinto Creek (as measured at the Magma Weir) would be expected to cause effects on surface flow, and in turn, on riparian vegetation.

It is significant that SRK's baseflow predictions were made by evaluating baseflow data at the Magma Weir, a gaging station that lies outside SRK's 5-foot groundwater drawdown contour. This raises an inherent contradiction—it cannot simultaneously be true that the effects of PVMC's pumping will be limited to the 5-foot groundwater drawdown contour (which excludes the Magma Weir) if SRK's conclusions and modeling are based on the undisputed existence of baseflow effects at the Magma Weir. The Court acknowledges that unlike SRK's groundwater drawdown analysis, SRK's model did not appear to attempt to determine the areal extent of baseflow reduction attributable to the mine's pumping. (*See, e.g.*, TNF_0051071 [Section 7 consultation meeting notes explaining that "[a] challenge in delineating the northern action area boundary is that the water modeling done does not estimate how far downstream the effects of drawdown may occur in the perennial reach of Pinto Creek"]; TNF_0051059 [Laura Stewart (ICF) "recommend[ing] further discussion with hydrologists and biologist to determine likely downstream extent of drawdown effects on surface water" to "inform how to redraw the northern boundary of the biological resources analysis area or action area"]. *See also* Doc. 51 at 19 [Plaintiffs agreeing that "[t]he five-foot drawdown contour did not predict the areal extent of baseflow reduction"].) This may be because there were data limitations related to baseflow and streamflow in Pinto Creek. (*See, e.g.*, TNF_0058269 ["The Forest Service acknowledges the limited information related to stream flows in Pinto Creek, how stream flows have specifically been affected by historical and ongoing operations at the Pinto Valley Mine, pre-mining baseflow records, groundwater and surface water interactions,

---

[23] Although "long-term" does not appear to be defined, the agencies acknowledge the proposed action would extend the baseflow effects of the pumping by 19 years compared to the no-action alternative and an additional 12 years compared to alternative 1.

and other information."]). Even so, the 5-foot groundwater drawdown contour cannot possibly encompass the full ESA "action area" given SRK's express acknowledgement that the baseflow effects of the action would extend, at a minimum, to the Magma Weir, which falls outside the 5-foot drawdown contour. Of course, "the determination of the scope of an analysis area requires application of scientific methodology and, as such, is within the agency's discretion." *Dombeck*, 304 F.3d at 902. But the Court cannot see how that discretion extends to an agency's decision to accept certain analyses from its own expert's model (i.e., the groundwater analysis) while ignoring other analyses from that model (i.e., the baseflow analysis) without explanation. *Cf. Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 422 F. Supp. 2d 1115, 1127-28 (N.D. Cal. 2006) ("[W]hile a reviewing court must show deference to the reasonable decisions of an agency, such deference is warranted only when the agency utilizes, rather than ignores, the analysis of its experts.") (cleaned up). *See generally Nat. Parks Conservation Ass'n v. E.P.A.*, 788 F.3d 1134, 1141 (9th Cir. 2015) ("[A]n internally inconsistent analysis is arbitrary and capricious.").[24]

The Federal Defendants' and PVMC's arguments to the contrary are unpersuasive. For example, the Federal Defendants and PVMC appear to argue that SRK's model could not predict, with "reasonable certainty," baseflow/streamflow effects outside the 5-foot groundwater drawdown contour modeled by SRK because "[c]hanges in groundwater levels of fewer than 5 feet often are difficult to distinguish from natural seasonal and annual fluctuations in groundwater levels." (Doc. 47-1 at 12, citation omitted; Doc. 48 at 16, citation omitted.) The Federal Defendants argue that, "[i]n other words, outside the 5-foot

[24] During oral argument, the Federal Defendants and PVMC asserted that SRK's groundwater analysis and baseflow analysis were not "conflicting" and that groundwater and baseflow are related concepts. The Court agrees and clarifies that it was the agency's decision to consider only SRK's groundwater analysis in identifying the "action area," while ignoring SRK's baseflow analysis at the Magma Weir, that was conflicting and inconsistent. As discussed elsewhere in this order, if SRK simulated baseflow effects caused by the mine's pumping at the Magma Weir, which lies outside of the 5-foot groundwater drawdown contour (and, thus, outside the "action area"), it cannot be that the agency's chosen "action area" included "*all areas*" to be affected. At a minimum, the "action area" should have included the Magma Weir or the agency should have explained why it excluded the Magma Weir despite SRK's model.

drawdown contour line, the model could not establish with reasonable certainty that changes in Pinto Creek *flows* were attributable to drawdown from pumping at the Peak Well field." (Doc. 47-1 at 12, emphasis added.) Plaintiffs characterize this argument as "sleight of hand" that "conflat[es] two related but distinct concepts"—i.e., "groundwater levels" and "Pinto Creek flows." (Doc. 51 at 18.) Plaintiffs are correct. The language cited by the Federal Defendants only explains why *groundwater drawdown* outside the 5-foot drawdown contour could not be reasonably attributed to the pumping at Peak Well field. It does not explain why areas downstream of that 5-foot drawdown contour would not experience *baseflow* reduction caused by that pumping-induced groundwater drawdown. As discussed, the Magma Weir—which lies outside the 5-foot groundwater drawdown—is where SRK's model simulated and predicted baseflow reduction caused by the mine's pumping.

The Federal Defendants (Doc. 55 at 2) and PVMC (Doc. 56 at 6) also argue that SRK's modeling concluded that the areal extent of baseflow effects was limited to the 5-foot groundwater drawdown contour. In support, the Federal Defendants and PVMC emphasize the following language from Section 3.4.1.2 of the Water Resources Report:

> Potential impacts on streams were evaluated by (1) using available baseline data to identify perennial stream reaches within the [groundwater] drawdown area; and (2) performing model simulations of baseflow reduction at Pinto Creek at the Magma Weir monitoring gage. . . . The drawdown is projected to encompass a total of 5.87 miles of perennial stream length that includes portions of Pinto Creek (4.80 miles), Miller Springs Gulch (0.82 mile), and an unnamed tributary to Pinto Creek (0.25 mile). This analysis assumes that baseflow in the specific stream reaches identified above are largely controlled by discharge from the groundwater flow system. *The predicted expansion of drawdown resulting from mine-induced drawdown could result in a reduction in baseflow in these stream reaches.* A reduction in baseflows would likely affect the perennial stream reach (reduce the length of or eliminate the perennial stream reach affected by drawdown). These types of impacts would likely persist until pumping ceases and groundwater levels recover to pre-pumping conditions.
>
> . . .
>
> Under the proposed action model scenario, pumping from the Peak Well field would continue for an additional 12 years compared to alternative 1 and an

> additional 18 years compared to the no-action alternative. Over this period, the baseflow rate is predicted to range from a minimum of 73 gallons per minute to 162 gallons per minute, which represents a total flow reduction ranging from 90 percent to 85 percent, respectively . . . .

(TNF_0058808.) During oral argument, PVMC further asserted that SRK's model showed that only those stream reaches within the 5-foot groundwater drawdown contour were predicted to experience baseflow reduction caused by the mine's pumping.

Defendants' arguments on these points are unavailing. As far as the Court can tell from the administrative record, it was not *SRK's model* that chose to look at only the stream reaches within the 5-foot groundwater drawdown contour when evaluating baseflow effects caused by the mine's pumping. Rather, it was the *agency's* decision to limit the analysis in that manner.[25] Indeed, SRK's "groundwater model domain encompasse[d] the entire hydrological study area," and that hydrological study area included the entire northern perennial reach up to Roosevelt Lake. (TNF_0058759; TNF_0058761 [Fig. 3-1 "Groundwater model domain"].) At any rate, as discussed elsewhere, SRK's model did not purport to evaluate the areal extent of baseflow reduction. Thus, any suggestion that SRK's model concluded that only the stream reaches within the 5-foot groundwater drawdown contour would experience baseflow reduction is incorrect.[26]

---

[25] To that end, Section 3.1.3.3 of the Water Resources Report, titled "Evaluation of Impacts on Surface Water Resources," states that "[t]he impact assessment identifies and evaluates potential impacts on streams, springs, and seeps *located within the maximum extent of the projected 5-foot groundwater drawdown contour*." (TNF_0058764, emphasis added.)

[26] Elsewhere, PVMC acknowledges that "baseflow from groundwater accounts for . . . about 35 percent of total streamflow at the Magma Weir." (Doc. 48 at 15, citing TNF_0038405-09.) PVMC uses this fact to argue that SRK's model did not predict direct streamflow reductions and only predicted baseflow reductions. This argument is unavailing for two reasons. First, PVMC's argument ignores that an ESA action area must include "all areas" to be affected by the agency action. Even if the model didn't directly predict streamflow reduction outside the 5-foot drawdown contour, it did predict baseflow reduction outside the 5-foot drawdown contour. That is an "effect" the agencies were required to include in the action area. Indeed, both agencies acknowledged that baseflow reduction would likely result in streamflow reduction and harm to surrounding riparian habitats. Second, as Plaintiffs explain, even if baseflow only makes up 35% of streamflow, that "refers to total streamflow averaged over the year." (Doc. 51 at 20.) But during low rain periods, surface flow in perennial streams may be sustained solely by baseflow. In other words, although baseflow only makes up 35% of total streamflow *averaged over the year*, there may be low-flow periods where, due to the absence of rainfall runoff, streamflow is controlled mostly (or even entirely) by baseflow. It is the maintenance of

During oral argument, PVMC sought to justify the agency's approach by arguing that, north of the Magma Weir, the geology shifts to impermeable rock, such that stream reaches north of the Magma Weir are not controlled by baseflow. Plaintiffs disagreed, arguing that even though the geology of the area north of the Magma Weir is impermeable, baseflow from upstream spills over into that area to maintain its streamflow. PVMC characterized Plaintiffs' argument as a "bathtub theory."

This argument does not change the outcome. Even assuming PVMC is correct that stream reaches north of the Magma Weir are not controlled by baseflow due to the area's impermeable nature, the Court has not located (and PVMC did not identify) any portion of the administrative record in which the agency explained that it excluded the area north of the Magma Weir due to the area's geologic impermeability. "Long-standing principles of administrative law require us to review the [agency's] decision based on the reasoning and factual findings offered by the [agency]—not *post hoc* rationalizations that attempt to intuit what the [agency] may have been thinking." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225-26 (9th Cir. 2009). *See also Citizens Awareness Network, Inc. v. U.S. Nuclear Regul. Comm'n*, 59 F.3d 284, 291 (1st Cir. 1995) ("Courts should not attempt to supply a reasoned basis for the action that the agency itself has not given."). Moreover, PVMC's argument still does not explain why the approximately 0.5 miles between the northern boundary of the action area and the Magma Weir was excluded from the action area, as PVMC's argument at the hearing was that the area north of the Magma Weir is impermeable.

The Federal Defendants also contend that "[e]ven if the Forest Service and FWS should have included Pinto Creek downstream to the Magma Weir in the 'action area' for the ESA Section 7(a)(2) consultation analyses, it would not have changed the result." (Doc. 55 at 3.)[27] The Federal Defendants then elaborate at length as to why, in their view, none

---

year-round baseflow in these perennial streams that matters—not the average baseflow contribution to streamflow throughout the year.

[27] During oral argument, PVMC made a related argument that even if the agency should have included the approximately half-mile stretch of Pinto Creek from the northern boundary of the action area to the Magma Weir, any effects in that area would have been

of the agencies' jeopardy or adverse-modification "determinations would change by adding one-half mile downstream to the 'action area.'" (*Id.* at 4-5.) This argument fails for two reasons. First, as discussed, the decision to limit the action area to the 5-foot groundwater drawdown contour, when SRK's model predicted baseflow effects at a gaging station outside that 5-foot drawdown contour, was arbitrary and capricious. That conclusion does not necessarily mean that *only* the 0.5 miles between the northern boundary of the 5-foot drawdown contour and the Magma Weir should have been included in the action area. On remand, it will be up to the agency to explain just how far that boundary should go (or provide a reasoned explanation as to why the boundary should not be extended at all). Second, the Federal Defendants' argument goes, at most, to the appropriate remedy in this case (which is addressed in later portions of this order), not to the distinct question of whether the agencies acted arbitrarily and capriciously when identifying the relevant action area.

During oral argument, Defendants cited *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007), in an effort to show that the dispute over this point isn't merely a question of remedy. This argument is unpersuasive. In that case, "[a] divided panel of the Ninth Circuit held that the EPA's approval of the transfer was arbitrary and capricious because the EPA 'relied during the administrative proceedings on legally contradictory positions regarding its section 7 obligations.'" *Id.* at 655 (citation omitted). The Ninth Circuit "therefore concluded that it was required to remand to the agency for a plausible explanation of its decision, based on a single, coherent interpretation of the statute." *Id.* (cleaned up). "The panel majority, however, *did not follow this course of action*. Rather, the panel went on to review the EPA's substantive construction of the

---

insignificant or only had a "small impact." But that argument misapprehends the ESA standard, which requires that the action area include "all areas to be affected." *Cf. Env't Prot. Info. Ctr. v. Van Atta*, 692 F. Supp. 3d 879, 897 (N.D. Cal. 2023) ("[T]he BiOp states that the 'proposed project may result in temporary and minimal adverse effects to Essential Fish Habitat' but, is likely to 'result in a net improvement to Essential Fish Habitat Conditions.' But that is not the standard. The ESA requires that the action area include 'all areas to be affected directly or indirectly by the Federal action and not nearly the immediate area involved in the action.'") (cleaned up).

statutes . . . and *vacated* the EPA's transfer decision." *Id.* at 656 (emphases added). The Supreme Court held that "if the EPA's action was arbitrary and capricious, as the Ninth Circuit held, the proper course would have been to remand to the Agency for clarification of its reasons. . . . But the Ninth Circuit did not take this course; instead, it jumped ahead to resolve the merits dispute. In so doing, it erroneously deprived the Agency of its usual administrative avenue for explaining and reconciling the arguably contradictory rationales that sometimes appear in the course of lengthy and complex administrative decisions." *Id.* at 657-58. *Nat'l Ass'n of Home Builders* thus stands for the proposition that if a court determines that an agency's decision was arbitrary and capricious because the agency failed to explain its reasoning, the appropriate remedy may be to remand to the agency without vacatur. But that option is still on the table here—the parties will have an opportunity to brief, during the next round of supplemental briefing, whether vacatur is warranted. *See generally Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.,* 605 U.S. 168, 185 (2025) ("Even if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS. . . . [E]ven if the EIS drew the line on the effects of separate upstream or downstream projects too narrowly, that mistake would not necessarily require a court to vacate the agency's approval of the railroad project.") (citation omitted); *Wild Fish Conservancy v. Quan*, 2024 WL 3842101, *1 (9th Cir. 2024) ("The district court abused its discretion by vacating the take statement's authorization of the troll fishery's summer and winter Chinook salmon harvests. Although vacatur of unlawful agency actions is the presumptive remedy under the APA, courts remand without vacatur when equity demands. This equitable determination requires courts to apply the *Allied-Signal* test, weighing: 1) the seriousness of the agency's errors, against 2) the disruptive consequences of vacatur.") (cleaned up).

As a final matter, the parties disagree, at length, about whether the non-modeling evidence (e.g., AGFD's and WestLand's surveys, anecdotal letters observing riparian tree

mortality in the northern perennial reach, the DEIS's more expansive action area, and TNF's letter to ADWR seeking a determination of appropriability) shows that the mine's pumping was causing, and is expected to continue to cause, effects to water resources and riparian habitats outside the chosen "action area." These arguments, however, miss the point. Even if this non-modeling evidence suggests that effects observed downstream of the action area were not caused by the mine's pumping, the agencies' decision to ignore, without explanation, the results of their own expert's model predicting baseflow effects outside the 5-foot groundwater drawdown contour means the decision to use that 5-foot groundwater drawdown contour as the chosen "action area" was arbitrary and capricious.

### C. Mitigation Measures

#### 1. The Parties' Arguments

##### a. Plaintiffs' Motion For Summary Judgment

Plaintiffs argue that a "BiOp may rely on mitigation measures only if they are 'reasonably certain to yield tangible benefits,'" "so a mere 'general commitment to future improvements—without more specificity—is insufficient." (Doc. 42 at 26-27, citations omitted). Plaintiffs argue that the "BiOp here failed those requirements" because "the BiOp's mitigation measures were merely plans that did not exist yet." (*Id.* at 27.) Put differently, Plaintiffs argue that the BiOp's mitigation measures were merely "a plan to have a plan to have a plan." (*Id.*) Plaintiffs also argue that "[t]hroughout the Section 7 consultation process, both TNF and FWS personnel questioned the validity of their monitoring-only framework and acknowledged that concrete mitigation *actions* were needed." (*Id.*) Thus, Plaintiffs argue that "FWS's blind acceptance of these vague, non-substantive mitigation measures, untethered to any scientific judgment, is owed no deference and was arbitrary and capricious." (*Id.*) Next, Plaintiffs argue that "[t]he monitoring-based mitigation approach was unlawful for another reason: the triggers for mitigatory action were defined relative to already-degraded conditions." (*Id.* at 28.) Because the "Biomonitoring Plan" only required discussion of mitigation "if monitoring reveals changes to vegetation 'compared with values record *during the first year of*

*monitoring*,'" Plaintiffs argue that the "nine years of degradation the mine caused between 2013 and 2022 will be completely ignored." (*Id.*, quoting TNF_0059072.) Plaintiffs conclude that the Federal Defendants' "fail[ure] to 'insure' that PVMC's ongoing pumping will not jeopardize the cuckoo or destroy its critical habitat . . . violated the ESA." (*Id.* at 29.)

**b. The Federal Defendants' Response And Cross-Motion**

The Federal Defendants argue that Plaintiffs' argument "is flawed, for the simple reason that FWS did not rely on any mitigation measures in determining that the proposed Project was not likely to jeopardize the yellow-billed cuckoo or not likely to adversely modify its critical habitat." (Doc. 47-1 at 15.) The Federal Defendants argue that "[b]ecause nothing in the ESA requires mitigation measures be included in those determinations, the threshold question in judicial review of a claim that a BiOp improperly relied on mitigation measures is whether the BiOp did, in fact, rely on mitigation measures for those determinations." (*Id.*) The Federal Defendants argue that "FWS's jeopardy and adverse modification determinations in the BiOp here are like the jeopardy determination the Ninth Circuit upheld in" *Ctr. for Bio. Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020). (Doc. 47-1 at 16.) The Federal Defendants argue that the four bullet points outlining the BiOp's "determination factors" do not "incorporate[] the mitigation measures or state[] that they will diminish any impacts on the species or its critical habitat, now or in the future." (*Id.* at 16-17, citing FWS_000625.) "Because FWS did not rely on mitigation measures for the [YBC] in determining that the proposed [MPO] would not jeopardize the [YBC] or adversely modify its critical habitat, whether the mitigation measures are 'reasonably certain to yield tangible benefits' is of 'no legal consequence.'" (*Id.* at 17, citation omitted). Last, the Federal Defendants argue that "Plaintiffs' second reason for alleging the 'monitoring-based mitigation approach was unlawful,' is also of no legal consequence" and that, "[i]n any event, basing mitigation triggers on vegetation changes compared to the first year of monitoring, is how a monitoring plan works, since there is no previous commensurate data . . . for direct comparison." (*Id.*, citations omitted.)

In sum, the Federal Defendants argue that "[t]he vegetation monitoring plan is not part of these determinations, but is designed to provide a basis for future mitigation, should changes to current conditions be detected." (*Id.* at 18.)

c. **PVMC's Response And Cross-Motion**

PVMC argues that "Plaintiffs' challenge to the MPO's monitoring and mitigation measures misapprehends the ESA's requirements" because "[n]either Section 7 of the ESA nor its implementing regulations requires that adverse impacts to listed species or their habitat be mitigated." (Doc. 48 at 32, cleaned up). PVMC argues that "adverse effects to a listed species and its critical habitat do not violate Section 7 *unless* they would appreciably reduce the species' survival and recovery or appreciably diminish the value of the critical habitat as a whole for the species' conservation," but "[i]n certain instances, . . . an action agency and FWS have relied on mitigation measures to reduce or offset the adverse effects of a proposed action to avoid a jeopardy or adverse-modification determination." (*Id.* at 32-33.) Like the Federal Defendants, PVMC argues that "[h]ere, FWS did not rely on the mitigation measures included in the MPO to support its no-jeopardy and no-adverse-modification determinations. . . . Thus, Plaintiffs' challenges to the MPO's mitigation measures under the ESA are groundless." (*Id.* at 33.)

d. **Plaintiffs' Reply And Response To Cross-Motions**

Plaintiffs contend that the "MPO's mitigation measures were not 'reasonably certain to yield tangible benefits' for purposes of Section 7 consultation" because the "measures had not even been written at the time the BiOp was issued, and, once developed, they required mere monitoring rather than actual, on-the-ground improvements, improperly using already degraded conditions as a baseline." (Doc. 51 at 22.) Plaintiffs argue that "[r]ather than trying to defend the measures, the [Federal Defendants and PVMC] now disavow them" and "claim only that FWS did not rely on the measures in reaching its no-jeopardy and no-adverse-modification conclusions." (*Id.*) Plaintiffs "accept the concession on this point." (*Id.* at 23.) Plaintiffs contend that "because [the Federal Defendants and PVMC] affirmatively assert that the BiOp's mitigation measures did not

factor into the jeopardy or adverse modification conclusions, they are foreclosed from arguing that the mitigation measures rendered the erroneous action area harmless." (*Id.*)

e. **The Federal Defendants' Reply**

The Federal Defendants argue that "Plaintiffs assert that FWS's determination that the Project was not likely to jeopardize the [YBC] or adversely modify its critical habitat and analysis of jeopardy in the BiOp violated the ESA because 'it arbitrarily relied on unlawful mitigation measures,'" "[b]ut Plaintiffs then immediately acknowledge that, in fact, FWS did not factor separate mitigation measures into the jeopardy and adverse modification conclusions, effectively conceding that their ESA claim is without merit and must be rejected." (Doc. 55 at 5.) Thus, the Federal Defendants reiterate that "[b]ecause FWS reached its no jeopardy conclusion without reliance on the mitigation measures, consideration of those measures would simply have further supported the conclusion." (*Id.* at 5-6, cleaned up.)

f. **PVMC's Reply**

PVMC argues that "[a]lthough extensive monitoring and mitigation measures were included in the MPO, there is no evidence that FWS relied on those measures to justify its determination that the action is not likely to jeopardize the continued existence of the YBC species or to destroy or adversely modify the species' critical habitat." (Doc. 56 at 8-9.) PVMC argues that "the BiOp never stated that mitigation measures were necessary to reduce the action's effects below the threshold for jeopardy or adverse modification," and the "BiOp's no-jeopardy conclusion was based on the absence of known breeding [YBCs] and limited habitat for the species within the action area, not on the presence of mitigation measures to offset impacts." (*Id.* at 9.) PVMC argues that "[f]or Plaintiffs claim to have merit, FWS would have needed to *rely* on the mitigation measures to justify its no-jeopardy determination, and there is no evidence that the agency did so." (*Id.*)

2. <u>Analysis</u>

Even if "mitigation measures in the BiOp are insufficiently specific to enforce," that "conclusion . . . has no legal consequence unless [the Court] separately conclude[s] that

FWS relied on those measures." *Bernhardt*, 982 F.3d at 747. The Court agrees with the Federal Defendants and PVMC that FWS did not rely on any mitigation measures when determining "that the action, as proposed, is not likely to jeopardize the continued existence of the cuckoo, and is not likely to destroy or adversely modify proposed critical habitat." (FWS_000625.) The BiOp states that the agency based its no-jeopardy and no-adverse-modification determinations on the following factors:

> • There are no known breeding cuckoos within the action area. We expect migrating and dispersing cuckoos can and will continue to use Pinto Creek within the action area for foraging, cover and shelter. We do not anticipate any fatalities, injuries, or other harm or harassment to individual migrating or dispersing cuckoos from the proposed action. Therefore, we anticipate no incidental take of cuckoos from the proposed action.
>
> • The ongoing and future proposed action will diminish the quality of approximately 308 acres of proposed cuckoo critical habitat for cuckoo conservation, but the proportion of the entire proposed designation affected is small. The adverse effects to proposed critical habitat are a small fraction (0.06 %) of the total 493,665 acres of proposed critical habitat across Arizona, California, Colorado, Idaho, New Mexico, Texas, and Utah.
>
> • The ongoing and future proposed action at Pinto Creek will affect 4.3 percent (308 acres) of the proposed cuckoo critical habitat in Tonto Basin (7,051 acres). Proposed critical habitat also occurs along the Salt River, and Tonto and Pinal Creeks. Breeding cuckoos occur on Rye, Cucamonga, Tonto and Cherry creeks; the Rockhouse Demonstration Site; Salt River; and the Rockhouse Demonstration Site within Tonto Basin.
>
> • Based upon the distribution of breeding cuckoos across Tonto Basin and the small proportion of proposed critical habitat affected within Tonto Basin and across the cuckoo's range, we do not expect PVM's effects to Pinto Creek will reach a tipping point, preventing the bird's recovery or appreciably diminishing the conservation role of proposed critical habitat.

(*Id.*) These conclusions "appear[] to conclude" that the proposed federal action "as a whole, will not significantly impact [the YBC], with or without the mitigation measures," and thus "FWS did not rely on any . . . mitigation measures in its no-jeopardy" and no-adverse-modification determinations. *Bernhardt*, 982 F.3d at 748. Indeed, Plaintiffs "accept" that is the case. (Doc. 51 at 23 ["[Plaintiffs] accept the concession on this point."].) Thus, any ESA claim premised on the alleged insufficiency of the mitigation

measures necessarily fails.

D. **Summary**

The agencies' determination of the scope of the "action area" was arbitrary and capricious because it was limited to the 5-foot groundwater drawdown contour modeled by SRK and excluded areas for which SRK's model separately predicted there would be baseflow effects caused by the mine's pumping. Meanwhile, the agencies' no-jeopardy and no-adverse-modification determinations did not rely on mitigation measures. Accordingly, as it relates to Count Four, Plaintiffs' motion for summary judgment is granted and the Federal Defendants' and PVMC's cross-motions for summary judgment are denied. As for Count Five, Plaintiffs' motion for summary judgment is denied and the Federal Defendants' and PVMC's motions are granted. As for Count Six, Plaintiffs' motion is granted to the extent it is based on an arbitrary "action area" but otherwise denied; conversely, the Federal Defendants' and PVMC's motions are denied to the extent they are based on the "action area" but are otherwise granted.

IV. <u>NEPA Claims</u>

In Count Two, Plaintiffs allege that TNF violated NEPA by failing to take a hard look at impacts to Pinto Creek. (Doc. 1 ¶¶ 145-50.) In Count Three, Plaintiffs allege that TNF violated NEPA by failing to identify and analyze effective mitigation measures. (*Id.* ¶¶ 151-56.) In their motion, Plaintiffs clarify that the alleged violations were (1) "fail[ing] to take a hard look at the mine's effects on Pinto Creek's northern perennial reach" by "irrationally constraining" the analysis area to the 5-foot groundwater drawdown contour (Doc. 42 at 29-31); and (2) "fail[ing] to identify and analyze appropriate mitigation measures" other than monitoring (*id.* at 31-33).

A. **NEPA**

"NEPA 'is our basic national charter for protection of the environment.'" *Nat'l Tr. for Historic Pres. v. Suazo*, 2015 WL 1432632, *9 (D. Ariz. 2015) (quoting *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008)). "NEPA seeks to make certain that agencies will have available, and will carefully

consider, detailed information concerning significant environmental impacts, and that the relevant information will be made available to the larger [public] audience." *Id.* (quoting *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008)). "The statute establishes factors to be considered in agency action, but does not mandate a particular substantive result." *Id.*(citing *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978)).

"A key procedural requirement of NEPA is the preparation of an environmental impact statement ('EIS')." *Id.* (citing *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1150 (9th Cir. 1997)). "In reviewing an EIS, courts apply a 'rule of reason' and determine whether the EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Id.* (cleaned up). "NEPA dictates that courts defer to agency opinion if it is not otherwise shown to be arbitrary and capricious." *Id.* (cleaned up).

The Supreme Court recently announced "[a] course correction of sorts . . . to bring judicial review under NEPA back in line with the statutory text and common sense." *Seven Cnty.*, 605 U.S. at 184. The Court continued: "In light of the continuing confusion and disagreement in the Courts of Appeals over how to handle NEPA cases, we think it important to reiterate and clarify the fundamental principles of judicial review applicable in those cases." *Id.* at 179. Throughout the opinion, the Court emphasized that the "central principle of judicial review in NEPA cases is deference." *Id.* *See also id.* at 185 ("The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference."). The Court also clarified that "[w]hen a party argues that an agency action was arbitrary and capricious due to a deficiency in an EIS, the reviewing court must account for the fact that NEPA is a *purely procedural statute*. Under NEPA, an agency's only obligation is to prepare an adequate report. . . . Unlike a plethora of other federal environmental statutes (such as the Clean Air Act, the Clean Water Act, etc.), NEPA imposes no *substantive* constraints on the agency's ultimate decision to build, fund, or approve a proposed project. So when reviewing an agency's EIS, the only role for a court is to confirm that the agency

has addressed environmental consequences and feasible alternatives as to the relevant project." *Id.* at 180 (cleaned up). "In short, when determining whether an agency's EIS complied with NEPA, a court should afford substantial deference to the agency." *Id*.

The Court also provided concrete examples of the forms this deference should take. For instance, "the question of whether a particular report is detailed enough in a particular case itself requires the exercise of agency discretion—which should not be excessively second-guessed by a court." *Id.* at 181. Additionally, "[a]n agency must make predictive and scientific judgments in assessing the relevant impacts . . . and alternatives . . . . Black-letter administrative law instructs that when an agency makes those kinds of speculative assessments or predictive or scientific judgments, and decides what qualifies as significant or feasible or the like, a reviewing court must be at its 'most deferential.'" *Id.* at 181-82. "To tie all of this together: When assessing significant environmental effects and feasible alternatives for purposes of NEPA, an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting EIS. Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.* at 182-83.

The Court concluded that "the proper judicial approach for NEPA cases is straightforward: Courts should review an agency's EIS to check that it addresses the environmental effects of the project at hand. . . . In conducting that review, courts should afford substantial deference to the agency as to the scope and contents of the EIS." *Id.* at 192. The Court also emphasized that "Congress did not design NEPA for *judges* to hamstring new infrastructure and construction projects." *Id.* at 184.

B. **Analysis Area**

1. <u>The Parties' Arguments</u>

a. **Plaintiffs' Motion For Summary Judgment**

Plaintiffs argue that "NEPA's hard look requirement obligates agencies to evaluate 'all foreseeable direct and indirect impacts' of their actions" and that "[t]he geographic

area included in an EIS 'must represent a reasoned decision and cannot be arbitrary.'" (Doc. 42 at 29, citations omitted). Thus, Plaintiffs argue that "an EIS is unlawful if it ignores impacts by irrationally constraining its analysis to an area smaller than the full geographic scope of foreseeable effects." (*Id.*) Plaintiffs argue that "[h]ere, TNF's analysis of the pumping's effects on plants and wildlife was unreasonable and arbitrary because it omitted Pinto Creek's northern perennial reach, precisely where much of the impact would occur." (*Id.*at 30.) Plaintiffs also argue that "TNF failed to explain why effects on these downstream populations were not worthy of inclusion in its analysis of effects on vegetation and wildlife" and that "[e]ven if TNF believed that, in the abstract, the modeled 5-foot drawdown contour would capture all biological effects—an assumption belied by the record—the significant evidence of baseflow reduction and riparian die-off downstream of that area should have made TNF reconsider" its choice of analysis area. (*Id.*) Thus, Plaintiffs ask the Court to "find that analysis arbitrary, capricious, and contrary to NEPA." (*Id.* at 31.)

b. **The Federal Defendants' Response And Cross-Motion**

The Federal Defendants argue that "Plaintiffs' first NEPA claim does little more than repackage their ESA 'action area' claim." (Doc. 47-1 at 18.) "As a threshold matter," the Federal Defendants argue that "the Court should reject this claim because Plaintiffs failed to exhaust mandatory administrative remedies by failing to raise" their argument about the analysis area "in their May 24, 2021 Objection to the Final EIS and Draft Record of Decision." (*Id.* at 19, citing TNF_0059913-62.) Next, the Federal Defendants argue that "[e]ven if Plaintiffs had properly raised this claim, it still fails on the facts and the law." (*Id.*) Specifically, the Federal Defendants argue that "[c]ourts commonly find that if the demarcation of the 'action area' satisfies the ESA, then using the same area for the scope of analysis in a NEPA document satisfies NEPA, and vice versa." (*Id.*) The Federal Defendants argue that because "the Forest Service's (and FWS's) use of the 5-foot drawdown contour to define the area of analysis for stream flow and riparian impacts satisfies the ESA . . . therefore the Forest Service's reliance on that same area for the

analysis in the Final EIS satisfies NEPA." (*Id.* at 20.) The Federal Defendants also argue that "the Court's review under NEPA, a purely procedural statute, must be highly deferential." (*Id.*) Citing *Seven County*, the Federal Defendants argue that "the Forest Service's reasonable and highly technical choice to draw a manageable line using the 5-foot drawdown contour model to identify potentially significant, reasonably foreseeable consequences of the proposed [MPO] on stream flows and riparian habitat, and the biological resources that depend on them" was reasonable and entitled to substantial deference. (*Id.* at 20-21.) Next, the Federal Defendants argue that "Plaintiffs' argument focuses specifically on plant and animal communities in 'Pinto Creek's northern perennial reach,' and in particular the desert sucker fish species"; that the FEIS "explains that the analysis area 'was defined as the furthest-reaching effects of the action that could alter the ecological setting and thereby affect biological resources'"; that the FEIS "identified 'water withdrawals' as having the potential to impact stream (aquatic) and riparian habitat areas"; that the FEIS found that "the furthest reaching effects of the proposed action generally correspond to the area subject to a change in groundwater level of 5 feet or greater as modeled by SRK Consulting, Inc, (2019b)"; and that, in the effects analysis for "Riparian and Wetland Vegetation Communities," the FEIS "further explains the rationale for determining that the 'predicted drawdown area' for assessing effects on these communities was based on the 5-foot drawdown contour, including why impacts below this contour could not be reasonably attributable to mining operations and pumping of the Peak Well field." (*Id.* at 21-22, cleaned up.) Next, the Federal Defendants argue that Plaintiffs' other evidence "alleging 'significant evidence of baseflow reduction and riparian die-off downstream'" of the analysis area "is the [AGFD's] 2018 assessment, which speculated that riparian vegetation disruptions for only 1.6 miles downstream of the 'analysis area' boundary *may* be the result of Peak Well field pumping" but that AGFD's "assessment was refuted by the more detailed, sophisticated, sound 2020 WestLand study of the exact same area," which "Plaintiffs ignore." (*Id.* at 22.) The Federal Defendants emphasize that the WestLand "study found limited riparian tree mortality—likely attributable to local changes

in stream morphology, not groundwater drawdown—and only for the first 0.6 miles downstream of the boundary." (*Id.*) The Federal Defendants argue that "[t]he Forest Service considered and relied on these results in the biological resources effects section of the Final EIS." (*Id.*)

c. **PVMC's Response And Cross-Motion**

As an initial matter, PVMC argues that "Plaintiffs have failed to exhaust their administrative remedies with respect to" their first NEPA challenge because Plaintiffs "fail[ed] to raise it during the predecisional objection process." (Doc. 48 at 24.) Specifically, PVMC argues that Plaintiffs' objections "generally concerned the impacts on Pinto Creek and whether satisfactory mitigation was being required, [but] did not challenge the scope of the Forest Service's analysis area for indirect effects." (*Id.*) Alternatively, PVMC argues that "Plaintiffs' argument should be rejected because it amounts to an improper request to second-guess the agency." (*Id.*) Specifically, PVMC argues that "[t]he effects of PVMC's groundwater pumping are indirect effects of the action—the Forest Service does not authorize or regulate groundwater use under its Subpart 228A regulations." (*Id.* at 24-25.) PVMC argues that "it is uncertain whether and to what extent lower Pinto Creek's streamflow is impacted by PVMC's groundwater pumping" and that Plaintiffs have not "shown that SRK's groundwater modeling was erroneous or that it was unreasonable for the Forest Service to use the modeled groundwater drawdown in determining the scope of the action's indirect effects." (*Id.* at 25.) Citing *Seven County*, PVMC argues that "[t]hat determination lies within the Forest Service's discretion and is entitled to substantial deference." (*Id.*)

d. **Plaintiffs' Reply And Response To Cross-Motions**

Plaintiffs argue that, "[l]ike the ESA action area, the analysis area that TNF used to evaluate the effects of PVMC's pumping on plants and wildlife arbitrarily omitted Pinto Creek's northern perennial reach, where most of the impacts are evident." (Doc. 51 at 23.) Plaintiffs argue "TNF's own modeling and ample other evidence showed clear harm to Pinto Creek's *baseflow* (surface flow) outside of the defined *groundwater* drawdown

contour." (*Id.*) Next, Plaintiffs argue that the "Federal Defendants also identify three statements in the FEIS to claim that TNF's line-drawing was reasonable, but those statements provide no actual analysis, explanation, or application of expertise. They consistent of a conclusory and unsupported statement that the analysis area for each issue was 'appropriate'; a conclusory and unsupported statement that the drawdown contour included the 'furthest-reaching effects' on plant and animal communities; and a restatement of the irrelevant point that changes in *groundwater levels* of less than five feet could not be reliably detected outside the drawdown contour." (*Id.* at 23-24, record citations omitted.) Plaintiffs emphasize that "[t]hese statements do not acknowledge, much less rationally reconcile, TNF's own modeling results showing *streamflow reduction* outside the drawdown contour." (*Id.* at 24.) Plaintiffs also dispute the Federal Defendants' arguments regarding the AGFD and WestLand studies. (*Id.*) Plaintiffs next argue that *Seven County* "does not excuse this error" because "[w]hile agencies are indeed entitled to deference about where to draw the line in the scope of an analysis, that is true only within a broad zone of reasonableness, and only if the analysis presents reasoned determinations consistent with what NEPA mandates the agency must consider." (*Id.*, cleaned up). Plaintiffs argue that "[h]ere, where TNF's own modeling, reinforced by a wealth of empirical evidence, showed harm to Pinto Creek outside the drawdown area, it was not reasonable to ignore that effect when assessing impacts on plant and wildlife—especially because the Federal Defendants never explained why those effects were excluded." (*Id.* at 24-25.) As for the Federal Defendants' and PVMC's argument that Plaintiffs failed to exhaust their administrative remedies, Plaintiffs argue that "TNF was well-apprised of [Plaintiffs'] concerns and had the opportunity to rectify them" and that "TNF's failure to consider effects along the northern reach of Pinto Creek was a central theme in the [Plaintiffs'] objections, which repeatedly discussed downstream effects on Pinto Creek from the mine's pumping and noted that they were irrationally omitted from the Final EIS." (*Id.* at 25.) Plaintiffs also argue that "TNF's response letter" to Plaintiffs' objections "recognized [Plaintiffs'] contention that 'pumping was having a profound adverse impact

on flows and [that Plaintiffs] stated their greatest concerns centered around a nine-mile perennial reach of Pinto Creek located below the Pinto Valley Mine.'" (*Id.* at 26, cleaned up.)

e. **The Federal Defendants' Reply**

As for administrative exhaustion, the Federal Defendants argue that "Plaintiffs assert that two stray sentences in their 50-page objections put the Forest Service on notice of their newly-minted claim that the Final EIS violated NEPA by limiting the 'analysis area' to the 5-foot drawdown contour." (Doc. 55 at 6.) The Federal Defendants argue that the "first of these sentences merely asserts that the discussion of the Final EIS contains a *less detailed* discussion of the alleged 'die off' of riparian vegetation in Pinto Creek below the Mine site, but it does not claim this discussion was eliminated or that the Final EIS in any way did not disclose impacts in this location because they were outside the 'analysis area,'" and that the "second of these sentences merely alleges that the Forest Service violated *the ESA* and other substantive law by failing to protect two fish species in Pinto Creek, but makes no assertion that the Final EIS failed to assess impacts to these species in violation of NEPA's procedural requirements, let alone that the species are present in the portion of Pinto Creek below the mine." (*Id.*) The Federal Defendants argue that, "[i]ndeed, the very next paragraph of Plaintiffs' objections appears to *endorse* the use of the 5-foot drawdown contour in identifying impacts to Pinto Creek, asserting that the modeling suggests that additional stretches 'will experience die-off.'" (*Id.*, record citation omitted.) At bottom, the Federal Defendants argue that "[n]othing in Plaintiffs' Objections comes close to alerting the Forest Service to a claim that it violated NEPA by defining the 'analysis area' using the 5-foot drawdown contour" and that "[n]owhere do Plaintiffs' Objections present any claim remotely similar to the claim Plaintiffs now pursue in this litigation," and thus "Plaintiffs are barred from bringing their 'analysis area' NEPA claim." (*Id.* at 6-7.) Alternatively, the Federal Defendants argue that "[e]ven if this claim was not barred, it is without merit, for the reasons discussed above in the ESA 'action area' context." (*Id.* at 7.) Among other things, the Federal Defendants argue that even if the

WestLand study observed tree mortality in the first one-half mile downstream of the analysis area, "Plaintiffs fail to explain how adding one-half mile more of streamflow reduction would have materially changed the analysis in the Final EIS for these species." (*Id.*) Last, the Federal Defendants argue that "Plaintiffs attempt to avoid the Supreme Court's admonishments about deferential NEPA review in *Seven County* by asserting that the Forest Service 'never explained why [effects below the 'analysis area' boundary] were excluded'" but "the Forest Service directly recruited the experts as SRK Consulting to develop a drawdown model that could be used in the EIS to predict groundwater drawdown from Project implementation and how that drawdown would impact surface flows in Pinto Creek (and elsewhere)" and "[t]hat is what SRK Consulting accomplished in creating the 5-foot drawdown contour model, which the Forest Service appropriately explained and applied in defining the 'analysis area' in the Final EIS." (*Id.* at 8.)

f. **PVMC's Reply**

PVMC argues that "[l]ike the action area used for Section 7 consultation, the NEPA analysis area for biological resources was based on the 'furthest-reaching effects of the action that could alter the ecological setting and thereby affect biological resources,' which effects 'generally correspond to the area subject to a change in groundwater level of 5 feet or greater as modeled by SRK Consulting, Inc. (2019b).'" (Doc. 56 at 9, record citations omitted.) PVMC adds that "[t]he Forest Service determined that the stream reaches that could be impacted by mine-related groundwater drawdown, including Pinto Creek, are located within the 5-foot drawdown contour predicted by SRK's groundwater modeling," so "[t]he Forest Service therefore limited its analysis of environmental effects to that area." (*Id.* at 9-10.) PMVC argues that Plaintiffs' "primary argument is again their belief that the reduction in simulated baseflow at the Magma Weir impacts streamflow in lower Pinto Creek, outside of the predicted drawdown area," "[b]ut that is not what the Forest Service determined, based on SRK's modeling." (*Id.* at 10.) PVMC argues that "the FEIS and accompanying [Water Resources Report] explain that the perennial stream segments likely to be affected by mine-induced groundwater drawdown are the stream segments within the

5-foot drawdown area" and that "[t]he other 'evidence' cited by Plaintiffs to support their argument, such as the 2018 AGFD report, is contradicted by other record documents." (*Id.*) Thus, PVMC argues that "the Forest Service's decision to limit the analysis area to the area within the modeled 5-foot drawdown contour was reasoned and supported by the record" and entitled to deference under *Seven County*. (*Id.*)

2. Analysis

a. **Administrative Exhaustion**

There is no merit to the Federal Defendants' and PVMC's argument that Plaintiffs failed to exhaust their administrative remedies. "Before a party can challenge an action by the Forest Service in federal court, it must exhaust administrative remedies." *Friends of the Norbeck v. U.S. Forest Serv.*, 661 F.3d 969, 974 (8th Cir. 2011). "The requirement of exhaustion serves two purposes. First, it protects administrative agency authority by allowing the agency to correct its own mistakes before it is haled into federal court and by discouraging disregard of its procedures. Second, it promotes efficiency by resolving disputes before the agency rather than through litigation in federal court." *Id.* (cleaned up). "When challenging an agency's compliance with NEPA, parties must structure their participation so that it alerts the agency to the parties' position and contentions in order to allow the agency to give the issue meaningful consideration." *Id.* (cleaned up). The Ninth Circuit has recognized "that claimants who bring administrative appeals may try to resolve their difficulties by alerting the decision maker to the problem in general terms, rather than using precise legal formulations." *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002). Claims need only "be raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised, but there is no bright-line standard as to when this requirement has been met and we must consider exhaustion arguments on a case-by-case basis." *Id.* Plaintiffs need not "incant . . . magic words," nor must they precisely use the language of the statute they assert was violated, "in order to leave the courtroom door open to a challenge." *Id.* at 966.

In Count Two, Plaintiffs allege that "TNF unlawfully limited its analysis of impacts

from the mine's pumping to the arbitrarily defined aquifer drawdown area, even though it knew that adverse effects extended beyond that area." (Doc. 1 ¶ 149.) In their objections to the FEIS and Draft ROD, Plaintiffs stated as follows:

> Die-off of riparian vegetation in Pinto Creek below the mine site was noticed shortly after Capstone reopened the mine in 2013. A recent field trip by Sierra Club members revealed about half a mile of dead and downed trees in the vicinity of the Magma Weir. Tree mortality of this magnitude has not been observed by our members in this area previously—Club members have been visiting Pinto Creek for many decades. Both Miller Ecological Consultants and [AGFD] (FEIS at 3-68 to 69) have studied and documented the die-off of vegetation and have noted that such impacts have not occurred on other nearby creeks. Clearly, groundwater pumping has lowered the water table and depleted flows to the point where major segments of the creek are being killed off. With no explanation, the FEIS removed much of this discussion that had been in the DEIS at 3-60 to 61.

(TNF_0059928.)[28]

On the one hand, this language makes no specific reference to the term "analysis area" and does not cite NEPA. It also makes no reference to the 5-foot groundwater drawdown contour and does not argue that the use of that 5-foot groundwater drawdown contour to define the boundaries of the analysis area was arbitrary or flawed. On the other hand, "[w]hile these references do not specifically cite" NEPA or NEPA's analysis-area requirements, Plaintiffs "clearly expressed concern" that depleted surface flow and tree mortality attributable to PVMC's mining activities was occurring in the vicinity of the Magma Weir (i.e., outside the analysis area) and that the FEIS had arbitrarily removed much of the discussion surrounding the Miller and AGFD studies discussing similar tree mortality downstream of the analysis area. *Idaho Sporting Cong.*, 305 F.3d at 966. In other words, Plaintiffs' "grievances" in this paragraph of their objections can be "fairly described as being directed at" TNF's alleged failure to address reasonably foreseeable

[28] Plaintiffs also cite their mention of the desert sucker and longfin dace "as potentially present in the excluded northern perennial reach" and the agency's "failure to protect these species and their habitat" as violating the law. (Doc. 51 at 26 [citing TNF_0059929].) This argument is unavailing because the objections at issue do not mention these species as specifically present in the northern perennial reach (as opposed to present in areas already included in the analysis area).

environmental effects of the proposed agency action outside the analysis area. *Id.* Moreover, in TNF's response letter to Plaintiffs' objections, TNF acknowledged that Plaintiffs "contend[] that the groundwater model clearly demonstrates that pumping is having a profound adverse impact on flows *and state their greatest concerns center around a nine-mile perennial reach of Pinto Creek located below the Pinto Valley Mine on the Forest*." (TNF_0060352, emphasis added.) In other words, TNF acknowledged that Plaintiffs' objections were focused on effects outside the analysis area. On this record, Plaintiffs did enough to exhaust their administrative remedies.

b. **Merits**

On the merits, Plaintiffs' claim that TNF's identification of the relevant "analysis area" violated NEPA is subject to the largely same analysis as Plaintiffs' ESA "action area" claim discussed above. Under NEPA, "[t]he Forest Service is required to take a 'hard look' at the environmental consequences of its actions. This includes considering all foreseeable direct and indirect impacts." *Idaho Sporting Cong.*, 305 F.3d at 973 (citations omitted).

To be sure, an agency is afforded substantial deference in its "choice of analysis scale." *Id.* *See also Friends of the Wild Swan*, 767 F.3d at 943 ("A recurring theme in this appeal is whether the agency gave sufficient reasons for limiting the geographic scope of its cumulative effects analysis to one side of the river or the other. An agency has the discretion to determine the physical scope used for measuring environmental impacts. Identifying the appropriate geographic scope is a task assigned to the special competency of the appropriate agency, and the agency must balance need for a comprehensive analysis versus considerations of practicality, while also keeping in mind that use of a larger analysis area can dilute the apparent magnitude of environmental effects.") (cleaned up); *Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 958 (9th Cir. 2003) ("The task of selecting the geographic boundaries of an EIS requires a complicated analysis of several factors, such as the scope of the project considered, the features of the land, and the types of species in the area. Determination of the extent and effect of these factors, and particularly identification of the geographic area within which they may occur, is a task

assigned to the special competency of the appropriate agencies.") (cleaned up). The Supreme Court recently reaffirmed the need to afford "substantial deference" when evaluating a NEPA challenge to an agency's choice regarding "how far to go in considering indirect environmental effects from the project at hand." *Seven Cnty.*, 605 U.S. at 182-83. The Court has faithfully applied that principle in post-*Seven County* cases. *Ariz. Mining Reform Coal.*, 172 F.4th at 659 (affirming that "the Government's decision to draw a line between modeling and analyzing the cumulative water impact from 'the portion of Superstition Vistas that has a demonstrated source of water,' and not '[o]ther portions of Superstition Vistas without demonstrated water supplies,' is the type of discretionary decision about 'how far to go in considering indirect environmental effects' that we must defer to pursuant to *Seven County*").

But substantial deference is not the same thing as automatic affirmance. And having concluded that the agencies acted arbitrarily and capriciously, in violation of the ESA, by limiting the ESA "action area" to the 5-foot groundwater drawdown contour modeled by SRK despite SRK also predicting that baseflow effects would occur outside that area (i.e., at the Magma Weir), it would seem to follow that the same determination was arbitrary and capricious, for the same reasons, for purposes of Plaintiffs' NEPA claim. Although agencies are afforded substantial deference under NEPA in their choice of analysis area—including "decisions about where to draw the line" and "how far to go in considering indirect environmental effects from the project at hand," *Seven Cnty.*, 605 U.S. at 182—an agency may nevertheless act arbitrarily when it ignores, without explanation, the conclusions of its own experts. *See, e.g.*, *Idaho Sporting Cong.*, 305 F.3d at 973-74 ("In the face of its own findings that there would be significant depletion of habitat, the Forest Service arbitrarily chose 'home range' as the scale of analysis for cumulative effects for the Long Prong sale. The Forest Service ignored the detailed and well-supported conclusions of its own scientists that cumulative effects analysis of the species at issue '*must* be addressed at a landscape scale.' The Long Prong EIS does not explain why the home range scale was chosen despite hard scientific information in the possession of the

Forest Service indicating that use of landscape scale analysis is mandatory. We hold, therefore, that the Forest Service acted arbitrarily in employing the home range for cumulative effects analysis in the Long Prong EIS . . . without justifying its decision in the face of contrary evidence.") (cleaned up); *Native Ecosystems Council v. Weldon*, 848 F. Supp. 2d 1207, 1217 (D. Mont. 2012), *vacated on other grounds*, 2012 WL 5986475 (D. Mont. 2012) (citing *Idaho Sporting Cong.* and holding that "[a] similar error exists here" where "the Forest Service's own scientist . . . concluded that the unit of analysis for the road-density standard should be the 'elk herd home range'" and the agency failed to explain why a different range was chosen). TNF's decision to limit its NEPA "analysis area" to the 5-foot drawdown contour modeled by SRK, while ignoring that SRK's model also predicted baseflow effects caused by the mine's pumping outside that area, does not fall within the "broad zone of reasonableness" required by NEPA and *Seven County*. *Cf. Oregon Wild v. U.S. Forest Serv.*, 2026 WL 96908, *10 (D. Or. 2026), *clarified on denial of recon.*, 2026 WL 916346 (D. Or. 2026) ("[*Seven County*] emphasized 'NEPA does not require the agency to weigh environmental consequences in any particular way.' *Seven County* nevertheless maintains that agency action must be 'reasonable and reasonably explained.' Courts 'should defer to agencies' decisions about where to draw the line' in the scope of an analysis within a 'broad zone of reasonableness,' but only if the analysis presents reasoned determinations consistent with what NEPA mandates the agency must consider. . . . *Seven County* does not grant an agency discretion to forgo NEPA requirements, nor does it displace arbitrary and capricious review.").[29]

---

[29] During oral argument, the Federal Defendants suggested that the Court's NEPA analysis as to the "analysis area" issue is inconsistent with its NEPA analysis as to the mitigation-measures issue because the former analysis fails to acknowledge that the effects caused by PVMC's pumping are indirect effects that are not effects of the "project at issue" and, under *Seven County*, agencies are entitled to deference in how far they go in analyzing such effects. But the FEIS clarifies that "[t]he analysis areas" addressed in the FEIS "include the extent of potential impacts that could result from the alternatives, *regardless of surface ownership*." (TNF_0057818, emphasis added.) Although an agency is entitled to deference under *Seven County* in how far it chooses to go in analyzing indirect effects, particularly where those indirect effects are caused by activities over which the agency lacks regulatory authority, here TNF expressly stated that it intended to include, in its "analysis area," impacts regardless of surface ownership.

C. **Mitigation Measures**

1. The Parties' Arguments

a. **Plaintiffs' Motion For Summary Judgment**

Plaintiffs argue that "TNF both failed to identify mitigation actions with reasonable specificity and failed to evaluate the effectiveness of the vague, lackluster measures it did identify." (Doc. 42 at 31.) First, Plaintiffs argue that "the FEIS included no details for implementing concrete mitigation *actions*, leaving that task for some unspecified time." (*Id.*) Plaintiffs contend that "TNF's last-minute modification to the [CWRMMP] listed, for the first time, *concepts* for real mitigation action," but "it provided no details on how or when they might be implemented." (*Id.*) Plaintiffs also argue that "in providing that late-breaking list . . . TNF conceded that real mitigation options were available and should have been analyzed"—including "[s]ecuring alternative water sources for mining operations"; "[i]mproving on-site water conservation measures"; and "[o]ptimizing the Peak wellfield performance including . . . [by] changing the configuration of the pumped wells." (*Id.*, record citation omitted.) Plaintiffs argue that one of these measures—"optimizing the Peak Well field to minimize effects to Pinto Creek"—"stands out as plainly feasible, appropriate, and suitable for implementation" because TNF's 2020 letter to ADWR emphasized certain wells were "the most likely to be pumping appropriable surface water" and the FEIS acknowledged that pumping from certain wells "may have a greater effect than others." (*Id.* at 31-32, record citations omitted.) Plaintiffs fault the FEIS for "reject[ing], without analysis," such a pumping optimization plan. (*Id.*at 32.) Second, Plaintiffs argue that "TNF did not evaluate the effectiveness of the mitigation measures it did include in the FEIS" and that "[i]ts conclusory sentences claiming that each monitoring measure would be effective, without explaining how they would actually mitigate the loss of water or associated harm to the creek, was insufficient." (*Id.*) Likewise, Plaintiffs argue that "the late amendments to the [CWRMMP] offered no analysis of their purported effectiveness." (*Id.*) As one example, Plaintiffs point to Water Rights Mitigation Measure No. 4 (WR-4), which "claimed that PVMC would 'monitor[] groundwater levels

downstream of the mine' and that any '[a]dverse impacts on . . . water rights would be identified and mitigated as required under Arizona State law.'" (*Id.* at 33, citing TNF_0059047.) Plaintiffs argue that "TNF had already concluded that mine-induced drawdown was impairing its instream water right, and still allowed PVMC's pumping to continue unabated," and "[t]hus, the assumption underlying TNF's approach—that the mitigation duty could be fulfilled at some future point when further monitoring showed harm—was fatally flawed." (*Id.*, record citation omitted.) Plaintiffs argue that "[b]ecause these failures amount to an abdication of TNF's NEPA duties and are not simply a disagreement with the agency's expertise, the Court should afford limited, if any, deference to TNF's ultimate decision." (*Id.*)

b. **The Federal Defendants' Response And Cross-Motion**

The Federal Defendants argue that "[b]ecause NEPA does not mandate particular results, NEPA does not require that an agency have a fully developed mitigation plan, and instead only requires that mitigation be developed and discussed in an EIS to a reasonable degree." (Doc. 47-1 at 22.) The Federal Defendants also argue that "[t]he Ninth Circuit has routinely upheld an EIS's discussion of monitoring and mitigation plans where specific mitigation would be developed in the future." (*Id.* at 23.) The Federal Defendants cite several sections of the DEIS discussing mitigation measures for air quality; fish and wildlife species; cultural resources; fires and fuels management; geology, minerals, and geotechnical stability; hazardous and non-hazardous materials; livestock grazing; public health and safety; soils; traffic and transportation; and water resources and hydrogeochemistry. (*Id.* at 23-24.) "[F]or water resources in particular," the Federal Defendants emphasize that "Appendix E of the Draft EIS presents an entire 'Technical Report,' that not only examines in detail environmental impacts related to water resources and mitigation of those impacts, but includes an entire section dedicated to identifying and discussing specific proposed monitoring and mitigation measures for those resources." (*Id.* at 24, record citations omitted.) Next, the Federal Defendants argue that "[t]he Forest Service took input from other agencies, PVMC, and the public on the Draft EIS to further

develop and refine mitigation measures in the Final EIS" and that the "Final EIS includes refined and updated analyses of mitigation measures and effectiveness in the context of assessing environmental impacts on each resource, as well as in the [Water Resources Report] in Appendix E." (*Id.*) The Federal Defendants also argue that the "Final EIS goes even further first adding and discussing 'General Mitigation Measures,' and then including a nearly 400-page Appendix H, titled 'Environmental Protection Measures, Monitoring, and Mitigation,' that describes the monitoring and mitigation measures that the Forest Service added." (*Id.*, record citations omitted.) The Federal Defendants argue that "[a]t the same time the Forest Serviced issued the Final EIS with Appendix H, it also released a Draft Record of Decision that likewise discussed the proposed monitoring and mitigation measures." (*Id.* at 25.) Next, the Federal Defendants argue that "[t]he Forest Service did not stop there" and "[d]uring the higher-level administrative review ('Objections') process for the Final EIS and Draft Record of Decision, . . . the agency . . . develop[ed] additional monitoring and mitigation measures"—specifically, "the Forest Service added three new mitigation measures relating to potential failure of tailings storage facilities, and it updated the first water resources mitigation measure ('WR-1') by adding specificity to the monitoring and mitigation requirements of the [CWRMMP] included in Appendix H of the Final EIS." (*Id.*) The Federal Defendants argue that "[d]espite this exhaustive and detailed review of mitigation measures throughout the NEPA process, Plaintiffs assert that the Forest Service violated NEPA by allegedly 'fail[ing] to identify mitigation actions with reasonable specificity and fail[ing] to evaluate the effectiveness of the vague, lackluster measures it did identify'" and that "Plaintiffs are wrong on both points." (*Id.* at 26.) For example, the Federal Defendants argue that the BRMMP "includes incredibly detailed and specific monitoring requirements" for the YBC and that such monitoring is "required." (*Id.*) The Federal Defendants also argue that "any exceedances of the specified thresholds requires implementation of appropriate adaptive management/mitigation measures, such as habitat restoration, reducing water-resource related impacts resulting from mine-drawdown, and other mitigation measures set forth in the [CWRMMP]." (*Id.* at 26-27.)

And the Federal Defendants argue that the Final ROD makes these mitigation measures "not optional." (*Id.* at 27.) Thus, the Federal Defendants argue that "[t]he Forest Service's *mandatory* plan for monitoring and mitigating [YBC] impacts goes beyond the purely procedural requirements of NEPA, which only requires as assessment of mitigation measures, not actual implementation." (*Id.*) The Federal Defendants also argue that "[c]ourts, including the Ninth Circuit, have consistently upheld the adequacy of discussions of mitigation plans in EISs, like the Forest Service's plan here, that include detailed monitoring requirements and specific thresholds and mitigation measures, but rely on adaptive management to determine which mitigation measures might be applied in the future." (*Id.*) Next, the Federal Defendants argue that "Plaintiffs' attack on the water resources mitigation measures fa[res] no better." (*Id.* at 28.) For example, the Federal Defendants dispute that a pumping optimization plan would have been a feasible mitigation measure. (*Id.*) As for WR-1, the Federal Defendants argue that "[a]lthough much of the [CWRMMP] necessarily deals with water *quality* issues, a substantial portion of the Plan is targeted at monitoring and identifying trends in Pinto Creek baseflows 'adjacent to and downstream of the Peak wellfield,' as well as groundwater levels, with the 'adaptive management strategy' of developing 'site specific mitigation plans, as necessary and feasible, to address reductions in baseflow or drying up of perennial stream reaches or springs that are directly and reasonably attributable to the mine operations.'" (*Id.* at 29, record citations omitted.) Thus, the Federal Defendants argue that "[l]ike the monitoring and adaptive management plan for mitigating potential impacts to the [YBC], this water quantity and flow plan easily passes muster under NEPA." (*Id.*) Next, the Federal Defendants argue that "Plaintiffs' brief argument that the Forest Service did not evaluate the effectiveness of the mitigation measures also fails." (*Id.* at 29-30.) The Federal Defendants emphasize that WR-4 "*requires* PVMC to collect relevant groundwater level information (in accordance with WR-1, discussed above) and to use that information to identify and mitigate adverse impacts on water rights, to the extent required by Arizona State law." (*Id.* at 30.) Last, the Federal Defendants argue that even if the discussion of

mitigation measures is brief, under *Seven County*, "[b]revity should not be mistaken for lack of detail" and "[a] relatively brief agency explanation can be reasoned and detailed." (*Id.* at 31.)

c. **PVMC's Response And Cross-Motion**

PVMC argues that "[t]he Forest Service considered and discussed post-decision monitoring and mitigation during the NEPA process," and "[i]ndeed, an entire volume of the FEIS is devoted to discussing the environmental protection measures employed at the Pinto Valley Mine, measures required by other agencies, and mitigation measures and monitoring plans that could be applied to the selected action and minimize potential adverse impacts." (Doc. 48 at 25.) PVMC argues that "[t]hese included monitoring and mitigation plans for biological resources and water resources" and that the "FEIS also contained a summary of each mitigation measures with a short discussion of the measure's effectiveness," and "[t]he Forest Service's ROD discusses monitoring and mitigation and required that specific mitigation requirements be included in the MPO." (*Id.*, record citations omitted.) Next, PVMC argues that "Plaintiffs quarrel with the monitoring and mitigation measures included in the selected action, claiming that the Forest Service was required to develop 'concepts' for 'real mitigation,'" but "NEPA does not require the development of detailed mitigation concepts and plans." (*Id.* at 26.) PVMC also argues that "Plaintiffs' brief makes clear that their real complaint is that the Forest Service did not restrict PVMC's groundwater pumping," but "[t]his would be unlawful" because "PVMC's groundwater pumping is governed by Arizona law." (*Id.* at 26-27.) "In short," PVMC argues that "[e]xtensive monitoring and mitigation requirements were discussed in the FEIS and ultimately included in the MPO" and "the Forest Service had no authority to restrict PVMC's groundwater use under the guise of mitigating environmental impacts under NEPA, which imposes procedural requirements on federal agencies." (*Id.* at 27.)

d. **Plaintiffs' Reply And Response To Cross-Motions**

Plaintiffs reiterate their argument that TNF violated NEPA "by failing to meaningfully analyze reasonably specific mitigation measures" and failing to assess the

effectiveness of mitigation measures the agency did identify. (Doc. 51 at 26.) First, Plaintiffs argue that "Federal Defendants' brief spends pages summarizing the FEIS, seemingly to suggest that volume equals sufficiency" but "[m]ost of that description is irrelevant to the mitigation measures challenged here." (*Id.* at 26-27.) Plaintiffs clarify that they "do not challenge any lack of specificity in identifying future *monitoring* protocols." (*Id.* at 27.) Rather, Plaintiffs argue that "TNF erred by failing to identify, much less analyze, specific mitigation *actions*—steps PVMC will undertake to improve actual, on-the-ground conditions." (*Id.*) For example, Plaintiffs point to the BRMMP and CWRMMP, arguing that they merely require PVMC to monitor and do not identify any mitigation actions with specificity. (*Id.*) Plaintiffs argue that this "glaring lack of detail stands in stark contrast to the cases cited by Defendants, which upheld mitigation measures far more specific than those here." (*Id.*) Plaintiffs argue that mere monitoring does not address or resolve reduced baseflows that are a result of pumping the Peak Well field. (*Id.* at 28.) Next, Plaintiffs argue that "PVMC asserts that TNF could not have analyzed more robust measures that 'restrict PVMC's groundwater pumping' because TNF lacked authority to impose such measures" but "that is false: TNF had the authority and obligation to regulate PVMC's pumping through reasonable mitigation measures under the Organic Act (not to mention the ESA)" and that "in making that argument, PVMC all but admits that TNF did not actually identify any concrete measures to address the 'adverse environmental consequences' of PVMC's pumping—just monitoring." (*Id.*) Plaintiffs also argue that, "[i]n any case, TNF certainly did not analyze how effective the measures would be." (*Id.* at 29.) Next, Plaintiffs argue that the "Federal Defendants . . . contort the discussion of WR-4." (*Id.*) At bottom, Plaintiffs argue that "true analysis of mitigation measures would have made crystal clear that TNF's monitoring-based approach was premised on pure fiction" and that "[t]he whole purpose, in theory, was to determine *whether* the mine was harming the creek's ecosystem and, if so, set a framework to decide what to do about it." (*Id.* at 30.) Plaintiffs contend that "the FEIS already found that PVMC's pumping was impairing Pinto Creek's baseflow, causing the formerly perennial

creek to run dry when it never had before," yet "[t]he mitigation measures were written as if those findings did not exist, leaving a fundamental, unexplained disconnect between the mitigation measures and the FEIS's findings." (*Id.*)

e. **The Federal Defendants' Reply**

The Federal Defendants argue that "Plaintiffs' thesis" that TNF "erred by failing to identify, much less analyze, specific mitigation *actions*—steps PVMC *will* undertake to improve actual, on-the-ground conditions" is "plainly at odds with *Seven County*'s admonition" that "NEPA does *not* require a fully developed plan detailing what steps *will* be taken to mitigate adverse environmental impacts and does not require a 'worst case analysis.'" (Doc. 55 at 9.) The Federal Defendants also argue that the "*lack* of detail in the mitigation plans described in those cases [cited by Plaintiffs] stands in stark contrast to the incredible detail in the mitigation plan that the Forest Service developed for the Project here." (*Id.*) Next, the Federal Defendants argue that Plaintiffs "focus[] on a single mitigation measure out of the dozens in the EIS: the monitoring and mitigation of water resources (and any concomitant significant impact on bioresources) that may result from mine groundwater drawdown" but that "Plaintiffs misunderstand (or just misrepresent) the purpose of this monitoring, claiming it is to determine 'whether' PVMC's pumping is affecting Pinto Creek's baseflow." (*Id.* at 10.) The Federal Defendants then argue, at length, regarding what the CWRMMP requires. (*Id.* at 10-11.) Next, the Federal Defendants argue that the "EIS also expressly evaluates the effectiveness of WR-1," and "[w]hile the Forest Service's explanation of effectiveness is short and to the point," *Seven County* requires no more than that. (*Id.* at 11.) "In short," the Federal Defendants argue that "the monitoring and mitigation plan for water resources is expected to determine how pumping from the Peak Well Field is impacting stream flows, including downstream of the 5-foot drawdown contour boundary in the vicinity of the Magma Weir," and that "[i]f this information shows such impacts, it can be used to develop a Peak Well field 'pumping optimization plan' . . . though, at the time of the Final EIS and Record of Decision, neither Plaintiffs, the Forest Service, nor PVMC could speculate about the necessity, feasibility,

or efficacy of such a plan." (*Id.*)

f. **PVMC's Reply**

PVMC argues that "[t]he Forest Service considered and discussed post-decision monitoring and mitigation during the NEPA process, devoting an entire volume of the FEIS to discussing measures required by other agencies and mitigation and monitoring plans that could be applied to the proposed action to minimize potential adverse effects." (Doc. 56 at 10-11.) PVMC also disputes Plaintiffs' argument that the Forest Service had authority to regulate PVMC's pumping, emphasizing that this pumping is "an activity that has been ongoing since the 1970s and is governed by Arizona law." (*Id.* at 11.) Next, PVMC reiterates that "NEPA does not impose an obligation to mitigate the adverse effects of major federal actions or require that an EIS contain a detailed discussion of specific mitigation measures which *will* be employed to mitigate the adverse impact," and an "EIS's proposed mitigation measures need not be legally enforceable, funded, or even in final form to comply with NEPA's procedural requirements." (*Id.*, cleaned up.) Thus, PVMC argues that "Plaintiffs' demand for a detailed plan to regulate PVMCs groundwater pumping goes beyond what NEPA requires—and beyond the Forest Service's regulatory authority, as the agency acknowledged." (*Id.*) Next, PVMC argues that "Plaintiffs erroneously treat PVMC's groundwater withdrawals as if they were the proposed federal action—'the project at hand,'" but "[t]he proposed federal action was the approval of PVMC's MPO authorizing the use of 795 acres of NFS lands for mining-related purposes" and "[t]he effects caused by PVMC's groundwater withdrawals are an indirect effect of that action." (*Id.*) PVMC argues that under *Seven County*, the agency "had broad discretion in deciding how far to go in considering indirect effects." (*Id.* at 11-12.) PVMC argues that "the Ninth Circuit, following *Seven County*, recently affirmed this Court's determination that the Forest Service had adequately considered mitigation measures concerning the effects of groundwater pumping in an EIS for a land exchange with a mining company" and "explained that 'the Supreme Court has made clear that it is largely within the agency's discretion to determine the detail afforded to particular issues in an EIS,

especially those issues over which it lacks regulatory authority.'" (*Id.* at 12, citations omitted.) Last, PVMC argues that "Plaintiffs' argument misstates the effects of PVMC's groundwater pumping on lower Pinto Creek." (*Id.*) Specifically, PVMC argues that "the FEIS did *not* conclude that the mine-induced groundwater drawdown would impact streamflow in lower Pinto Creek, other than in the 600-foot segment in the immediate vicinity of the Magma Weir. Instead, the stream segments that may be impacted by groundwater drawdown were limited to the segments within the 5-foot drawdown contour," and "[e]ven then the Forest Service explained that the predicted expansion of drawdown *could result* in a reduction in baseflow in those stream segments, which in turn may affect streamflow—not that would 'run dry.'" (*Id.*, cleaned up.) PVMC further argues that "[t]he Forest Service also explained that because of the uncertainty about the extent of streamflow impacts, monitoring and mitigation requirements were included 'that provide a mechanism to collect additional data to inform subsequent adaptive management and mitigation.'" (*Id.*, record citation omitted.)

2. Analysis

"Implicit in NEPA's demand that an agency prepare a detailed statement on 'any adverse environmental effects which cannot be avoided should the proposal be implemented,' is an understanding that the EIS will discuss the extent to which adverse effects can be avoided." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351-52 (1989) (quoting 42 U.S.C. § 4332(C)(ii)). "Federal regulations also require an EIS to discuss appropriate and possible mitigation measures." *Nat'l Tr. for Historic Pres.*, 2015 WL 1432632 at *9. With that said, "NEPA does not require a fully developed plan detailing what steps *will* be taken to mitigate adverse environmental impacts and does not require a 'worst case analysis.'" *Methow Valley*, 490 U.S. at 359. As the Supreme Court has explained, "one important ingredient of an EIS is the discussion of steps that can be taken to mitigate adverse environmental consequences." *Id.* at 351. "There is a fundamental distinction, however, between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated, on

the one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted, on the other." *Id.* at 352. "[I]t would be inconsistent with NEPA's reliance on procedural mechanisms—as opposed to substantive, result-based standards—to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act." *Id.* at 353.

"The distinction between inadequate and adequate mitigation discussions appears to be one of degree." *Nat'l Tr. for Historic Pres.*, 2015 WL 1432632 at *10 (cleaned up). "A mere listing of mitigation measures is insufficient to qualify as the reasoned discussion required by NEPA." *Id.* (quoting *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998)). "Furthermore, '[a]n essential component of a reasonably complete mitigation discussion is an assessment of whether the proposed mitigation measures can be effective . . . . A mitigation discussion without at least *some* evaluation of effectiveness is useless in making that determination.'" *Id.* (quoting *S. Fork Band Council of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009)). "The Court must be 'satisfied that the agency took the requisite "hard look" at the possible mitigating measures.'" *Id.* (quoting *Okanogan Highlands All. v. Williams*, 236 F.3d 468, 473 (9th Cir. 2000)).

Plaintiffs identify two reasons why TNF's discussion of mitigation measures violated NEPA: (1) TNF "failed to identify mitigation actions with reasonable specificity"; and (2) TNF "failed to evaluate the effectiveness of the vague, lackluster measures it did identify." (Doc. 42 at 31.) At bottom, Plaintiffs' arguments turn on whether an agency is permitted, under NEPA, to only identify and evaluate monitoring protocols that may trigger future, tangible mitigation where that future, tangible mitigation has not been specifically identified or analyzed by the agency. Indeed, Plaintiffs clarify that they "do not challenge any lack of specificity in identifying future *monitoring* protocols." (Doc. 51 at 27.) Rather, they argue that "TNF erred by failing to identify, much less analyze, specific mitigation *actions*—steps PVMC will undertake to improve actual, on-the-ground conditions." (*Id.*)

Plaintiffs' argument is not without force, at least under caselaw that predates the

Supreme Court's "course correction" in *Seven County*. Plaintiffs challenge four mitigation measures: "Those identified in Appendix H of the FEIS as BR-1 . . . ; WR-1 . . . , as modified by TNF's additions to WR-1 in response to objections; WR-3; and WR-4." (*Id.* at 27 n.8 [citing TNF_0059023-24; TNF_0059042-43; TNF_0059045-47; and TNF_0060441-42].) These mitigation measures fall under two separate categories in the FEIS. BR-1 falls under "Biological Resources (Vegetation, Fish and Wildlife, Special Status Species)." (TNF_0059023). WR-1, WR-3, and WR-4 fall under "Water Resources and Hydrogeochemistry." (TNF_0059042.) As Plaintiffs correctly observe, none of these measures actually considers or analyzes any concrete mitigation actions. Instead, each proposes some form of "monitoring" and/or "surveying" and then defers consideration and analysis of concrete mitigation measures to a future date once certain thresholds are triggered by the proposed monitoring. (TNF_0059023 [BR-1: BRMMP "outlines a program of monitoring, surveys, and potential mitigation and adaptive management to address the [ESA]-listed threatened [YBC] and its proposed critical habitat . . . [and] identifies thresholds for these monitored ecosystem components and identifies possible mitigation actions that could be taken if these thresholds are exceeded"]; TNF_0059042 [WR-1: CWRMMP "provides for a comprehensive approach to monitoring and tracking" and "identifies monitoring triggers and mitigation measures, actions, and adaptive management that would be considered to reduce potential impacts"]; TNF_0060441-42 [amendment to WR-1 providing that "[b]ased on the analysis of trends and collection of additional data to confirm findings, PVMC will coordinate with [TNF] to identify appropriate and practicable measures for those impacts deemed to be mining related"]; TNF_0059045 [WR-3: PVMC "would host and facilitate meetings annually, or as deemed necessary . . . [to] review observed and modeled surface water flows" and the meeting group "could propose additional recommended monitoring and mitigation measures to minimize potential impacts, which would include reviewing options for acquisition of future water supplies from elsewhere within or outside the Pinto Creek basin in order to reduce the impacts on Pinto Creek surface resources from groundwater withdrawals"];

TNF_0059047 [WR-4: making PVMC "responsible for monitoring groundwater levels downstream of the mine to ensure surface water rights within the projected mine-related and well field-related drawdown area are not affected as part of the water resources monitoring program" and "[i]f future monitoring or other information indicates potential impacts on water rights and beneficial uses, adverse impacts would be mitigated as required under Arizona law"].)

The Ninth Circuit has held, albeit pre-*Seven County*, that "[t]his sort of 'wait and see' approach to mitigation does not always suffice under NEPA" because "[p]utting off an analysis of possible mitigation measures until after a project has been approved, and after adverse environmental impacts have started to occur, runs counter to NEPA's goal of ensuring informed agency decisionmaking." *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1107 (9th Cir. 2016).[30] Thus, courts (again, pre-*Seven County*) have held that an adaptive management plan, such as the ones at issue here, cannot be used to simply defer analysis of concrete mitigation measures and their effectiveness until after environmental effects have been observed. *See, e.g.*, *Ohio Env't Council v. U.S. Forest Serv.*, 2023 WL 2712454, *15 (S.D. Ohio 2023) ("[W]hile some degree of flexibility in how agencies respond to unexpected effects is allowable, an agency cannot abdicate entirely its responsibility. In other words, reliance on an adaptive management strategy does not provide a justification for postponing altogether the discussion of mitigation measures.") (cleaned up); *League to Save Lake Tahoe v. Tahoe Reg'l Plan. Agency*, 739 F. Supp. 2d 1260, 1284 (E.D. Cal. 2010), *aff'd in part, vacated in part, remanded on other grounds*, 469 F. App'x 621 (9th Cir. 2012) ("Principles of adaptive management support leaving open the possibility, recognized in the NEPA caselaw, of a future change in mitigation strategy, but adaptive management does not provide a justification for postponing altogether the discussion of mitigation measures.").

[30] The Ninth Circuit in *Great Basin* held that this sort of "wait-and-see" approach may be reasonable where there is a "relatively low probability and temporal remoteness of adverse impacts." *Id.* Neither party has addressed this exception and it does not appear, based on the Court's independent review of the FEIS, that the effects of PVMC's pumping are expected to have a "low probability" or are expected to be "temporally remote."

With that said, some of the mitigation measures at issue here—e.g., the BRMMP adopted by BR-1 and the amendment to WR-1—do identify, albeit without any analysis, some potential, concrete mitigation measures that might be considered in the future. (TNF_0059072 [BRMMP providing a bullet-point list of "potential mitigation actions that may be considered" if monitoring thresholds for the YBC are triggered]; TNF_0060442 [WR-1 amendment providing a bullet-point list of potential mitigation measures to be identified in the future based on triggers/thresholds].) But it's not clear whether any of these concrete mitigation measures would actually be required. *Neighbors of Cuddy Mountain*, 137 F.3d at 1381 (agency did not take the required "hard look" at mitigation measures where, among other things, it was "not clear whether any mitigating measures would in fact be adopted"). And the Ninth Circuit (again, pre-*Seven County*) has held that "[a] 'mere listing' of mitigating measures, without supporting analytical data, . . . is inadequate." *Okanogan Highlands*, 236 F.3d at 473 (citation omitted). *See also Neighbors of Cuddy Mountain*, 137 F.3d at 1380 ("A mere listing of mitigation measures is insufficient to qualify as the reasoned discussion required by NEPA."). At most, several of the mitigation measures at issue here amount to promises to develop site-specific mitigation in the future. (*See, e.g.*, TNF_0059198 [CWRMMP providing that "[a]s part of the adaptive management strategy, PVMC will develop site-specific mitigation plans, as necessary and feasible, to address reductions in baseflow or drying up of perennial stream reaches or springs that are directly and reasonably attributable to the mine operations"].) But that too is typically insufficient under pre-*Seven County* caselaw. *Japanese Vill., LLC v. Fed. Transit Admin.*, 843 F.3d 445, 461 (9th Cir. 2016) ("mere promise to develop site-specific mitigation measures in the future might not pass muster" under NEPA). Nor does the FEIS address or analyze the effectiveness of the concrete mitigation measures identified by TNF. *Compare Okanogan Highlands*, 236 F.3d at 477 (monitoring and mitigation plan did not violate NEPA where "[e]ach mitigating process was evaluated separately and given an effectiveness rating") *with Neighbors of Cuddy Mountain*, 137 F.3d at 1381 ("Nor has the Forest Service provided an estimate of how effective the mitigation measures would be

if adopted, or given a reasoned explanation as to why such an estimate is not possible. . . . The Forest Service's broad generalizations and vague references to mitigation measures in relation to the streams affected by the Grade/Dukes project do not constitute the detail as to mitigation measures that would be undertaken, and their effectiveness, that the Forest Service is required to provide.").[31] Again, this approach would normally be insufficient under NEPA, at least based on pre-*Seven County* caselaw.

The wrinkle here is that the downstream effects caused by PVMC's pumping are indirect effects, and PVMC's pumping occurs (with one irrelevant exception) on private land. In *Seven County*, the Supreme Court held that "the environmental *effects* of the project at issue may fall within NEPA even if those *effects* might extend outside the geographical territory of the project or might materialize later in time—for example, run-off into a river that flows many miles from the project and affects fish populations elsewhere, or emissions that travel downwind and predictably pollute other areas." 605 U.S. at 187. But that is only the case when those effects are "effects *of the project at issue*." *Id.* (emphases altered). Here, the downstream effects of PVMC's pumping are indirect effects. But it's not clear they are effects "of the project at issue"—i.e., approval of the MPO. The MPO does not approve or deny PVMC's pumping activities on private land.[32]

---

[31] Each of the mitigation measures at issue here—BR-1, WR-1, WR-3, and WR-4—purports to set forth an analysis of the "Effectiveness of the mitigation measure." However, those analyses only speak to the effectiveness of the monitoring, not to the effectiveness of any concrete mitigation actions to be implemented if that monitoring reveals environmental effects.

[32] At oral argument, Plaintiffs, citing TNF_0060158, argued that TNF itself characterized what it was approving as "*[u]se of the Peak Well field* on National Forest System lands, including the well and pipelines previously authorized under right-of-way PHX-080742, plan of use operations POO-0002, and special use permits GLO-445303 and Tonto 468, would be consolidated and authorized under the approved mining plan of operations." (TNF_0060158, emphasis added.) To the extent Plaintiffs are arguing that PVMC's use of Peak Well field is part of the MPO, or the "project at issue," that argument is without merit. The ROD explicitly states that "[p]rivate land activities are not part of the proposed action and are not within the decision space of the Forest Service." (TNF_0060106.) The ROD further explains that "a description of private land activities [was] included and analyzed" only because "the activities on private land and Federal land constitute interdependent parts of a larger action (that is, an integrated mine)." (*Id.*) The ROD later provides: "[T]he description of the selected action in this ROD does not include actions on private land and only those activities that are proposed for Forest Service authorization." (TNF_0060146.) At bottom, PVMC's pumping from Peak Well field, which occurs almost exclusively on private land, was not part of what was being

Thus, PVMC is correct that "Plaintiffs erroneously treat PVMC's groundwater withdrawals as if they were the proposed federal action.'" (Doc. 56 at 11.)

The question then becomes: is an agency required under NEPA to consider the environmental effects of other activities that are related to, but not expressly a part of, the "project at issue"? The Supreme Court held in *Seven County* that "when the effects of an agency action arise from a *separate project*—for example, a *possible future project* or one that is *geographically distinct* from the project at hand—NEPA does not require the agency to evaluate the effects of that separate project." 605 U.S. at 187 (emphases added). But here, PVMC's pumping is not really a "separate project," nor is it a "possible future project" or "geographically distinct" from approval of the MPO. The FEIS explains:

> In addition to the activities described above that require Forest Service approval, the integrated mining operations at Pinto Valley Mine also includes [PVMC's] actions on private lands that support ongoing and expanded mining operations. While the Forest Service does not have authority to regulate activities on private land, the actions on private lands are described and analyzed in accordance with 40 CFR 1508.25. These other activities on private lands are *interdependent parts of the integrated mining operations at the Pinto Valley Mine*, they are *closely related to the proposed operations on National Forest System lands*, and they generally *would not occur unless the Forest Service takes action* to approve previously authorized activities. The description of activities at the Pinto Valley Mine in this section distinguishes between activities that would occur on private land and those that would occur on National Forest System lands, and the effects of these actions are analyzed in chapter 3, "Affected Environment and Environmental Consequences."

(TNF_0057784, emphases added. *See also* TNF_0057707 ["Clarification that private land activities are described and analyzed in the final EIS because the activities on private land and National Forest System lands constitute an integrated mine. Correspondingly, the final EIS clarifies that activities on private land are not under the Forest Service's regulatory authority. This change was made to reduce potential confusion on why private land activities are included and analyzed in the document."].)

---

"approved" by the agency under the proposed action. Thus, PVMC's pumping on private lands is not "the project at issue" under *Seven County*.

This leads to the next question: where other activities, like PVMC's pumping, are "interdependent" and "closely related" to the project at issue, is an agency required under NEPA to consider the indirect effects of those other activities? The Supreme Court held in *Seven County*:

> To be sure, in certain circumstances, other projects may be interrelated and close in time and place to the project at hand—a residential development next door to and built at the same time as a ski resort, for example. *The question then is whether that is a single project within the authority of the agency in question. There may be a gray area in defining the project at hand. Even in those circumstances, however, a court's review still must remain deferential* . . . . In other words, even if the reviewing court in such a case might think that NEPA would support drawing a different line, a court should defer to an agency so long as the agency drew a reasonable and "'manageable line.'" All of that is again to underscore that a difference may exist between what an agency should do as a matter of good policy and best practices under NEPA, and what a reviewing court may subsequently order an agency to do under NEPA.

605 U.S. at 190-91 (citations omitted, emphasis added). Thus, the question is whether the approval of the MPO, and PVMC's pumping activities on private land, are "a single project within the authority of" TNF. *Id.* at 190. The Court concludes they are not—or, at a minimum, that the agency acted reasonably in concluding they are not.

During oral argument, Plaintiffs argued that the circumstances of this case are distinguishable from the hypothetical in *Seven County* (i.e. a ski resort and residential development being built next to one another) because PVMC's pumping activities on private land, and its use of National Forest System land, are a "single project." The problem with this argument is that it amounts to nothing more than a disagreement with the agency's decision to treat PVMC's pumping on private lands as "interdependent" and "closely related" to PVMC's operations on NFS lands. (TNF_0057784.) But as *Seven County* makes clear, where there is "gray area in defining the project at hand," "a court's review still must remain deferential." 605 U.S. at 190. Because there is such a "gray area" here, TNF's conclusion that PVMC's pumping activities on private lands are "interdependent" and "closely related to the proposed operations on National Forest

System lands" (TNF_0057784), but are not themselves a part of the proposed action or the "project at issue" (TNF_0060106), is entitled to deference.

Alternatively, even if approval of the MPO and PVMC's pumping activities were considered a "single project," the question under *Seven County* is whether they are together "a single project *within the authority of the agency*." 605 U.S. at 190 (emphasis added). The tentative order stated that PVMC's pumping activities, which occur (with one irrelevant exception) on private lands, were not within TNF's regulatory authority. (Doc. 63 at 94.) The tentative order based that conclusion on the fact that TNF, in the FEIS, unequivocally stated that it lacked such authority. (*Id.*, citing TNF_0057784.) Indeed, the FEIS explains that the "proposed action" is "authorization of new and existing uses of National Forest System lands," which are "activities . . . that require Forest Service approval," and although PVMC's "actions on private lands . . . support ongoing and expanded mining operations," "the Forest Service does not have authority to support ongoing and expanded mining operations." (TNF_0057784, cleaned up.)[33] In response, Plaintiffs argued at length during oral argument that PVMC's pumping activities on private lands *are* within TNF's regulatory authority—or, at the very least, that TNF has authority under 36 C.F.R. § 228 to condition approval of the project on the adoption of mitigation measures targeting PVMC's pumping on private land.[34]

With respect to mitigation specifically, the FEIS explains that TNF's "role . . . under its primary authorities in the Organic Administration Act, Surface Resources Act of 1955, and the Locatable Regulations (36 CFR 228 subpart A) is to ensure that mining activities minimize adverse environmental effects on National Forest System surface resources to

[33] *See also* TNF_57707 ("[T]he [F]inal EIS clarifies that activities on private land are not under the Forest Service's regulatory authority."); TNF_0057714 ("[T]he Forest Service does not have authority to regulate activities on private land."); TNF_0057784 (same); TNF_0060109 ("The Forest Service has no decision-making authority for the activities and operations on private land."); TNF_0060146 ("[T]he Forest Service does not have authority to regulate activities on private land. . . . The Forest Service has no decision-making authority for the activities and operations on private land.").

[34] To the extent Plaintiffs asserted for the first time during oral argument that such authority also arises under the Property Clause, this argument is forfeited. *Perez-Guzman v. Lynch*, 835 F.3d 1066, 1075 n.4 (9th Cir. 2016) ("[W]e treat this argument as waived because [it] was raised for the first time at oral argument.").

the extent practicable." (TNF_0059012.) The FEIS further explains that TNF "may impose reasonable conditions to protect surface resources but cannot materially interfere with reasonably necessary activities under the General Mining Law of 1872 that are otherwise unlawful," and TNF's "authority related to mitigation is limited to protection of surface resources of National Forest System lands." (TNF_0059012-13.) Plaintiffs argue that because mitigation measures BR-1, WR-1, WR-3, and WR-4 identify the Subpart 228A regulations as the agency's "[a]uthority to require" each mitigation measure, it follows that the agency tacitly admitted it possesses the regulatory power in dispute.

The difficulty with this argument is that the Subpart 228A regulations do not clearly specify how far TNF's authority extends in mixed landownership cases—that is, the regulations do not clearly explain whether TNF's authority under those regulations extends to regulating PVMC's pumping activities on private lands simply by virtue of the fact that PVMC seeks TNF's approval for activities (e.g., electricity and piping) ancillary to that pumping that occur on National Forest System lands. *See generally Rock Creek Alliance v. U.S. Forest Serv.*, 703 F. Supp. 2d 1152, 1172 (D. Mont. 2010) ("Plaintiffs' position is weakened by the qualifying language in the Organic Act standards. The implementing regulations do not impose strict duties, but rather general requirements . . . ."). The lack of clarity on this point is underscored by the fact that TNF repeatedly discussed, throughout its decisionmaking process, whether it could require concrete mitigation measures targeting PVMC's pumping activities on private lands and repeatedly expressed concern that, to the extent it had any authority to do so under the Subpart 228A regulations, its authority was likely limited to seeking voluntary mitigation from PVMC. (*See, e.g.*, TNF_0051037 [John Priecko (ICF) explaining that "monitoring and adaptive management are a key components of the proposed mitigation because of . . . complications presented by mixed landownership"]; TNF_0051060 [Mindy Vogel (USFS) "explained that there may be nuances determining when the Forest Service may or may not play a role in [mitigation] compliance, for instance whether effects and mitigation would occur on private lands"]; *id.* [Vogel "said the Forest Service may have limited authority to require

mitigation under 228A, and this mitigation could take the form of a request for voluntary mitigation from PVMC"]; *id.* [Vogel explaining that "a water workshop" is an "approach [that] is sometimes used in situations where the Forest Service has limited authority to require mitigation" and further explaining that "the Forest Ervice does not have authority to regulate water use under NEPA"]; TNF_0051071 ["The Forest Service could request voluntary mitigation for actions outside the agency's authority."]; TNF_000051230 [Vogel "said the Forest Service needs to ensure it has the authority to require proposed mitigation measures"]; *id.* [Vogel "said the Forest Service generally had more authority to apply mitigation for Carlota [mine] because it is largely on NFS lands"]; TNF_0051231 ["[Vogel] said PVMC seems to have issue with the Forest Service regulating facilities on their private land. [Plumley] said NEPA requires reasonable measures to be put forward regardless of jurisdiction, even if they are not ultimately carried forward in the ROD. [Bosworth] will make the ultimate decision on what to include in the ROD, but [Vogel] wants to be prepared to advise him on whether proposed mitigation is within Forest Service authority."]; TNF_0051352 ["[Vogel] explained that Forest Service authority to require mitigation for actions on private lands under NEPA is limited, particularly for actions authorized under the mining laws. [Vogel] continues to coordinate with the OGC to better understand the limits of agency authority."]; *id.* [Vogel "said that due to the Forest Service's limited authority to apply mitigation, asking PVMC to commit to voluntary measures may be the most effective means of providing some protection for the resources"]; TNF_0051529 [Vogel "noted that USFS is currently working through regulatory authorities for requiring mitigation" and "noted that many of the impacts associated with the project are due to activities and facilities on private land"].)[35]

---

[35] As these meeting notes make clear, TNF seemed to conclude that it could request, at most, voluntary mitigation from PVMC for its pumping activities on private land. Because TNF concluded that any concrete mitigation measures targeting PVMC's pumping on private lands would need to be voluntary, it makes sense that mitigation measures BR-1, WR-1, WR-3, WR-4 provide for a monitoring-only approach with concrete mitigation measures that "could" be considered by PVMC down the line if certain thresholds were triggered. Indeed, contrary to Plaintiffs' contention during oral argument that TNF indicated in the FEIS that it could require concrete mitigation down the road under the Subpart 228A regulations, the only time TNF seemed to indicate that mitigation would be "required" is in WR-4, which provides that "[a]dverse impacts on water wells

During oral argument, Plaintiffs also argued that because PVMC could not, as a practical matter, continue pumping from Peak Well field without approval of the MPO (because PVMC's pumping activities require electricity and pipelines), this shows that TNF is empowered to impose mitigation measures targeting PVMC's pumping activities on private land. The problem with this argument is twofold. First, although Plaintiffs contend that PVMC could not, as a *practical* matter, continue pumping on its private land without approval of the MPO, Plaintiffs acknowledge that PVMC could, as a *legal* matter, continue pumping. Thus, even if approval of the MPO and PVMC's pumping activities were considered a "single project," the entirety of that project would not be "within the authority of" TNF. *Seven County*, 605 U.S. at 190. Second, to the extent Plaintiffs' argument is that, but for approval of the MPO, PVMC would not continue pumping on its private land, *Seven County* holds that "[u]nder NEPA, . . . a mere 'but for' causal relationship is insufficient to make an agency responsible for a particular effect." *Id.* at 189 (cleaned up).

The pre-*Seven County* cases cited by Plaintiffs do not compel a different conclusion. For example, in *Cnty. of Okanogan v. Nat'l Marine Fisheries Serv.*, 347 F.3d 1081 (9th Cir. 2003), the "appellants argue[d] that the Forest Service does not have authority to condition the use of rights-of-way in a national forest on the maintenance of instream flows because such restrictions deny them their vested water rights under state law." *Id.* at 1084. But there, "[t]he ditch rights-of-way granted over federal land, from their inception, were subject to termination at the discretion of the federal government through its designated agent." *Id.* Thus, the Ninth Circuit held that "the Forest Service had the authority to restrict the use of the rights-of-way to protected endangered fish" because "[t]he permits themselves, from their inception, provided the government with unqualified discretion to restrict or terminate the rights-of way." *Id.* at 1085. In contrast here, where there was a lack of clarity regarding the extent of TNF's regulatory authority over PVMC's pumping

---

and water rights would be identified and mitigation *as required under Arizona State law*." (TNF_0059047, emphasis added.)

activities on private land under the Subpart 228A regulations—or at the very least, a lack of clarity regarding the extent of that authority in mixed landownership cases such as this one—TNF's conclusion that it lacked regulatory authority to impose concrete mitigation measures targeting PVMC's pumping activities on private lands was not arbitrary and capricious. *Cf. Rock Creek Alliance*, 703 F. Supp. 2d at 1172 (emphasizing the existence of "qualifying language in the Organic Act standards," noting that "[t]he implementing regulations do not impose strict duties, but rather general requirements," and rejecting a claim that the Forest Service violated those regulations through its identification of "mitigation, monitoring and permitting" requirements in a ROD after "taking into account the deferential standard of review under the APA").[36]

In *San Carlos Apache Tribe v. U.S. Forest Serv.*, 803 F. Supp. 3d 879 (D. Ariz. 2025), this Court recently addressed a similar NEPA claim. The plaintiff there argued that the Forest Service had "failed to consider, and require, sufficient mitigation measures." Motion for Preliminary Injunction at 25, *San Carlos Apache Tribe v. U.S. Forest Serv.*, 803 F. Supp. 3d 879 (D. Ariz. 2025) (No. 21-122, Doc. 87) (emphasis omitted). The plaintiff argued that "the FEIS admits to substantial regional groundwater declines caused by the Desert Wellfield pumping, and that these declines will adversely impact individual wells throughout the East Salt River Valley, rendering shallow wells dry or requiring other well owners to deepen their wells." *Id.* The plaintiff further argued that the "FEIS failed to analyze or require any mitigation measures to compensate for these impacts" and instead "deferred this analysis to future state permitting." *Id.* at 26. The Court disagreed, concluding that "to the extent [the plaintiff] argues the Forest Service should have made 'Measure PF-WR-03' mandatory, the Court agrees with the Federal Defendants that Forest Service did not act arbitrarily and capriciously in concluding it lacked regulatory authority as to this specific issue because Resolution Copper's recovery wells will not be located on

[36] The conclusion that TNF did not act arbitrarily and capriciously in concluding that it lacked regulatory authority over PVMC's pumping on private lands obviates the need to consider whether the agency permissibly omitted concrete mitigation measures targeting PVMC's pumping on private lands because it lacked data on the effects of that pumping.

federal land." *San Carlos Apache Tribe*, 803 F. Supp. 3d at 930 n.14.[37]

On appeal, the plaintiff renewed its contention "that the FEIS 'failed to fully analyze potential mitigation measures, especially regarding the groundwater pumping and transport of water via the proposed pipelines." *Ariz. Mining Reform Coal.*, 172 F.4th at 660. The Ninth Circuit rejected that argument, emphasizing that "the Forest Service considered mitigation measures across 'hundreds of pages' in the FEIS." *Id.* So too here, Appendix H to the FEIS, titled "Environmental Protection Measures, Monitoring, and Mitigation," is several hundred pages long. (TNF_0059004-399.)

In *Arizona Mining*, the Ninth Circuit also emphasized that "[t]he FEIS explicitly discuss[d] various commenters' concerns about groundwater impacts." 172 F.4th at 660. So too here, Chapter 3 of the FEIS discusses at length potential groundwater and surface water effects of PVMC's pumping. Indeed, TNF commissioned SRK to develop an entire model to assess groundwater drawdown and baseflow effects attributable to PVMC's pumping, and that model is cited extensively in the FEIS.

In *Arizona Mining*, the Ninth Circuit also emphasized that the FEIS "note[d] the limits of the Forest Service's regulatory authority." 172 F.4th at 660. So too here, the FEIS, the ROD, and the administrative record are replete with statements from TNF acknowledging that PVMC's activities on private land are not within the Forest Service's regulatory authority and questioning the Forest Service's authority to impose any concrete

---

[37] During oral argument, Plaintiffs sought to distinguish *San Carlos Apache Tribe* on the ground that Measure PF-WR-03 in that case dealt with pumping for a site that was far away from the mine. Plaintiffs argued that a different mitigation measure in that case, Measure FS-WR-01, was directed at mining activity that would be entirely on private land and that TNF recognized its authority to require that mitigation measure under 36 C.F.R. 228.8. Although Measure FS-WR-01 was not addressed by this Court in *San Carlos Apache Tribe*, a review of that measure shows that it was, like here, a *monitoring* measure that proposed, but did not require, any concrete mitigation measures if certain thresholds were triggered by the monitoring. Response to Motion for Preliminary Injunction, Exhibit 1, *San Carlos Apache Tribe v. U.S. Forest Serv.*, 803 F. Supp. 3d 879 (D. Ariz. 2025) (No. 21-122, Doc. 93-1 at 194-96) ("This plan . . . outlines a *monitoring plan* to assess potential impacts on each GDE, identifies triggers and associated actions to be taken by Resolution Copper to ensure that GDEs are preserved, and *suggests mitigation measures* for each GDE if it is shown to be impacted by future mine dewatering. . . . A variety of *potential actions* are identified that *could* be used to replace water resources *if* monitoring reaches a specified trigger.") (emphases added).

mitigation measures (other than voluntary mitigation) targeting PVMC's pumping on private lands. Appendix H also explains that the monitoring and mitigation measures included in the FEIS are those that "are within the authority of the Forest Service." (TNF_0059013.)

In holding that the plaintiff's mitigation-measures claim was unlikely to succeed on the merits, *Arizona Mining* concluded: "[T]he Supreme Court [in *Seven County*] has made clear that it is largely within the agency's discretion to determine the detail afforded to particular issues in an EIS, especially those issues over which it lacks regulatory authority." 172 F.4th at 660. Here, too, although a monitoring-only wait-and-see approach to mitigation measures may sometimes violate NEPA, at least under pre-*Seven County* caselaw, *Seven County* and *Arizona Mining* compel the conclusion that TNF's decision to impose monitoring-only mitigation measures to address the downstream effects of PVMC's pumping on private land is entitled to deference and was not arbitrary and capricious.[38]

D. **Summary**

As for Count Two, Plaintiffs' motion is granted, and the Federal Defendants' and PVMC's cross-motions are denied, because TNF's chosen "analysis area" was arbitrary and capricious. As for Count Three, Plaintiffs' motion is denied and the Federal Defendants' and PVMC's cross-motions are granted.

V. <u>Organic Act Claim</u>

In Count One, Plaintiffs allege that the FWS violated certain Forest Service regulations, 36 C.F.R. § 228.8, via its "[f]ailure to protect and minimize harm to National Forest resources." (Doc. 1 ¶¶ 137-44.)

---

[38] During oral argument, Plaintiffs also contended that TNF could have, but failed to, consider mitigation measures that wouldn't alter PVMC's pumping activities on private land—e.g., flow augmentation. This argument ignores that "NEPA is a *purely procedural statute*" and "an agency's only obligation is to prepare an adequate report." *Seven County*, 605 U.S. at 180. Even if there were mitigation measures that could have been imposed on public lands to offset the effects of PVMC's pumping on private lands, *Seven County* instructs that the Court must remain deferential and cannot retrospectively flyspeck an agency's analysis of mitigation measures. So long as the agency considered mitigation, which TNF extensively did, the agency is entitled to deference.

A. **Organic Act And Regulations**

"The Organic Act authorizes the Forest Service to regulate use and occupancy . . . on National Forest System lands." *Save Our Cabinets v. U.S. Dept. of Agriculture*, 254 F. Supp. 3d 1241, 1250 (D. Mont. 2017). On the one hand, "[t]hose regulations require that 'all [mining] operations shall be conducted so as, where feasible, to minimize adverse environmental impacts on National Forest surface resources.' They further require that mining operators comply with applicable state and federal water quality standards including the Clean Water Act; take all practicable measures to maintain and protect fisheries and wildlife habitat; and construct and maintain all roads so as to assure adequate drainage and to minimize or, where practicable, eliminate damage to soil, water, and other resource values." *Id.* (citation omitted). On the other hand, "[t]he Organic Act limits the Forest Service's regulatory authority . . . by requiring that no such regulation 'prohibit any person from entering upon such national forests for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof.' The Forest Service does not have authority to prohibit or deny mine proposals that can be approved in a manner that will comply with applicable environmental laws that are reasonably necessary to mining of a private mineral estate . . . ." *Id.* (citation omitted).[39] As noted in earlier portions of this order, "[t]he implementing regulations do not impose strict duties, but rather general requirements" and include "qualifying language." *Rock Creek Alliance*, 703 F. Supp. 2d at 1172.

B. **The Parties' Arguments**

1. <u>Plaintiffs' Motion For Summary Judgment</u>

Plaintiffs argue that "[r]egulations implementing the Organic Act require the Forest

---

[39] *See also Hells Canyon Pres. Council v. Haines*, 2006 WL 2252554, *6 (D. Or. 2006) ("While some tension exists between an individual's right to mine and the Forest Service's responsibility to safeguard public land, the Secretary of Agriculture has been given the responsibility and the power to maintain and protect our national forests and the lands therein. While prospecting, locating and developing of mineral resources in the national forests may not be prohibited . . . , the Secretary may adopt reasonable rules and regulations which do not impermissibly encroach upon the right to the use and enjoyment of placer claims for mining purposes.") (cleaned up).

Service to ensure that forest resources are not unduly harmed by mining operations" and that "[s]uch operations must 'be conducted so as, where feasible, to minimize adverse environmental impacts on National Forest surface resources.'" (Doc. 42 at 33, quoting 36 C.F.R. § 228.8.) Plaintiffs specifically argue that the regulations "require the mine operator to protect 'fisheries and wildlife habitat.'" (*Id.*, quoting 36 C.F.R. § 228.8(e).) Plaintiffs argue that "[t]he Forest Service enforces these requirements by, among things, making 'changes' or 'additions' to a plan of operations as 'necessary to meet the purpose' of the Part 228 regulations, i.e., by adding mitigation measures." (*Id.*, quoting 36 C.F.R. § 228.5(a)(3).) Plaintiffs argue that "[a]pproval of a mining plan of operations without fulfilling the minimization requirement violates the Organic Act" and that "the Forest Service violates the Organic Act and Part 228 regulations if it fails to impose feasible, environmentally protective mitigation measures." (*Id.* at 34.) Plaintiffs argue that "TNF approved mining operations that were, and are, destroying critical water resources while failing to minimize those harmful effects." (*Id.*) Plaintiffs contend that "the record is replete with the harm that PVMC's mining operations are causing to Pinto Creek by both prolonging and worsening the suppression of the creek's baseflow" and that "TNF's approval decision also enabled impairment of its legal instream water right—a forest resource in its own respect—by functionally surrendering that right to PVMC." (*Id.*) "Given these known harms," Plaintiffs argue that "TNF was obligated to assess and impose feasible mitigation measures" and that "feasible mitigation options existed, including a pumping optimization plan aimed at decommissioning or reducing pumping from Peak Wells with the greatest impact on Pinto Creek's flows." (*Id.* at 34-35.) Plaintiffs argue that "[b]y failing to examine and implement measures to minimize harm, TNF violated the Organic Act and Part 228 regulations." (*Id.* at 35.)

2. <u>The Federal Defendants' Response And Cross-Motion</u>

The Federal Defendants argue that the "Administrative Record readily refutes" any claim premised on the Part 288A regulations because "the Forest Service reviewed and required detailed and extensive mitigation measures before approving the Project" and "the

Record of Decision cites the 36 C.F.R. Part 228A regulations as the basis for the Forest Service's imposition of each of these many mitigation measures on PVMC." (Doc. 47-1 at 31.) The Federal Defendants argue that under Ninth Circuit law, "the Forest Service may regulate use of National Forest lands by holders of unpatented mining claims, . . . but only to the extent that the regulations are 'reasonable' and do not impermissibly encroach on legitimate uses incident to mining and mill site claims." (*Id.* at 32, citation omitted.) As for Plaintiffs' argument that a pumping optimization plan would have been feasible, the Federal Defendants argue that "there is no evidence in the Administrative Record that shutting down a portion of the Peak Well field on private lands is a feasible or practicable plan that can be implemented to a degree that will meaningfully reduce impacts on Pinto Creek flows without unduly interfering with the Mine's operations" and that the "Forest Service has, however, reasonably imposed substantial mitigation obligations requiring PVMC to collect new data (including 'installation of four new supplemental monitoring wells'), to analyze that data and develop new groundwater models to determine whether surface water impacts are mining related and, if so, to identify and implement feasible and practicable mitigation measures to minimize those impacts." (*Id.* at 32-33.) "By implementing these specified mitigation measures," the Federal Defendants argue that "PVMC will be meeting its obligations under 36 C.F.R. § 228.8, and the Forest Service's decision is not arbitrary and capricious under the Organic Act." (*Id.* at 33.) Last, the Federal Defendants argue that "[t]he cases Plaintiffs rely on for their Organic Act claim are inapposite or support upholding the Forest Service's action here." (*Id.* at 33-34.)

3. <u>PVMC's Response And Cross-Motion</u>

PVMC argues that the Organic Act "limits the Forest Service's regulatory authority over mining activities, providing that no regulation shall 'prohibit any person from entering upon such national forests for all proper and lawful purposes, including that of prospecting, locating and developing mineral resources thereof.'" (Doc. 48 at 20, citation omitted.) In addition, PVMC argues that "the [Organic] Act expressly authorizes the use of water on [National Forest System] lands for mining and milling purposes in accordance with state

law." (*Id.*) PVMC argues that, "[a]t bottom, the regulation requires that mine operators comply with applicable federal and state environmental laws and standards; it does not require mining operations to be restricted to protect environmental interests." (*Id.* at 21.) "In this case," PVMC argues that "the Forest Service specifically determined that PVMC's operations comply with Subpart 228A's requirements, including applicable federal and state environmental laws" and that "[t]he MPO also includes an extensive suite of monitoring and mitigation measures intended to minimize potential adverse impacts on [National Forest System] surface resources." (*Id.*) Next, PVMC argues that "it is uncertain whether and to what extent Pinto Creek's streamflow is impacted by PVMC's groundwater pumping" and that "PVMC's groundwater use is governed by, and complies with, Arizona law," and "[t]hus, PVMC has the legal right to withdraw and use water pumped from its wells for mining and mineral processing." (*Id.*) PVMC argues that "[n]either the Organic Act nor the Subpart 228A regulations authorize the Forest Service to use the MPO-approval process to override Arizona law or dictate how state water rights may be exercised" and "water use on the [National Forest System] land is generally governed by state law." (*Id.* at 21-22.) Last, PVMC argues that "none of the decisions cited by Plaintiffs support their argument" because "[t]here was evidence in each case that the mining project at issue was either violating or was likely to violate *state water quality* standards" and "[h]ere, by contrast, no violation of any federal or state environmental law is asserted." (*Id.* at 22.)

4. Plaintiffs' Reply And Response To Cross-Motions

Plaintiffs argue that "TNF abdicated [its] statutory and regulatory duties" by "ignor[ing] its own evidence of harm to Pinto Creek's northern perennial reach and then—in the face of PVMC's lobbying—decid[ing] not to identify, analyze, and ultimately require, feasible solutions to mitigate that harm. TNF settled instead for further monitoring to determine something it had already established: that PVMC's pumping was harming Pinto Creek." (Doc. 51 at 31.) Plaintiffs argue that "TNF's decision, leaving PVMC to decide whether, when, and how to mitigate the damage to National Forest resources, falls short of its affirmative statutory and regulatory duties." (*Id.*) Plaintiffs also argue that,

"[t]ellingly, the Defendants do not try to explain how TNF's passive, watch-and-wait monitoring strategy actually ensured that mining operations would 'minimize adverse environmental impacts' or 'maintain and protect fisheries and wildlife habitat'" and that "[i]ndeed, they could not, as TNF failed to evaluate concrete mitigation measures and determine whether or to what extent they would reduce the documented harm to Pinto Creek." (*Id.*) Next, Plaintiffs respond to PVMC's "argument . . . that it had an unfettered right under state law to pump and pipe water at will," arguing that some of that pumped water is appropriable subflow subject to TNF's instream flow right and that "even if PVMC did have a right to pump, it certainly cannot pipe that water across National Forest land without TNF's approval." (*Id.*) Plaintiffs then argue that the Federal Defendants "presuppos[e] that mitigation measure to protect Pinto Creek would be impermissible" but "imposing reasonable costs on the operator does not categorically make a measure impermissible." (*Id.* at 32.) Further, Plaintiffs argue that "the record shows that TNF erroneously scrutinized potential mitigation options using a more rigorous test than feasibility" and that "[t]ime and again, TNF declined to consider mitigation options on the basis that it could not 'materially interfere' with PVMC's 'reasonably necessary activities.'" (*Id.*) Plaintiffs argue "that test does not apply here" and that "[e]ven when TNF *stated* the proper standard—feasibility—it applied the term to mitigation measures in a way that functionally meant material interference, without analyzing the measures' true feasibility." (*Id.* at 32-33.) Focusing again on the potential for a pumping optimization plan, Plaintiffs argue that "TNF dismissed a pumping optimization plan as 'technically infeasible' based on a single, unsupported statement that PVMC did 'not have excess pumping capacity that would allow for idling of Peak Wells closest to Pinto Creek.'" (*Id.* at 33.) Responding to the Federal Defendants' argument that there is no evidence in the record that a pumping optimization plan would be feasible or practicable, Plaintiffs argue that this "just proves the point: there is limited evidence in the record on the feasibility of this option because TNF never did that analysis." (*Id.*) Plaintiffs also argue that "TNF similarly rejected other feasible measures out of hand, with no analysis and based on its

legally erroneous view of feasibility." (*Id.*) Next, citing the WR-1 amendment, Plaintiffs argue that "it is impossible to square the Federal Defendants' assertion that there were no feasible alternatives with their eleventh-hour admission that several options were, in fact, feasible." (*Id.* at 34.) In sum, Plaintiffs argue that "[i]t was arbitrary, capricious and a violation of the Organic Act to settle for mere monitoring without a rational, fact-based analysis that actual mitigation options were genuinely infeasible." (*Id.*) And in a footnote, Plaintiffs dispute the "Defendants['] attempt to distinguish the cases cited in [Plaintiffs'] opening brief on the basis that they involved violations of § 228.8(b) rather than the umbrella provision of § 228.8 and § 228.8(e)," arguing that the "distinction is irrelevant: PVMC may not violate any part of § 228.8." (*Id.* at 34 n.10.)

5. <u>The Federal Defendants' Reply</u>

The Federal Defendants argue that "[t]he Forest Service expressly imposed the Project's many mitigation measures . . . in order to fulfill its obligations under 36 C.F.R. Part 228A" and that "Plaintiffs' claim that the Forest Service's numerous and detailed mitigation measures are insufficient to meet these 'general requirements' depends on several mischaracterizations of the record." (Doc. 55 at 12, citation omitted.) First, the Federal Defendants dispute Plaintiffs' reliance on TNF's letter to ADWR, arguing that it does not establish that PVMC's pumping was harming Pinto Creek. (*Id.*) The Federal Defendants argue that the Forest Service "repeatedly emphasized the need for additional data," so Mitigation Measure WR-1 and the CWRMMP "impose substantial obligations requiring PVMC to collect and analyze new data and develop new models to determine whether surface water impacts are mining related." (*Id.* at 12-13.) The Federal Defendants argue that "[f]ar from a 'watch-and-wait' strategy . . . WR-1 mandates an active adaptive management approach." (*Id.* at 13.) The Federal Defendants argue that "without sufficient data linking specific mining-related pumping to specific surface water impacts, limiting PVM[C]'s pumping from its private wells on private land could 'impermissibly encroach on legitimate uses incident to mining and mill site claims.'" (*Id.* at 13-14, citation omitted.) Next, the Federal Defendants argue that "resolution of any water rights dispute regarding

the Forest Service's in-stream flow right and PVMC's pumping from wells primarily on private land is under the purview of the State of Arizona—not a dispute to be resolved through the imposition of mitigation measures under 36 C.F.R. § 228.8" and that "where those rights have been established and clarified by the State, Mitigation Measure WR-4 also requires that '[a]dverse impacts on water wells and water rights be identified and mitigated as required under Arizona state law.'" (*Id.* at 13 n.2, quoting TNF_0059047.) Last, the Federal Defendants argue that "it is Plaintiffs who apply the wrong standard in arguing the Organic Act creates 'an affirmative duty to ensure protection of forest resources and minimize harm to them wherever feasible'" and that "[u]nder Plaintiffs' theory, every mining proposal requiring an EIS would violate the Act." (*Id.* at 14.) The Federal Defendants also argue that "[m]any of Plaintiffs' arguments in response to Federal Defendants' opening brief actually object to the Forest Service's explanation, reasoning, and level of detail in rejecting potential *Project alternatives* as technically or economically infeasible" but "Plaintiffs did not challenge the sufficiency of the agency's alternatives analysis under NEPA, and neither the Organic Act nor Part 228A requires such analysis." (*Id.* at 14 n.4.)

6. PVMC's Reply

First, PVMC argues that "Plaintiffs exaggerate the scope of the Forest Service's authority." (Doc. 56 at 13.) Among other things, PVMC argues that "the Subpart 228A Regulations apply to *the use of the surface of [National Forest System] land* in connection with mining and mineral processing operations, not to private land" and that "with one exception, PVMC's wells are located on the company's private land" and "[t]hus, their use is not authorized or regulated by Forest Service." (*Id.*) PVMC next disputes Plaintiffs' argument "that even if PVMC had the right to pump groundwater without Forest Service approval, the company cannot pipe its water across NFS land without approval," arguing that "many of the wells within the mine's private land footprint do not require infrastructure crossing NFS land"; "the access roads, power lines, and water pipelines used in connection with the remaining Peak Wells have been in place for decades and were previously

authorized by the Forest Service"; and "[n]o new surface disturbance is associated with those facilities and there are no environmental impacts to minimize or mitigate." (*Id.* at 13-14). Regardless, PVMC argues that "the existence of these facilities does not expand the Forest Service's regulatory authority and allow the agency to override Arizona law and regulate PVMC's groundwater withdrawals, which is what Plaintiffs are seeking in this case." (*Id.* at 14.) Next, PVMC argues that "[n]one of the decisions cited by Plaintiffs hold that the Forest Service may withhold access under Subpart 228A Regulations in order to prevent the use of private property for a lawful purpose." (*Id.*) Last, PVMC argues that "Plaintiffs' argument again hinges on their belief that PVMC's groundwater pumping is drying up lower Pinto Creek and interfering with [TNF's] instream flow water right," but TNF explained in the FEIS that there is "limited information related to stream flows in Pinto Creek, how stream flows have specifically been affected by historical and ongoing operations at the Pinto Valley Mine, pre-mining baseflow records, [and] groundwater and surface water interactions" and "also explained that impacts to surface water resources caused by mine-induced groundwater drawdown, including Pinto Creek streamflow, were expected to occur within the modeled 5-foot drawdown contour." (*Id.* at 14-15.) Thus, PVMC argues that "[g]iven the uncertainty about the effects of PVMC's groundwater withdrawals on streamflow in lower Pinto Creek and considering the Forest Service's limited regulatory authority, the Forest Service appropriately exercised its discretion to approve the MPO with monitoring and mitigation requirements as the agency explained in its ROD," and the "Court should defer to that decision." (*Id.* at 15.)

C. **Analysis**

The relevant Forest Service regulations require that "[a]ll operations shall be conducted so as, *where feasible*, to minimize environmental impacts on National Forest surface resources" and that operators "shall take all practicable measures to maintain and protect fisheries and wildlife habitat which may be affected by the operations." 36 C.F.R. § 228.8 (emphasis added), 228.8(e). Plaintiffs' main argument is that TNF violated these regulations by failing to "assess and impose feasible mitigation measures" to address the

harm caused by PVMC's activities. This argument fails for largely the same reasons as Plaintiffs' NEPA mitigation-measures claim.[40] As discussed, TNF reasonably concluded that its authority to require mitigation under Subpart 228A was limited because it lacked regulatory authority over PVMC's pumping activities on private land. (TNF_0051060 ["Mindy said the Forest Service may have limited authority to require mitigation under 228A, and this mitigation could take the form of a request for voluntary mitigation from PVMC."].) Plaintiffs argue that a "pumping optimization plan aimed at decommissioning or reducing pumping from Peak Wells with the greatest impact on Pinto Creek's flows" was a feasible mitigation measure that TNF failed to properly analyze and require. (Doc. 42 at 35.) But it was not arbitrary and capricious for TNF to conclude that a pumping optimization plan requiring PVMC to restrict its pumping on private land was not "feasible" where TNF reasonably believed it lacked authority over such activity.

Moreover, TNF may only impose "reasonable rules and regulations *which do not impermissibly encroach* upon the right to the use and enjoyment of placer claims for mining

40 If anything, the fact that Plaintiffs' mitigation-measures theory fails under NEPA and the ESA underscores why it also fails as a standalone claim under the Organic Act and/or the 228A regulations. *Concerned Citizens & Retired Miners Coal. v. U.S. Forest Serv.*, 279 F. Supp. 3d 898, 939 (D. Ariz. 2017) ("Because the Forest Service acted reasonably when it determined that the Baseline Project will not have a significant impact on ozone levels [in compliance with the Clean Air Act], the Forest Service did not violate the Organic Act and mining regulations."). In *Save our Cabinets*, which Plaintiffs cite as an authority supporting their position (Doc. 42 at 34), the court stated that "[t]he Forest Service does not have authority to prohibit or deny mine proposals *that can be approved in a manner that will comply with applicable environmental laws* that are reasonably necessary to mining of a private mineral estate." 254 F. Supp. 3d at 1250 (emphasis added). To that end, although the court found that some of the plaintiff's Organic Act claims were meritorious, it did so in the context of stating that the plaintiff had also established violations of other environmental statutes. *See, e.g., id.* at 1258 ("[A]pproval of the Project violated the Clean Water Act and Organic Act insofar as it violated Montana's nondegradation standards."); *id.* at 1270 ("The Forest Service acted arbitrarily and capriciously in approving the Project despite noncompliance with Montana nondegradation standards in violation of the Clean Water Act, the Organic Act, and NFMA."). Likewise, in *Hells Canyon* (another case cited by Plaintiffs), the court stated that "[t]o the extent that this court finds a violation of the Clean Water Act, a finding that the Organic Act has been violated follows." *Hells Canyon*, 2006 WL 2252554 at *6. Finally, although the court in *Rock Creek Alliance* (also cited by Plaintiffs) noted that the defendants did not "dispute[] the viability of the Plaintiffs' Organic Act claim standing alone," it noted in other portions of the decision that at least one of plaintiffs' Organic Act claims "appear[ed] to be derivative of their Clean Water Act claim." *Rock Creek Alliance*, 703 F. Supp. 2d at 1164-65.

purposes.'" *Hells Canyon*, 2006 WL 2252554 at *6 (citation omitted). Plaintiffs fail to explain how mitigation measures imposed by TNF over PVMC's activities on private land, which TNF reasonably concluded fall outside its regulatory authority, would not "impermissibly encroach" upon PVMC's activities. Plaintiffs' focus on whether any such mitigation measures would be "feasible" in the abstract—i.e., based on economics or technical feasibility—asks the wrong question.

To the extent Plaintiffs are attempting to argue that PVMC's pumping on private land is appropriating "subflow subject to TNF's instream flow right" and that PVMC's pumping is somehow violating Arizona law (Doc. 51 at 31), Plaintiffs' argument is underdeveloped and, at any rate, without support. ADWR expressly rejected TNF's request to make a determination of appropriability regarding TNF's instream flow right for Pinto Creek and PVMC's pumping. (TNF_0061821.) Plaintiffs' argument that "even if PVMC did have a right to pump, it certainly cannot pipe that water across National Forest land without TNF's approval" (Doc. 51 at 31), is also without merit. As discussed above, Plaintiffs have not cited any authority supporting that TNF was required to condition its approval of the MPO on the regulation of PVMC's pumping activities on private lands, which TNF reasonably determined was outside its regulatory authority and which were already occurring before consideration of the MPO.

### D. **Summary**

With respect to Count One, Plaintiffs' motion for summary judgment is denied, and the Federal Defendants' and PVMC's cross-motions for summary judgment are granted.

## VI. Remedy

In their opening brief, Plaintiffs request remand and vacatur of the BA, BiOp, FEIS, ROD, and TNF's approval of the MPO. (Doc. 42 at 35.) They argue that vacatur and remand is the "default remedy [and] is warranted here." (*Id.*)

In response, the Federal Defendants argue that "vacatur is not a mandatory remedy in APA cases." (Doc. 47-1 at 34.) The Federal Defendants "respectfully request" that if the Court concludes they did not satisfy any of their obligations under the ESA, NEPA, or

the Organic Act, "that the Court afford the Parties an opportunity to submit remedy briefing for the Court's consideration." (*Id.*) PVMC similarly argues that "[i]f the court were to rule in Plaintiffs' favor on any of their claims, the Court should remand to the agency without vacatur" and that "it is unlikely that either agency would reach a different result on remand." (Doc. 48 at 34.) PVMC also points to its motion to admit certain extra-record evidence on the issue of remedy. (Doc. 49.)

In reply, Plaintiffs "maintain that the record fully justifies remand and vacatur as the appropriate remedies." (Doc. 51 at 35.) However, "in light of the Federal Defendants' request" for supplemental briefing on the issue of remedy, as well as "PVMC's outstanding motion" to admit extra-record evidence on the issue of remedy, Plaintiffs "respectfully join in the request for additional briefing on remedy should the Court find such briefing useful." (*Id.*) Concurrently with their reply brief, Plaintiffs moved to admit certain extra-record evidence on the issue of remedy. (Doc. 52.) The Court has since granted that motion. (Doc. 57.)

In reply, the Federal Defendants argue that "Plaintiffs have joined in [the] request for additional remedy briefing," "[a]nd while Federal Defendants dispute that any harm to federal protected species is likely even if the Court were to find fault with FWS's BiOp, the fact that Plaintiffs assert a different remedy standard must be applied to their ESA claims further demonstrates the utility focused remedy briefing allowing the Parties to tailor their equitable and legal arguments to the Court's order on the merits" would have. (Doc. 55 at 15.)

In reply, PVMC reiterates its request that "if the Court determines that a particular decision is deficient, the Court should remand to the agency for further proceedings addressing such deficiency without vacatur for the reasons set forth in PVMC's initial brief." (Doc. 56 at 15.)

Given that (1) both Plaintiffs and the Federal Defendants request additional briefing on remedy; (2) Plaintiffs at least appear to argue that a different standard applies to ESA claims; (3) no party has addressed how (or if) the Court's orders granting the requests to

admit extra-record evidence on the issue of remedy would alter the remedy analysis; and (4) Plaintiffs have not had the opportunity to respond to the caselaw cited by PVMC and the Federal Defendants at oral argument, the Court will permit the parties to submit additional briefing on remedy.

Accordingly,

**IT IS ORDERED** that:

1. Plaintiffs' motion for summary judgment (Doc. 42) is **granted in part and denied in part** consistent with this order.

2. The Federal Defendants' motion for summary judgment (Doc. 47) is **granted in part and denied in part** consistent with this order.

3. PVMC's motion for summary judgment (Doc. 48) is **granted in part and denied in part** consistent with this order.

4. Within 14 days of the issuance of this Order, Plaintiffs shall file their supplemental brief on the issue of remedy. Plaintiffs' supplemental brief shall not exceed seven pages. Within 14 days of Plaintiffs' filing of their supplemental brief, the Federal Defendants and PVMC shall file their separate responses, each not to exceed seven pages. Within 7 days of the filing of the responses, Plaintiffs may file a consolidated reply, not to exceed five pages.

Dated this 24th day of September, 2026.

Dominic W. Lanza
United States District Judge